CONFORM

SPERTUS, LANDES & UMHOFER, LLP
James W. Spertus (SBN 159825)
Matthew D. Umhofer (SBN 206607)
Ezra D. Landes (SBN 253052)
1990 South Bundy Dr., Suite 705
Los Angeles, California 90025
Telephone: (310) 826-4700
Facsimile: (310) 826-4711
jim@spertuslaw.com
matthew@spertuslaw.com
ezra@spertuslaw.com

Attorneys for Plaintiff Edward M. Weaver

FILED
CLERK, U.S. DISTRICT COURT

SEP 3 - 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EDWARD M. WEAVER, an
individual,

Plaintiff,

v.

AXIS SURPLUS INSURANCE
COMPANY, an Illinois corporation,

Defendant.

Case No. CV13- 6439 GW (RZx)

COMPLAINT FOR:

(1) BREACH OF INSURANCE
CONTRACT (DUTY TO
DEFEND)

(2) BREACH OF IMPLIED
COVENANT OF GOOD
FAITH AND FAIR DEALING
(INSURANCE BAD FAITH)

(3) DECLARATORY RELIEF

DEMAND FOR A JURY TRIAL

*Spertus, Landes & Umhofer, LLP*
*1990 South Bundy Dr., Suite 705*
*Los Angeles, CA, CA 90025*
*Telephone 310-826-4700; Facsimile 310-826-4711*

*COMPLAINT*

Comes now Plaintiff EDWARD M. WEAVER, and complains, avers and
alleges as follows:

## THE PARTIES

1.      Plaintiff EDWARD M. WEAVER ("Plaintiff" or "Mr. Weaver") is
a resident of the State of Ohio, and at all times material herein was a resident of
the State of Ohio or the State of New York.  Mr. Weaver formerly served as
President and Chief Executive Officer of Multivend, LLC d/b/a Vendstar
("Multivend"), a now-defunct vending machine sales company formerly located
in the State of New York, and a former portfolio company of Alpine Investors,
LP ("Alpine"), an entity located in the State of California.

2.      Defendant AXIS SURPLUS INSURANCE COMPANY
("Defendant" or "AXIS") is, and at all times material herein was, an Illinois
corporation that operates as a surplus lines insurer in all 50 states, the District of
Columbia and Puerto Rico, and has its principal place of business in the State of
Georgia.  AXIS issued the insurance policy that is the subject of the instant
action.

## JURISDICTION AND VENUE

3.      Jurisdiction over this action is founded upon 28 U.S.C. § 1332.
Complete diversity exists between Plaintiff and Defendant.  Mr. Weaver is a
citizen of the State of Ohio.  AXIS is a citizen of the State of Illinois, where it is
incorporated, and is also a citizen of the State of Georgia, where it maintains its
principal place of business.  The matter in controversy exceeds the sum or value
of $75,000.

4.      This Court has personal jurisdiction over AXIS because AXIS is,
and at all times material herein was, engaged in substantial, continuous and
systematic activities within the State of California.  AXIS issues insurance
policies to and for entities and individuals in the State of California.  AXIS
conducts business in California, directs its advertising towards California

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   residents, has an active website that targets California residents, and maintains
2   agents for service of process in California.  The insurance policy that is the
3   subject of the instant action was entered into in California.

4       5.    Separately, pursuant to the express terms of the insurance policy
5   underlying this action, AXIS has agreed to submit to the jurisdiction of this
6   Court.  Section VIII.M. of the underlying insurance policy provides:

7   > The Insurer agrees that in the event of its failure to pay any
8   > amount claimed to be due under this Policy, it, at the request of
9   > an **Insured**, shall submit to the jurisdiction of any court having
10  > competent jurisdiction within the United States of America, and
11  > all matters arising under this Policy shall be determined in
12  > accordance with the law and practice of such court.

11      6.    Venue is proper under 28 U.S.C. § 1391(b)-(d).  Although AXIS has
12  minimum contacts with the State of California, on information and belief, AXIS
13  does not have a principal place of business within the State of California.
14  Additionally, Mr. Weaver's claims in the instant action arose from AXIS's
15  wrongful denial of coverage in the Central District of California.  Accordingly,
16  venue is proper in this judicial district.

17  ## GENERAL ALLEGATIONS

18      7.    In 2010, AXIS issued to Multivend Privatus Policy No. ENN588818
19  for the policy period February 20, 2010 through February 20, 2011, and
20  subsequently extended to February 20, 2014 (the "Policy").  Attached hereto as
21  Exhibit "A," and incorporated herein by this reference, is a true and correct copy
22  of the Policy.

23      8.    Under the Policy, the insured is Multivend and any past, present or
24  future directors, officers, trustees, managers or employees of Multivend.  (Ex. A
25  at § III.B.4 (defining "Insured Individual")).  AXIS does not dispute that Mr.
26  Weaver qualifies as an insured under the Policy.  (*See* Ex. D at p.4 n.4 (AXIS
27  letter dated Dec. 11, 2012) ("Messrs. Weaver, Kaplan, Doumas, Benowitz,
28  Goldberg, Linick, Raia and Strauss, as former directors, officers, Managers

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  and/or employees of Multivend, all appear to fall within the definition of

2  "Insured Individual" at Section III.B.4. of the Policy.")).

3        9.      The AXIS Policy provides a $5 million limit of liability on behalf of

4  the Insured Individuals for:

5        **Loss** . . . arising from any **D&O Claim** for a **Wrongful Act**,
         other than a **Wrongful Act** while serving in an **Outside Position**,
6        first made against such Insured . . . during the **Policy Period** or
         Extended Reporting Period, if applicable, and reported in writing
7        to the Insurer as soon as practicable after any of the
         **Policyholder's Executive Officers** first becomes aware of such
8        **Claim**, but in no event later than sixty (60) days after the
         expiration of the **Policy Period** or Extended Reporting Period, if
9        applicable.

10  (Ex. A at § I.A.).  Under the Policy:

11       **Loss** means the amount(s) which the Insureds become legally
         obligated to pay on account of a **Claim**, including damages,
12       judgments, any award of pre-judgment and post-judgment
         interest, settlement amounts, costs and fees awarded pursuant to
13       judgments, and **Defense Costs**.

14       **Defense Costs** means reasonable and necessary legal fees and
         expenses (other than regular or overtime wages, salaries, fees or
15       benefits of the **Insured Individuals or Employees** of the
         **Policyholder** or the **Policyholder's** overhead expenses) incurred
16       by or on behalf of the **Insureds** in defending, settling,
         appealing or investigating **Claims**, and the premiums for appeal,
17       attachment or similar bonds. The Insurer, however, shall have no
         obligation to furnish such bonds.

18

19  (Ex. A at § III.A.2. and III.A.7.).

20        10.     On or about October 10, 2012, an indictment filed on October 2,

21  2012 was unsealed in the United States District Court for the Southern District of

22  Florida, naming Mr. Weaver and others in grand jury charges of conspiracy, mail

23  fraud and wire fraud in connection with Mr. Weaver's and his co-defendants'

24  operation of Multivend (the "Indictment").  Attached hereto as Exhibit "B," and

25  incorporated herein by this reference, is a true and correct copy of the Indictment

26  filed in *United States v. Weaver, et al.*, S.D. Fla. Case No. 12-cr-20756.

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

4
*COMPLAINT*

11.     On or about October 25, 2012, Mr. Weaver tendered the Indictment to AXIS for a defense.  Attached hereto as Exhibit "C," and incorporated herein by this reference, is a true and correct copy of the October 25, 2012 tender letter.

12.     On or about December 11, 2012, AXIS informed Mr. Weaver in writing that AXIS will not defend Mr. Weaver or his co-defendants against the Indictment.  Attached hereto as Exhibit "D," and incorporated herein by this reference, is a true and correct copy of the December 11, 2012 letter.  In its coverage determination letter, AXIS stated:

> Pursuant to Section I.(A) of the Policy, the D&O Insuring Agreement will only respond to D&O Claims 'first made' against an Insured during the Policy Period of February 20, 2010 to February 20, 2014, among other requirements.  Section III.B.2. of the Policy provides, in relevant part, that "D&O Claim" means:
>
> a. a written demand against an **Insured** for monetary or non-monetary relief;
>
> b. a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by: . . .
>
> > (ii) the filing of a notice of charge, investigative order or like document; or
> >
> > (iii) written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or
>
> c. a criminal investigation or proceeding against any **Insured Individual** commenced by:
>
> > (i) the return of an indictment, information, or similar pleading[.]

AXIS argued that "on November 26, 2007, the Securities Division of the Office of the Attorney General of Maryland" (the "Maryland AG") sent a letter to Multivend, in which the Maryland AG: "(1) made a written demand for certain non-monetary relief, including that Multivend 'immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents;' and (2) commenced an administrative proceeding against Multivend by providing

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

5

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

written notice identifying Multivend as an entity 'against whom a formal proceeding may be commenced.'" According to AXIS, "[a]s such, on November 26, 2007 the [Maryland AG] made a D&O Claim against Multivend (which is an 'Insured' under the Policy) under Section III.B.2.a. and/or III.B.2.b. of the Policy." Multivend did not tender the November 26, 2007 letter for coverage since the Maryland AG's letter did not trigger coverage for a defense under the Policy. Attached hereto as Exhibit "E," and incorporated herein by this reference, is a true and correct copy of the Maryland AG's November 26, 2007 letter requesting information from Multivend, which AXIS relied upon to wrongfully deny benefits under the Policy.

13. AXIS's December 11, 2012 letter asserted two different reasons for its coverage position related to the Maryland AG's November 26, 2007 letter. First, AXIS argued that the November 26, 2007 letter precludes coverage for a defense of the Indictment pursuant to Section V.A. of the Policy, which provides in pertinent part:

> V. LIMITS OF LIABILITY, RETENTION, DEFENSE AND SETTLEMENT
>
> A. Limits of Liability . . .
>
> All **Claims,** including all **D&O Claims** . . . arising from the same **Wrongful Act, Wrongful Third Party Act,** and all **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the earlier date that: (1) any of the **Claims** is first made against an **Insured** under this Policy or any prior policy, or (2) valid notice was given by the **Insureds** under this Policy or any prior policy of any **Wrongful Act, Wrongful Third Party Act,** or any fact, circumstance, situation, event, transaction or cause which underlies such **Claim.** Coverage under this Policy shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to the Insurer in accordance with the terms herein.

AXIS argued that "pursuant to Section V.A. of the Policy," the Maryland AG's letter "and the Indictment 'shall be deemed one Claim,' and such Claim shall be

1  deemed to be 'first made' on November 26, 2007.  Accordingly, because the

2  Indictment does not constitute a D&O Claim 'first made' against Insureds during

3  the Policy Period of February 20, 2010 to February 20, 2014, the Indictment does

4  not trigger the D&O Insuring Agreement and AXIS has no coverage obligations

5  in connection with this matter."

6       14.  Next, AXIS argued in its December 11, 2012 letter that coverage for

7  a defense is also precluded under the exclusion set forth in Section IV.A.2. of the

8  Policy, under which AXIS "shall not be liable for **Loss** arising from any **Claim**

9  made against any **Insured**:" . . .

10      2.  based upon, arising out of, directly or indirectly resulting from,
in consequence of or in any way involving:

       a. any demand, suit or other proceeding pending, or order,
decree or judgment entered, against any **Insured** on or prior
to the applicable Pending or Prior Claim Date set forth in
Item 8 in the Declarations, [February 20, 2008], or any
**Wrongful Act,** fact, circumstance or situation underlying or
alleged therein; or

       b. any other **Wrongful Act** whenever occurring, which
together with a **Wrongful Act** described in a. above,
constitute **Interrelated Wrongful Acts**;

18  Under the Policy:

    5. **Wrongful Act** means:

       a. any actual or alleged error, misstatement, misleading
statement, act, omission, neglect, or breach of
duty by:

          (i) any **Insured Individual** in their capacity as such;

          (ii) any **Insured Individual** in an **Outside Position**
with respect to Section I. Insuring Agreement D; or

          (iii) the **Policyholder** with respect to Section I.
Insuring Agreement A; or

       b. any matter claimed against any **Insured Individual** solely
by reason of their serving in their capacity as such or in an

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

**Outside Position** with respect to Section I. Insuring Agreement D.

6. **Interrelated Wrongful Acts** means any and all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

AXIS argued that:

On November 26, 2007, the [Maryland AG] sent a letter to Multivend that made a demand for certain non-monetary relief and commenced an administrative proceeding and, therefore, the [Maryland AG] matter constitutes a demand or other proceeding pending against any Insured (Multivend) prior to the February 20, 2008 Pending or Prior Claim Date. Moreover, . . . the Indictment is based upon, arises out of, or involves: (1) the same Wrongful Acts, facts, circumstances or situations underlying or alleged in the previous Maryland [AG] matter; and/or (2) Wrongful Acts that, together with the Wrongful Acts at issue in the prior Maryland [AG] matter, constitute Interrelated Wrongful Acts. Accordingly, . . . Section IV.A.2. of the Policy provides another independent basis for AXIS's determination that there is no coverage for the Indictment.

15.    On January 18, 2013, Mr. Weaver responded to AXIS's December 11, 2012 denial letter. Mr. Weaver's January 18, 2013 letter provided AXIS with detailed points and authorities establishing that AXIS's coverage position is incorrect. Attached hereto as Exhibit "F," and incorporated herein by this reference, is a true and correct copy of Mr. Weaver's January 18, 2013 letter. As set forth in the January 18, 2013 letter, as a matter of law, the Maryland AG's November 26, 2007 letter did <u>not</u> constitute a "demand for certain non-monetary relief" and did <u>not</u> "commence[] an administrative proceeding against Multivend by providing written notice identifying Multivend as an entity 'against whom a formal proceeding may be commenced.'"

16.    The Maryland AG's November 26, 2007 letter did not constitute a "demand for certain non-monetary relief" and AXIS mischaracterized the contents of the Maryland AG's letter. The Maryland AG's letter makes it clear that it is simply requesting certain "information and materials" from Multivend

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

"[s]o that we may determine the extent of your activities and your compliance with the Maryland Business Opportunities Act." As a matter of law, such a request to Multivend that it voluntarily provide the Maryland AG with "information and materials" does not constitute a "demand for non-monetary relief." In fact, in a case involving subpoenas and a search warrant served on AXIS's insured (documents that clearly have more legal effect than the Maryland AG's letter in this case), AXIS took a contrary position and argued that coverage was not triggered because subpoenas and search warrants do not constitute "demands for non-monetary relief," and the court in that case agreed with AXIS's position. *Diamond Glass v. Twin City Fire Ins. Co.*, 2008 WL 4613170, at *4 (S.D.N.Y. Aug. 18, 2008).

17.    In response to Mr. Weaver's January 18, 2013 letter, AXIS stated in a February 19, 2013 letter that "AXIS has never asserted that a demand to produce documents or information constitutes a demand for 'non-monetary relief.' As we previously explained, the [Maryland AG's] November 26, 2007 letter included a demand that Multivend 'acknowledge in writing that it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents." Attached hereto as Exhibit "G," and incorporated herein by this reference, is a true and correct copy of AXIS's February 19, 2013 letter.

18.    Mr. Weaver's January 18, 2013 letter in fact addressed AXIS's argument that the Maryland AG's letter contained a "demand for non-monetary relief" because it purportedly requested that Multivend "immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents." As set forth in Mr. Weaver's January 18, 2013 letter, the sentence from the Maryland AG's November 26, 2007 letter quoted by AXIS in its December 11, 2012 and February 19, 2013 letters is not accurate and is taken out of context. The entire paragraph in the Maryland AG's letter reads as follows:

> The Division further requests that Multi Vend acknowledge in writing that it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland resident, <u>pending the outcome of this inquiry</u>. Please confirm whether the company agrees to <u>voluntarily cease</u> offering and selling the Vendstar business opportunity [in] this State and with Maryland residents <u>at this time</u>.

This statement is not a "demand" as AXIS contends, and it does not qualify as a demand under numerous authorities cited by Mr. Weaver in his January 18, 2013 letter, including the *Diamond Glass* case where AXIS confirmed that such a letter does not trigger a claim that entitles its insured to a defense. The Maryland AG's letter simply asked Multivend to "voluntarily," temporarily refrain from offering the Vendstar business opportunity to Maryland residents until the Maryland AG had the opportunity to review the requested materials. The request fully contemplates that Multivend will be able to resume offering the Vendstar business opportunity once the inquiry is completed.

19.    Next, as set forth in Mr. Weaver's January 18, 2013 letter, the Maryland AG's letter did not "commence[] an administrative proceeding against Multivend by providing written notice identifying Multivend as an entity 'against whom a formal proceeding may be commenced.'" The Maryland AG's letter states that: "<u>Failure to respond</u> may result in more formal legal action by the Division." This sentence in no way constitutes notice that the Maryland AG intends to commence formal administrative proceedings against Multivend for violations of the Maryland Business Opportunities Act. The Maryland AG's letter merely states that "failure to respond" to the letter "may" require the Maryland AG to obtain the information and materials requested through "formal legal action," such as by serving a subpoena, which under *Diamond Glass*, would not trigger a claim. *See Diamond Glass*, 2008 WL 4613170, at *4 ("subpoenas and search warrants do not fit within this meaning the term 'relief'"). Even if Multivend failed to respond to the letter, and the Maryland AG pursued its option of obtaining the requested information and materials through "formal legal

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

action," any formal "administrative proceedings" against Multivend would still be implicitly conditioned upon the outcome of the Maryland AG's review of the requested materials.  Multivend therefore did not receive notice as a result of the Maryland AG's November 26, 2007 letter that it was an entity against whom a formal administrative proceeding may be commenced.

20.    Also, as set forth in Mr. Weaver's January 18, 2013 letter, contrary to AXIS's assertion, the Maryland AG's letter does not allege any "Wrongful Act" by Multivend, as that term is defined in the Policy.  At most, the Maryland AG's letter asserts that it "received information suggesting" that Multivend "may be offering and selling business opportunities in violation" of the Maryland Business Opportunity Act.  The Maryland AG itself, however, makes it perfectly clear in its letter that the Maryland AG is not making any allegations against Multivend, and the decision as to whether or not it intends to make allegations against Multivend will be reserved until the Maryland AG has reviewed the information and materials that it is informally requesting Multivend to voluntarily provide.  Consequently, since the Maryland AG does not allege any "Wrongful Act" by Multivend, the Indictment also does not involve any "Interrelated Wrongful Acts," as that term is defined in the Policy.

21.    Separately, as set forth in Mr. Weaver's January 18, 2013 letter, there is not a "common nexus" between the information that is the subject of the Maryland AG's letter and the Indictment, as AXIS argues in its December 11, 2012 letter.  The Maryland AG's letter relates solely to Multivend's compliance with specific provisions of the Maryland Business Code that are not the subject of the Indictment.  The Maryland AG's letter relates solely to the activities of Multivend and does not relate to the activities of Mr. Weaver or any of the individuals named in the Indictment.  The activities for which information and materials were sought by the Maryland AG regarding Multivend only, and not Mr. Weaver, cannot be causally related or connected to the activities alleged in

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

11

the Indictment because the Indictment does not allege any acts in the State of Maryland or involving any Maryland residents.  The Maryland AG's letter does not contain any "allegations" at all, let alone allegations of a conspiracy, mail fraud or wire fraud, which are the only charges alleged in the Indictment.

22.    Finally, as set forth in Mr. Weaver's January 18, 2013 letter, AXIS's reliance on Section V.A. of the Policy is misplaced.  Section V.A. of the Policy relates only to the number of limits of liability available to the Insured. AXIS cannot rely on that language for a purpose other than for which it was intended, and its intended purpose does not apply since Mr. Weaver is not attempting to obtain an additional limit of liability through his tender of the Indictment, and Multivend did not tender the Maryland AG's letter for coverage.

23.    AXIS's February 19, 2013 letter in response to Mr. Weaver's January 18, 2013 letter rejected Mr. Weaver's arguments and further confirmed in writing that AXIS will not defend Mr. Weaver or his co-defendants against the Indictment.  (*See generally* Ex. G).

## FIRST CAUSE OF ACTION
### (BREACH OF INSURANCE CONTRACT – DUTY TO DEFEND)

24.    Mr. Weaver re-alleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 23 of this Complaint as though set forth fully herein.

25.    A valid written insurance contract exists between Mr. Weaver and AXIS, for which Mr. Weaver was an "insured," as that term is defined in the insurance contract.

26.    Mr. Weaver timely tendered the Indictment filed against him.

27.    AXIS had, and continues to have, a duty to defend Mr. Weaver against the Indictment.  AXIS has an express obligation to defend Mr. Weaver pursuant to Section I.A. of the Policy and, separately, AXIS has implied obligations by law to defend Mr. Weaver.  Even though AXIS argues that the

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   claims against Mr. Weaver are not covered, AXIS still has a duty to defend Mr.

2   Weaver because the claims potentially fall within the Policy for the reasons set

3   forth in Mr. Weaver's October 25, 2012 and January 18, 2013 letters.

4       28.   AXIS breached its insurance contract with Mr. Weaver when it

5   refused to defend him against the Indictment and continues to breach its contract

6   by not defending Mr. Weaver against the Indictment.

7       29.   AXIS's breach of the insurance contract has directly and

8   proximately caused Mr. Weaver to suffer damages.  Mr. Weaver has incurred

9   and will continue to incur substantial defense costs, including, but not limited to,

10   attorneys' fees that AXIS is responsible for paying.  Mr. Weaver's damages are

11   in an amount to be proven at trial, exceeding the sum or value of $75,000.

12       WHEREFORE, Mr. Weaver prays for judgment against AXIS, as more

13   fully set forth below.

### SECOND CAUSE OF ACTION

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH
### AND FAIR DEALING – INSURANCE BAD FAITH)

17       30.   Mr. Weaver re-alleges and incorporates herein by this reference

18   each and every allegation set forth in paragraphs 1 through 29 of this Complaint

19   as though set forth fully herein.

20       31.   A valid written insurance contract exists between Mr. Weaver and

21   AXIS, for which Mr. Weaver was an "insured," as that term is defined in the

22   insurance contract.

23       32.   Mr. Weaver timely tendered the Indictment filed against him.

24       33.   AXIS had, and continues to have, a duty to defend Mr. Weaver

25   against the Indictment.  AXIS has an express obligation to defend Mr. Weaver

26   pursuant to Section I.A. of the Policy and, separately, AXIS has implied

27   obligations by law to defend Mr. Weaver.  Even though AXIS argues that the

28   claims against Mr. Weaver are not covered, AXIS still has a duty to defend Mr.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA, 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Weaver because the claims potentially fall within the Policy for the reasons set forth in Mr. Weaver's October 25, 2012 and January 18, 2013 letters. Additionally, AXIS had and continues to have a duty implied by law to act in good faith and deal fairly with Mr. Weaver with respect to these express and implied obligations to defend Mr. Weaver under the insurance contract.

34.     AXIS breached the implied covenant of good faith and fair dealing by unreasonably, without proper cause, and in bad faith withholding policy benefits due to Mr. Weaver and by wrongfully refusing to defend Mr. Weaver against the Indictment.

35.     AXIS's breach of the implied covenant of good faith and fair dealing has directly and proximately caused Mr. Weaver to suffer damages.  Mr. Weaver has incurred and will continue to incur substantial defense costs, including, but not limited to, attorneys' fees that AXIS is responsible for paying. Mr. Weaver has also suffered emotional distress damages as a result of AXIS's breach.  Additionally, Mr. Weaver has incurred additional attorneys' fees and costs as a result of AXIS's tortious refusal to pay amounts due under the Policy and the efforts required to compel AXIS to pay amounts due under the Policy, including, but not limited to, attorneys' fees and costs incurred in connection with the instant action.  AXIS's bad faith conduct is malicious, oppressive and fraudulent conduct for which Mr. Weaver is entitled to an award of punitive damages.  Mr. Weaver's damages are in an amount to be proven at trial, exceeding the sum or value of $75,000.

WHEREFORE, Mr. Weaver prays for judgment against AXIS, as more fully set forth below.

//

//

//

//

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## THIRD CAUSE OF ACTION
### (DECLARATORY RELIEF)

36.     Mr. Weaver re-alleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 35 of this Complaint as though set forth fully herein.

37.     There is an actual controversy between Mr. Weaver and AXIS that justifies a declaration of Mr. Weaver's and AXIS's rights and duties under the insurance contract.

38.     Mr. Weaver faces an imminent injury absent a declaration from the Court that Mr. Weaver is entitled to a defense from AXIS against the Indictment.

39.     A declaration of Mr. Weaver's and AXIS's rights and duties is necessary at this time so that Mr. Weaver can receive the funds to which he is entitled and so that Mr. Weaver can make informed decisions regarding his finances and his defense of the Indictment.  Mr. Weaver will be prejudiced when making those decisions unless there is a declaration from the Court establishing Mr. Weaver's and AXIS's rights and duties.

WHEREFORE, Mr. Weaver prays for judgment against AXIS, as more fully set forth below.

## PRAYER FOR RELIEF

Wherefore, Mr. Weaver prays for judgment against AXIS, as follows:

### FIRST CAUSE OF ACTION
### (BREACH OF INSURANCE CONTRACT – DUTY TO DEFEND)

1.     For compensatory damages and other special, general, and consequential damages in an amount according to proof;

2.     For an award of costs as authorized by law;

3.     For an award of interest, including prejudgment interest, at the legal rate of interest;

4.     For such other and further relief as this Court deems just and proper.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA, 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## SECOND CAUSE OF ACTION

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH

### AND FAIR DEALING – INSURANCE BAD FAITH)

1.   For compensatory damages and other special, general, and consequential damages in an amount according to proof;

2.   For mental and emotional distress, including pain and suffering;

3.   For punitive and exemplary damages;

4.   For an award of reasonable attorneys' fees and costs incurred by Mr. Weaver in connection with Mr. Weaver's Complaint and in connection with Mr. Weaver's efforts to obtain his Policy benefits;

5.   For an award of interest, including prejudgment interest, at the legal rate of interest;

6.   For such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

### (DECLARATORY RELIEF)

1.   For a declaration from the Court that Mr. Weaver has been entitled to a defense against the Indictment since his tender of the Indictment to AXIS;

2.   For a declaration from the Court that Mr. Weaver is entitled to a defense against the Indictment;

3.   For an award of costs as authorized by law;

4.   For an award of interest, including prejudgment interest, at the legal rate of interest;

5.   For such other and further relief as this Court deems just and proper.

//
//
//
//
//

## DEMAND FOR JURY TRIAL

Mr. Weaver hereby demands a jury trial.

Dated:   September 2, 2013          SPERTUS, LANDES & UMHOFER, LLP

By:   _____

James W. Spertus
Matthew D. Umhofer
Ezra D. Landes
Attorneys for Plaintiff Edward M. Weaver

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

# EXHIBIT A

EXHIBIT A

 **CUE BROKERAGE CORPORATION**                    WWW.CUEBROKERAGE.COM

April 29, 2011

Ms. Chris Santa Maria
Multivend c/o Alpine Investors
Three Embarcadero Center Suite 2330
San Francisco, CA 94111

Re: Directors & Officers Liability Policy
      Policy #ENN588818

Dear Chris:

Enclosed please find a copy of the captioned policy along with endorsement No. 8. This
endorsement amends the policy by extending the policy reporting period to 02/20/2014.

For additional information or if you require any changes, please do not hesitate to call
me.

Sincerely,

Cue Brokerage Corp.

Cathy D Guerriera
Account Executive, ext. 142

180 EAST MAIN ST.
SUITE 205
PATCHOGUE, NY 11772
(631) 475-6000
(800) 233-8283
FAX: (631) 475-0030

Endorsement No.  8

Effective date of this endorsement: 12:01 a.m. on 02/20/2011
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

**RUN-OFF ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**PRIVATUS®**

In consideration of the additional premium of $27,750, it is agreed that:

1.    The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured** for any **Wrongful Act**
      actually or allegedly committed on or after 2/20/2011.

2.      Item 2 of the Declarations is deleted and amended to read in its entirety as follows:

      Item 2.   Policy Period:

      From 12:01 AM (Local time at the address stated in Item 1) on    2/20/2010
      To 12:01 AM (Local time at the address stated in Item 1) on    2/20/2014

3.      Section II C., Section VIII A.2. of the Policy and Item 5 of the Declarations are deleted in their entirety.

4.      All references in the Policy to Extended Reporting Period is hereby deleted.

5.      Section VIII C., Cancellation/Nonrenewal, subparagraphs 1. and 4. of the Policy are hereby deleted in their
      entirety.  The premium for this Policy shall be deemed fully earned as of the inception of the Policy Period listed in
      Item 2 of the Declarations.

All other provisions remain unchanged.

_____
Authorized Representative

_____
3/22/11
Date

PV1005 0903


EXCESS LINE ASSOCIATION
OF NEW YORK

This is to certify that Excess Line Association of New York received and reviewed the    04/14/2011
attached insurance document in accordance with Article 21 of the New York State
Insurance Law

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK,
NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF
THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS.
THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE



**PRIVATUS**
(Including Directors, Officers and Corporate Liability, Employment Practices Liability, Fiduciary Liability and Outside Directorship Liability Insurance)

## DECLARATIONS

THIS POLICY IS WRITTEN ON A CLAIMS MADE AND REPORTED BASIS AND COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED IN WRITING TO THE INSURER WITHIN THE TIME AND PURSUANT TO THE TERMS HEREIN. THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

| COMPANY: Axis Surplus Insurance Company | POLICY NUMBER: ENN586818 |
|---|---|

| | |
|---|---|
| Item 1.  Parent Company:<br>Multivend, LLC<br>660 Grand Blvd.<br>Deer Park, NY 11729 | Item 2.  Policy Period:<br>a.   Inception Date 02/20/2010<br>b.   Expiration Date 02/20/2011<br>Both dates at 12:01 a.m. at the<br>address listed in item 1. |

**Item 3.  Limits of Liability (inclusive of defense costs):**
| | |
|---|---|
| (A)  Maximum aggregate Limit of Liability for all Loss for all Claim(s) under all Insuring Agreements during the Policy Period | $5,000,000 |
| (B)  Maximum aggregate Sublimit of Liability for Internal Revenue Service fines, penalties and sanctions under Insuring Agreement C during the Policy Period | N/A |

**Item 4.  Retentions:**
| | |
|---|---|
| (A) Each Claim: | |
| (i)    under each Insuring Agreement A | $25,000 |
| (ii)   under each Insuring Agreement B | N/A |
| (iii)  under each Insuring Agreement C | N/A |
| (iv)  under each Insuring Agreement D | $25,000 |
| (B) No Retention shall apply for non-indemnifiable Loss under Insuring Agreements A and D | |

**Item 5.  Extended Reporting Period:**
(A)  Additional Premium: 100 percent of annualized premium for the Policy Period
(B)  Extended Reporting Period: One Year

| Item 6.  Insuring Agreements Included and Effective at Inception | Item 7.   Third Party Claim Coverage Included?  No |
|---|---|
| Section I.  Insuring Agreement A (D&O):         Included<br>Section I.  Insuring Agreement B (EPL):         Not Included<br>Section I.  Insuring Agreement C (Fiduciary):  Not Included<br>Section I.  Insuring Agreement D (ODL):        Included | |

| Item 8.  Pending and Prior Claim Date: | Item 9.  Continuity Date: |
|---|---|
| Section I.  Insuring Agreement A: 02/20/2008<br>Section I.  Insuring Agreement B: N/A<br>Section I.  Insuring Agreement C: N/A<br>Section I.  Insuring Agreement D: 02/20/2008 | Section I.  Insuring Agreement A: 02/20/2008<br>Section I.  Insuring Agreement B: N/A<br>Section I.  Insuring Agreement C: N/A<br>Section I.  Insuring Agreement D: 02/20/2008 |



This is to certify that Excess Line Association of New York received and reviewed the     05/05/2010
attached insurance document in accordance with Article 21 of the New York State
Insurance Law

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK,
NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF
THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS.
THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE
DEPARTMENT PERTAINING TO POLICY FORMS.

Item 10. Notices to Insurer.

| Notice of Claim(s) To Be Sent To: | All Other Notices To Be Sent To: |
|---|---|
| Axis Financial Insurance Solutions Claims<br>Address: Connell Corporate Park<br>300 Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Facsimile: (908) 508-4389<br>Toll-Free Number: (866) 259-5435 | Axis Financial Insurance Solutions<br>Address: Connell Corporate Park<br>300 Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Facsimile: (908) 508-4301<br>Toll-Free Number: (866) 259-5435 |

| Item 11.  Endorsements Effective at Inception: | Item 12.    Terrorism Coverage:  Yes |
|---|---|
| PV 1700 (Ed. 06 05),     MU-1046,<br>MU 1050,              MU-1049,<br>MU-1048,             MU-1047 (01-05),<br>MU 1025 (Ed. 02 03), | |

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_____          04/26/2010

Authorized Representative                  Date


_____          _____

            President                              Secretary



**PRIVATUS**
(Including Directors, Officers and Corporate Liability, Employment Practices Liability, Fiduciary Liability
and Outside Directorship Liability Insurance)

## DECLARATIONS

**THIS POLICY IS WRITTEN ON A CLAIMS MADE AND REPORTED BASIS AND COVERS ONLY CLAIMS
FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING
PERIOD, IF APPLICABLE, AND REPORTED IN WRITING TO THE INSURER WITHIN THE TIME AND
PURSUANT TO THE TERMS HEREIN. THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR
SETTLEMENTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY AMOUNTS INCURRED AS
DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

| COMPANY: Axis Surplus Insurance Company | POLICY NUMBER: ENN588818 |
|---|---|

**Item 1. Parent Company:**
Multivend, LLC
880 Grand Blvd.
Deer Park, NY 11729

**Item 2. Policy Period:**
a. Inception Date 02/20/2010
b. Expiration Date 02/20/2011
Both dates at 12:01 a.m. at the
address listed in Item 1.

**Item 3. Limits of Liability (inclusive of defense costs):**
(A) Maximum aggregate Limit of Liability for all Loss for all Claims(s)
under all Insuring Agreements during the Policy Period — $5,000,000
(B) Maximum aggregate Sublimit of Liability for Internal Revenue
Service fines, penalties and sanctions under Insuring Agreement C — N/A
during the Policy Period

**Item 4. Retentions:**

(A) Each Claim:
(i) under each Insuring Agreement A — $25,000
(ii) under each Insuring Agreement B — N/A
(iii) under each Insuring Agreement C — N/A
(iv) under each Insuring Agreement D — $25,000
(B) No Retention shall apply for non-indemnifiable Loss under Insuring Agreements A and D

**Item 5. Extended Reporting Period:**
(A) Additional Premium: 100 percent of annualized premium for the Policy Period
(B) Extended Reporting Period: One Year

**Item 6. Insuring Agreements Included and Effective at**
Inception
Section Insuring Agreement A (D&O):        Included
Section Insuring Agreement B (EPL):         Not Included
Section Insuring Agreement C (Fiduciary):   Not Included
Section Insuring Agreement D (ODL):         Included

**Item 7.   Third Party Claim Coverage**
Included? No

**Item 8. Pending and Prior Claim Date:**
Section I. Insuring Agreement A: 02/20/2008
Section I. Insuring Agreement B: N/A
Section I., Insuring Agreement C: N/A
Section I. Insuring Agreement D: 02/20/2008

**Item 9. Continuity Date:**
Section I. Insuring Agreement A: 02/20/2008
Section I. Insuring Agreement B: N/A
Section I. Insuring Agreement C: N/A
Section I. Insuring Agreement D: 02/20/2008

| Item 10. Notices to Insurer: | |
|---|---|
| <u>Notice of Claim(s) To Be Sent To:</u> | <u>All Other Notices To Be Sent To:</u> |
| Axis Financial Insurance Solutions-Claims<br>Address: Connell Corporate Park<br>300 Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Facsimile: (908) 508-4389<br>Toll-Free Number: (866) 259-5435 | Axis Financial Insurance Solutions<br>Address: Connell Corporate Park<br>300 Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Facsimile: (908) 508-4301<br>Toll-Free Number: (866) 259-5435 |

| Item 11. Endorsements/Effective at Inception:<br>PV 1700 (Ed. 06 05), ✓ MU-1046,<br>✓ MU 1050, ✓ MU-1049,<br>✓ MU-1048, ✓ MU-1047 (01-05),<br>✓ MU 1025 (Ed. 02 03), | Item 12. Terrorism Coverage: Yes |
|---|---|

The **Insurer** has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the **Insurer**.

_(signature)_
_____
Authorized Representative

04/26/2010
_____
Date

_(signature)_
President

_(signature)_
Secretary

Endorsement No.   1

Effective date of this endorsement:  12:01 a.m. on 02/20/2010
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### PRIVATUS®

In consideration of the premium charged, it is agreed that

1.  Section IV A. 3 of the Policy is deleted and amended to read in its entirety as follows:

    3.  for bodily injury, mental anguish, emotional distress, sickness, disease or death of any
        person or damage to or destruction of any tangible property including loss of use thereof,
        but this exclusion shall not apply with respect to any actual or alleged libel, slander,
        mental anguish or emotional distress in a Employment Practices Claim for a Wrongful
        Act, solely as that term is defined in Section III.C.12., brought by an Employee;

2.  Section IV A. 5 of the Policy is deleted and amended to read in its entirety as follows:

    5.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any
        way involving:

        a. the gaining of any profit, remuneration, or advantage to which the Insured was not
        legally entitled; or

        b. any criminal or deliberately fraudulent act, error or omission by an Insured;

        if evidenced by any judgment, final adjudication or alternate dispute resolution
        proceeding.

    With respect to exclusion A. 5. set forth above no fact pertaining to, knowledge possessed by
    or conduct by any Insured Individual shall be imputed to any other Insured Individual.

3.  Section IV D. 2 and Section IV D. 7 of the Policy is deleted.

4.  Section V. C of the Policy is deleted and amended to read in its entirety as follows:

    C.  Defense

        Except as provided in Section V.C.2., the Insurer shall have both the right and the duty to
        defend and appoint counsel with respect to any Claim made against the Insureds alleging a
        Wrongful Act or Wrongful Third Party Act, even if such Claim is groundless, false or
        fraudulent. The Insureds shall have the right, at their own expense, to associate with the
        Insurer in the defense of any Claim, including but not limited to negotiating a settlement.
        However, the Insurer shall not be obligated to defend any Claim after the Limit of Liability set
        forth in Item 3(A) in the Declarations has been exhausted or after the rejection of a settlement
        offer as described below.

        1.  Notwithstanding the foregoing, the Insureds shall have the right to assume the defense
            of any Claim if the Insureds notify the Insurer in writing of their election to defend such
            Claim within 30 days of the date the Claim is first made. This right shall terminate if not
            exercised within 30 days of the date the Claim is first made. The appointment of counsel

PV 1700 (Ed. 06 05)                        Page 1 of 3                          Printed in USA

with respect to such Claim shall require the consent of the Insurer, which shall not be unreasonably withheld.

2. In the event that the Insureds elect to assume the defense of any Claim, it shall be the duty of the Insureds and not the duty of the Insurer to defend such Claim. The Insurer shall have the right and shall be given the opportunity to effectively associate with the Insureds in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any Claim that appears reasonably likely to be covered in whole or in part hereunder.

3. Subject to Section V.C.4. regarding allocation, in the event that the Insureds elect to assume the defense of any Claim, the Insurer shall advance on behalf of the Insureds Defense Costs which the Insureds have incurred in connection with such Claim, prior to the final disposition of such Claim, provided that to the extent it is finally established that any such Defense Costs are not covered under this Policy, the Insureds, severally according to their interests, shall repay such Defense Costs to the Insurer.

4. If in any Claim in which the Insureds elect to assume their own defense under Section V.C.2., the Insureds who are afforded coverage for such Claim incur Loss jointly with others (including other Insureds) who are not afforded coverage for such Claim, or incur an amount consisting of both Loss covered by this Policy and loss not covered by this Policy because such Claim includes both covered and uncovered matters, then the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of covered Loss. The Insurer's obligation shall relate only to those sums allocated to matters and Insureds which are afforded coverage.

If the Insureds and the Insurer agree on an allocation of Defense Costs, the Insurer shall advance Defense Costs allocated to the covered Loss. If the Insureds and the Insurer cannot agree on an allocation of Defense Costs, the Insurer shall advance on a current basis Defense Costs which the Insurer believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of Defense Costs on account of a Claim shall be applied retroactively to all Defense Costs on account of such Claim, notwithstanding any different allocation made in connection with any prior advancement of Defense Costs. Any allocation or advancement of Defense Costs on account of a Claim shall not apply to or create any presumption with respect to the allocation of other Loss arising from such Claim or any other Claim.

5. Section VI. A. of the Policy is deleted and amended to read in its entirety as follows:

A. If during the Policy Period any Insured becomes aware of circumstances which could give rise to a Claim, and the Insured gives written notice of such circumstances to the Insurer during the Policy Period, then any Claim subsequently arising from such circumstances shall be considered to have been made during the Policy Period in which the circumstances were first reported to the Insurer. No coverage shall be provided for fees and expenses incurred prior to the time such circumstances result in a Claim.

If during the Extended Reporting Period any Insured becomes aware of circumstances which could give rise to a Claim, and the Insured gives written notice of such circumstances to the Insurer during the Extended Reporting Period, then any Claim subsequently arising from such circumstances shall be considered to have been made during the Extended Reporting Period in which the circumstances were first reported to the Insurer. No coverage will be available for any potential Claim described in the proceeding sentence for any Wrongful Acts committed after the expiration of the Policy Period. No coverage shall be provided for fees and expenses incurred prior to the time such circumstances result in a Claim.

)                                    )

6.  For the purposes of Section VIII B. 1 of the policy the term Executive Officer shall not include
    the Risk Manager or Chief Operations Officer of the Policyholder.

All other provisions remain unchanged.

_Authorized Representative_

_4/26/10_
_Date_

Endorsement No.  2

Effective date of this endorsement:  12:01 a.m. on: 02/20/2010
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

## AMEND SETTLEMENT CLAUSE ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

In consideration of the premium charged, it is agreed that the second paragraph of Section V. D. of the Policy is deleted and amended to read in its entirety as follows:

> If the Insurer recommends a settlement within the Policy's applicable Limits of Liability which is acceptable to the claimant and the Insureds refuse to consent, then the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim, plus an additional *Seventy-Five* (75%) percent of such amount, plus Defense Costs up to the date the Insureds refused to settle such Claim. However, in no event shall the Insurer's liability exceed the applicable Limits of Liability set forth in Item 3 (A) or (B) in the Declarations.

All other provisions remain unchanged.

_____
Authorized Representative

4/26/10
_____
Date

)                                    )

Endorsement No.  3

Effective date of this endorsement: 12:01 a.m. on: 02/20/2010
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

## PRIORITY OF PAYMENTS ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

In the event of Loss arising from a Claim or Claims for which payment is due under the provisions of this Policy, and to the extent permitted by law, the Insurer shall:

1.  first, pay such Loss from Claims against an Insured Individual for which coverage is provided under Section I. Insuring Agreement A of this Policy for which the Policyholder is not permitted by law to indemnify the Insured Individual or for which the Policyholder does not indemnify an Insured Individual by reason of Financial Impairment;

2.  second, pay such Loss for which coverage is provided under Section I. Insuring Agreement D;

3.  third, pay such Loss from Claims against an Insured Individual for which the Policyholder is permitted to indemnify an Insured Individual and for which coverage is provided for such Claim under Section I. Insuring Agreement A; and

4.  then, with respect to whatever remaining amount of the Limits of Liability is available after payment of such Loss in accordance with paragraphs 1,2 and 3 above, apply such remaining limits to remaining Loss in accordance with the order of when such Loss was incurred.

All other provisions remain unchanged.

_____
Authorized Representative

_____
4/26/10
Date

MU-1050                          Page 1 of 1

Endorsement No.   4

Effective date of this endorsement:  12:01 a.m. on: 02/20/2010
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

REPRESENTATIONS AND SEVERABILITY WITH RESPECT TO APPLICATION (AMENDED)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

PRIVATUS®

In consideration of the premium charged, it is hereby understood and agreed that Section VIII. B. of the Policy is hereby amended by the addition of the following paragraph immediately following Section VIII. B. 2:

Notwithstanding the foregoing, it is agreed that this Policy shall not be rescindable by the Insurer with respect to an Insured Individual for which coverage is afforded for a Claim against such Insured Individual solely under Insuring Agreement A under this Policy, but only if with respect to such Claim:

1.      The Policyholder is not permitted by law to indemnify such Insured Individual; or

2.      The Policyholder does not indemnify such Insured Individual solely because of Financial Impairment.

Notwithstanding the foregoing, nothing herein shall affect the Insurer's rights under this Policy to adjust, investigate or deny claims or to otherwise reserve its rights under this Policy with respect to any Claim under any Insuring Agreement.

All other provisions remain unchanged.

_____
Authorized Representative

_____
4/26/10
Date

Endorsement No.   5

Effective date of this endorsement:  12:01 a.m. on: 02/20/2010
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

**MANUSCRIPT ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**PRIVATUS®**

In consideration of the premium charged, it is agreed that Section IV. EXCLUSIONS, B. 1. a. of this Policy is
deleted and amended to read in its entirety as follows:

> "a. a Claim that is a securityholder derivative action brought and maintained on behalf of the
> Policyholder without any active assistance or participation of, or solicitation by, any Insured
> Individual (other than assistance, participation or solicitation for which Section 806 of the
> Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of an applicable
> federal, state, local or foreign securities law, affords protection to such Insured Individual)."

All other provisions remain unchanged.

_(signature)_
_____
Authorized Representative

4/26/10
_____
Date



Endorsement No.   6

Effective date of this endorsement:  12:01 a.m. on: 02/20/2010
To be attached to and form part of Policy Number: ENN588818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

## POLICY PERIOD PREMIUM ADDITION TO THE DECLARATIONS ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

This endorsement modifies insurance provided under the following:

**PRIVATUS**

It is understood and agreed that the following section is added to the DECLARATIONS:

Item 13. Policy Period Premium: $18,500

All other provisions remain unchanged.

_____
Authorized Representative

4/26/10
_____
Date

MU-1047                         Page 1 of 1                   Printed in USA

Endorsement No.   7

Effective date of this endorsement:  12:01 a.m. on: 02/20/2010
To be attached to and form part of Policy Number: ENN583818
Issued to: Multivend, LLC
By: Axis Surplus Insurance Company

## AMEND DEFINITION OF INSURED INDIVIDUAL

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

In consideration of the premium charged, it is agreed that the term Insured Individual, as defined in the Policy, is amended
to include *Tolga Latif* in their capacity as *CEO* of the Policyholder.

All other provisions remain unchanged.

_____
Authorized Representative

_____
4/26/10
Date

MU1025  2/2003

## PRIVATUS
### (INCLUDING DIRECTORS, OFFICERS AND CORPORATE LIABILITY, EMPLOYMENT PRACTICES LIABILITY, FIDUCIARY LIABILITY AND OUTSIDE EXECUTIVE LIABILITY INSURANCE)

In consideration of payment of the premium, and in reliance on all statements made in the Application for this Policy and all information provided to the Insurer, and subject to all the provisions of this Policy, the Insurer designated as such in the Declarations and the **Parent Company**, on behalf of all **Insureds**, agree as follows:

I.   INSURING AGREEMENTS

The Insurer shall pay in connection with a **Wrongful Act** as appropriate per the Insuring Agreements below, which takes place before or during the **Policy Period:**

DIRECTORS, OFFICERS AND CORPORATE LIABILITY
(A)   all **Loss** on behalf of any **Insured** arising from any **D&O Claim** for a **Wrongful Act**, other than a Wrongful Act while serving in an **Outside Position**, first made against such **Insured;**

EMPLOYMENT PRACTICES LIABILITY
(B)   all **Loss** on behalf of any **Insured** arising from any:

    (1)   **Employment Practice Claim** for a Wrongful Act first made against such **Insured** by or on behalf of any **Employee;** or

    (2)   **Third Party Claim** for a **Wrongful Third Party Act** first made against such **Insured**, but solely if such coverage is purchased and marked as "included" in Item 7 of the Declarations;

FIDUCIARY LIABILITY
(C)   all **Loss** on behalf of any **Insured** arising from any **Fiduciary Claim** for a **Wrongful Act** first made against such **Insured;** or

OUTSIDE EXECUTIVE LIABILITY
(D)   all **Loss** on behalf of any **Insured Individual** arising from any **D&O Claim** for a **Wrongful Act** while serving in an **Outside Position** first made against such **Insured Individual;**

during the **Policy Period** or Extended Reporting Period, if applicable, and reported in writing to the Insurer as soon as practicable after any of the **Policyholder's Executive Officers** first becomes aware of such **Claim**, but in no event later than sixty (60) days after the expiration of the **Policy Period** or Extended Reporting Period, if applicable.

Coverage under each Insuring Agreement above shall only be included in this Policy if such Insuring Agreement is marked as "included" in Item 6 of the Declarations.

II.   COVERAGE EXTENSIONS

A.   Spouses

If a **Claim** made against an **Insured Individual** includes a claim against the **Insured Individual's** lawful spouse solely by reason of (1) such spouse's status as a spouse of the **Insured Individual**, or (2) such spouse's ownership interest in property from which the claimant seeks recovery for the **Wrongful Acts** of the **Insured Individual**, all loss which such spouse becomes legally obligated to pay on account of such claim will be treated for purposes of this Policy as **Loss** which the **Insured Individual** is legally obligated to pay on account of the **Claim** made against the **Insured Individual**. Such loss shall be covered under this Policy only if and to the extent that such loss would be covered under this Policy if incurred by the **Insured Individual**.

The coverage extension afforded by this Subsection does not apply to any **Claim** alleging any wrongful act or omission by an **Insured Individual's** spouse. The term "spouse" as used in this paragraph shall include any natural person qualifying as a domestic partner under the provisions of any applicable federal, state of local law in the United States of America.

B.  Estates and Legal Representatives

Coverage under this Policy shall extend to a **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Individual** who is deceased or against the legal representatives or assigns of an **Insured Individual** who is incompetent, insolvent or bankrupt for the **Wrongful Acts** of such **Insured Individual**.

The coverage extension afforded by this Subsection does not apply to any **Claim** alleging any wrongful act or omission by the **Insured Individual's** estates, heirs, legal representatives or assigns.

C.  Extended Reporting Period

If the Insurer chooses not to renew or the **Parent Company** cancels or non renews this Policy, the **Policyholder** or the **Insured Individuals** shall have the right, upon payment of the additional premium required by the Insurer in Item 5(A) in the Declarations, to a one year Extended Reporting Period following the termination of the **Policy Period**, but only with respect to **Wrongful Acts** occurring prior to the effective date of cancellation or nonrenewal.

The right to purchase the Extended Reporting Period shall not be available in the event of non-renewal or cancellation of this Policy resulting from the failure to pay any premium due. The offer of renewal terms, conditions or premiums different from those in effect prior to renewal shall not constitute a refusal to renew.

This right to elect any Extended Reporting Period shall lapse unless written notice of the of the election, together with payment of the additional premium due, is given by the **Policyholder** or **Insured Individual** and is received by the Insurer within sixty (60) days following the effective date of cancellation or nonrenewal, as appropriate. Coverage under the Extended Reporting Period shall apply only to a **Claim** that is first made against the **Policyholder** or **Insured Individual** during the Extended Reporting Period and any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period**. The Limit of Liability applicable to the Extended Reporting Period shall be part of, and not in addition to, the Limit of Liability for the immediately preceding **Policy Period**.

## III.  DEFINITIONS

A.  Definitions Applicable To the Coverage Afforded Under All Section I. Insuring Agreements:

The following definitions apply to all Insuring Agreements under this Policy:

1.  **Application** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other such documents submitted in connection with the underwriting of this policy or of which this policy is a renewal, replacement or which succeed it in time.

2.  **Defense Costs** means reasonable and necessary legal fees and expenses (other than regular or overtime wages, salaries, fees or benefits of the **Insured Individuals** or **Employees** of the **Policyholder** or the **Policyholder's** overhead expenses) incurred by or on behalf of the **Insureds** in defending, settling, appealing or investigating **Claims**, and the premiums for appeal, attachment or similar bonds. The Insurer, however, shall have no obligation to furnish such bonds.

3.  **Employee** means any one or more natural persons who are past, present or future:

    a.  duly appointed officer of the **Policyholder**;

    b.  individuals whose labor or service is directed by the **Policyholder**, whether such labor or service is on a part-time, temporary, seasonal, or full-time basis;

    c.  leased employees and volunteers whose labor or service is directed solely by the **Policyholder**;

    d.  applicants for prospective employment by the **Policyholder**; or

e.   any individual contracted to perform work for the **Policyholder** or who is an independent contractor for the **Policyholder**, but only if such individual performs work or services solely for or on behalf of the **Policyholder**.

4.   **Executive Officer** means any one or more natural persons who are a past, present or future chairperson of the board of directors, president, chief executive officer, chief operating officer, chief financial officer, in-house general counsel, human resource manager or risk manager of the **Policyholder** or the functional equivalent of any such positions.

5.   **Financial Impairment** means:

   a.   the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Policyholder**; or

   b.   the **Policyholder** becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

6.   **Interrelated Wrongful Acts** means any and all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

7.   **Loss** means the amount(s) which the **Insureds** become legally obligated to pay on account of a **Claim**, including damages, judgments, any award of pre-judgment and post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments, and **Defense Costs**.

**Loss** does not include:

   a.   fines, penalties, or taxes imposed by law, except for:

   (i)   the five (5) percent or less civil penalty imposed upon an **Insured** under Section 502(i) of the Employee Retirement Income Security Act of 1974, including any amendments thereto, ("ERISA");

   (ii)   the twenty (20 ) percent or less penalty imposed upon an **Insured** under Section 502(i) of ERISA;

   (iii)   fines, penalties or sanctions imposed upon an **Insured** pursuant to the Internal Revenue Service's Voluntary Compliance Resolution Program, Closing Agreement Program, or Tax Sheltered Annuity Voluntary Correction program, subject always to the Sublimit of Liability set forth in Item 3(C) in the Declarations; or

   (iv)   penalties or other awards imposed by the Pension Ombudsman of England or Occupational Pensions Regulatory Authority of England pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, as amended, and any rules and regulations promulgated thereunder, provided always that no part of the premium for this Policy attributable to this exception has been funded, paid or reimbursed from the funds or assets or any pension scheme insured under this Policy;

   with respect to covered settlements or judgments in a **Fiduciary Claim** arising under Section .I. Insuring Agreement C; or

   b.   matters uninsurable under the law pursuant to which this Policy shall be construed.

   However, in determining the insurability of punitive or exemplary damages, or the multiplied portion of any multiplied damage award, other than as excluded in Subsection III.A7.b., it is agreed that the law of the jurisdiction most favorable to the insurability of those damages will control for purposes of resolving any dispute between the Insurer and the Insureds, provided that such jurisdiction is:

   (i)   where the punitive, exemplary or multiplied damages were awarded or imposed;

   (ii)   where the **Wrongful Act** or **Wrongful Third Party Act** underlying the **Claim** took place;

            )                           )

      (iii)    where either the Insurer or any Insured is incorporated, has its principal place of business or resides; or

      (iv)    where the Policy was issued or became effective.

8.    **Manager** means any one or more natural persons who are a past, present or future manager, managing member, member of the board of managers or equivalent executive of a **Policyholder** that is a limited liability company.

9.    **Non-Profit Entity** means any non-profit corporation, community chest, fund or foundation that is not included in the definition of **Policyholder** and that is: (a) exempt from federal income tax as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended; or (b) organized for a religious or charitable purpose under any non-profit organization statute.

10.    **Outside Entity** means:

    (a)    any **Non-Profit Entity**; or

    (b)    any other entity, if **Outside Position** coverage under Section I. Insuring Agreement D with respect to such entity is specifically granted by endorsement to this Policy.

11.    **Outside Position** means the position of director, officer, trustee or other equivalent executive position held by any **Insured Individual** in an **Outside Entity** if service in such position is at the specific request of the **Policyholder**.

12.    **Parent Company** means the company designated in Item 1 in the Declarations.

13.    **Policyholder** means:

    a.    the **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law; and

    b.    any foundation or charitable trust controlled by the **Parent Company** and/or its **Subsidiaries**.

14.    **Policy Period** means the period of time specified in Item 2 in the Declarations, subject to prior termination in accordance with Section VIII.C.

15.    **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, mold, spores, fungi, germs, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil product, infectious or medical waste, asbestos or asbestos product, lead or lead product, noise, and electric, magnetic or electromagnetic field.

16.    **Subsidiary(ies)** means any entity in which and so long as the **Parent Company**, either directly or indirectly:

    a.    owns more than 50% of the issued and outstanding voting securities; or

    b.    controls voting rights representing the present right to elect or to appoint more than fifty (50) percent of the directors or trustees;

on or before the effective date of this Policy, or after the effective date of this Policy if the entity is covered pursuant to Section VIII. A. 1, solely with regard to **Wrongful Acts** occurring at or after the time such entity became a **Subsidiary**.

B.   Definitions Applicable To The Coverage Afforded Under Section I. Insuring Agreements A and D, Directors, Officers and Corporate Liability and Outside Executive Liability:

With respect to Insuring Agreements A and D the following definitions shall apply:

1.   **Claim** means any D&O Claim.

2.   **D&O Claim** means:

    a.   a written demand against an **Insured** for monetary or non-monetary relief;

    b.   a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by:
       (i)   the service of a complaint or similar pleading;
       (ii)   the filing of a notice of charge, investigative order or like document; or
       (iii)   written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or

    c.   a criminal investigation or proceeding against any **Insured Individual** commenced by:
       (i)   the return of an indictment, information, or similar pleading; or
       (ii)   written notice or subpoena from an authority identifying such **Insured Individual** as an individual against whom a formal proceeding may be commenced.

3.   **Insured** means the **Insured Individual** and the **Policyholder**.

4.   **Insured Individual** means any one or more natural persons who are past, present or future:

    a.   duly elected or appointed director(s), officer(s), trustee(s) or **Manager(s)** of the **Policyholder** or their functional equivalents if serving in such a position outside the United States;

    b.   management committee members of a joint venture which is a **Subsidiary**; or

    c.   **Employees**, other than independent contractors, who are named in any **D&O Claim**;

provided always that, with regard to paragraph III. B. 4. c. above, such **Employees** shall not be considered **Insureds** for the purposes of Exclusion IV. B. 1.b.

5.   **Wrongful Act** means:

    a.   any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by:

       (i)   any **Insured Individual** in their capacity as such;

       (ii)   any **Insured Individual** in an **Outside Position** with respect to Section I. Insuring Agreement D; or

       (iii)   the **Policyholder** with respect to Section I. Insuring Agreement A; or

    b.   any matter claimed against any **Insured Individual** solely by reason of their serving in their capacity as such or in an **Outside Position** with respect to Section I. Insuring Agreement D.

C.   Definitions Applicable To The Coverage Afforded Under Section I. Insuring Agreement B, Employment Practices Liability:

With respect to Insuring Agreement B, the following definitions shall apply:

1.   **Breach of Employment Contract** means a breach of any oral, written or implied employment contract.

2. Claim means any **Employment Practice Claim**. If **Third Party Claim** Coverage is included in Item 7 in the Declarations, **Claim** shall include a **Third Party Claim**.

3. **Discrimination** means the violation of any Federal, State, or local statute, regulation, ordinance or common law concerning discrimination in employment anywhere in the world.

4. **Employment Benefits** means perquisites, fringe benefits, deferred compensation or payments (including insurance premiums) in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. **Employment Benefits** shall not include salary, wages, commissions or non-deferred cash incentive compensation.

5. **Employment Practices Claim** means:

   a. a written demand against any **Insured** for monetary or non-monetary relief;

   b. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

   c. a formal, administrative, investigative or regulatory proceeding by or before the Equal Employment Opportunity Commission (EEOC), the Office of Federal Contract Compliance Programs (OFCCP), or similar formal proceeding before another federal, state or other governmental agency against any **Insured** commenced by a notice of charges, formal investigative order or similar document; or

   d. an arbitration or other alternative dispute resolution proceeding against any **Insured** commenced by a written demand or notice.

   The term **Employment Practices Claim** shall not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement. If **Third Party Claim** Coverage is purchased and marked as "included" in Item 7 in the Declarations, **Employment Practices Claim** shall include **Third Party Claim** Coverage.

6. **Insured** means the **Insured Individual** and the **Policyholder**.

7. **Insured Individual** means any one or more natural persons who are past, present or future:

   a. duly elected or appointed director, officer, trustee, or **Manager** of the **Policyholder** or their functional equivalent if serving in such a position outside the United States;

   b. individuals compensated by the **Policyholder** through wages, salary and/or commissions and whose labor or service is directed by the **Policyholder**, whether such labor or service is on a part-time, temporary, seasonal, or full-time basis;

   c. volunteers whose labor or service is directed by the **Policyholder**;

   d. individuals leased to the **Policyholder**, but only if prior to any **Claim** against such individual the **Policyholder** has agreed in writing to indemnify such individual or the company leasing that individual for matters within the scope of coverage of the Policy; or

   e. individuals contracted to perform work for the **Policyholder** or who is an independent contractor for the **Policyholder**, but only if prior to any **Claim** against such individual the **Policyholder** has agreed in writing to indemnify such individual for matters within the scope of coverage of this Policy.

8. **Harassment** means:

   a. work related sexual harassment that interferes with an **Employee's** performance or creates an intimidating, hostile or offensive working environment;

   b. sexual advances, requests for sexual favors, or other conduct of a sexual nature that is made a condition of employment or that is used as a basis for employment decisions; or

c.    illegal work related harassment.

9.    **Other Workplace Tort** means

a.    an employment related misrepresentation to an employee;

b.    failure to grant or adopt adequate employment related policies and procedures;

c.    negligent hiring, supervision, evaluation or retention of employees;

d.    employment-related invasion of privacy or defamation;

e.    employment-related wrongful infliction of emotional distress; or

f.    employment-related libel, slander, false arrest, detention, or imprisonment;

but only when alleged as part of a **Employment Practices Claim** for an actual or alleged **Breach of Employment Contract, Discrimination, Harassment, Retaliation,** or **Wrongful Job Action**

10.   **Retaliation** means the illegal retaliatory treatment of **Employees**, including any retaliatory treatment against an **Employee** for such **Employee** engaging in any of the following activities:

a.    exercising his or her rights under the law;

b.    refusing to violate any law or opposing an unlawful practice;

c.    threatening to disclose or actually disclosing violations of the law to any governmental authority or the management of the **Policyholder;** or

d.    testifying, cooperating, or assisting with respect to an investigation or proceeding by a governmental authority against the **Policyholder.**

11.   **Third Party Claim** means any **Employment Practices Claim** brought and maintained against any **Insured** by or on behalf of any natural person(s) who is, or attempted to be, a past, present or future customer(s) or vendor(s), or an employee of customer(s) or vendor(s) of the **Policyholder** for any **Wrongful Third Party Act.**

12.   **Wrongful Act** means any **Breach of Employment Contract, Discrimination, Harassment, Retaliation, Wrongful Job Action,** or **Other Workplace Torts** actually or allegedly committed or attempted by:

a.    the **Policyholder;**

b.    any **Insured Individuals** in their capacities as such; or

c. .  by any other persons for whom the **Insureds** are legally responsible.

13    **Wrongful Job Action** means wrongful:

a.    dismissal, discharge or termination (either actual or constructive) of employment;

b.    wrongful failure to employ or promote;

c.    wrongful reference, discipline or deprivation of a career opportunity; or

d.    wrongful demotion or adverse change in the terms, conditions or status of employment.

14.   **Wrongful Third Party Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by:

a.   the **Policyholder**;

b.   any **Insured Individuals** in their capacities as such; or

c.   any other persons for whom the **Insureds** are legally responsible;

which discriminates against any natural person who is a customer or vendor, or employee of a customer or vendor, of the **Policyholder** on the basis of that natural person's race, color, creed, national origin, gender, sexual orientation or preference, marital status, sex, religion, age, military service, disability or handicap, pregnancy, or on any other basis prohibited by law, including the sexual or other discriminatory harassment of such customer or vendor or employee of such customer or vendor; provided, however, that a **Wrongful Third Party Act** does not include, in whole or in part:

y.   any actual or alleged battery or bodily injury (other than mental anguish, humiliation or emotional distress); or

z.   any actual or alleged price discrimination or violation of any antitrust statute or other law proscribing unfair competition or unfair business practices.

D.   Definitions Applicable To The Coverage Afforded Under Section I. Insuring Agreement C, Fiduciary Liability:

With respect to Insuring Agreement C, the following definitions shall apply:

1.   **Administrator** means an **Insured Individual** with responsibility for the performance of one or more of the following administrative duties or activities:

a.   counseling participants or beneficiaries with respect to a **Plan**,

b.   providing interpretations with respect to a **Plan**,

c.   handling of records with respect to a **Plan**, or

d.   activities affecting enrollment, termination, amendment or cancellation of participants or beneficiaries under the **Plan**.

**Administrator** also means any third party which is included in the definition of **Administrator** by written endorsement attached hereto, but only with respect to a **Plan**.

2.   **Benefits** means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property or the grant of a privilege or perquisite.

3.   **Claim** means any **Fiduciary Claim**.

4.   **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985), and any amendment or revision thereto, or any similar common or statutory law of the United States, Canada or any state or other jurisdiction to which a **Plan** is subject. **ERISA** shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government mandated disability benefits or similar law.

5.   **ESOP** means any employee stock ownership plan as defined in **ERISA**.

6.   **Fiduciary(ies)** means a fiduciary(ies) of a **Plan** as defined in **ERISA**.

7.   **Fiduciary Claim** means:

a.   a written demand against any **Insured** for monetary or non-monetary relief,

b.   a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by:

(i)   the service of a complaint or similar pleading,

(ii)   the filing of a notice of a charge, investigative order or like document, or

(iii)   written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced,

c.   a criminal proceeding against any **Insured** commenced by:

(i)     the return of an indictment, information, or similar pleading, or

(ii)    written notice or subpoena from an authority identifying such **Insured** as an individual or entity against whom a subsequent formal proceeding may be commenced, or

d.     any fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency located outside the United States.

8.    **Insured** means any of the **Insured Individuals**, the **Policyholder** (including any general or limited partnership scheduled by written endorsement hereto) and any **Plan**.   **Insured** shall also include any natural person in the capacity of **Fiduciary** or **Administrator** of a **Plan** if such person is scheduled by written endorsement attached hereto.

9.    **Insured Individual** means any one or more natural persons who are past, present or future duly elected or appointed director(s), officer(s), **Managers** or employee(s) of the **Policyholder** or a **Plan** (including a general partner(s) of a general or limited partnership scheduled by written endorsement attached hereto) or his or her functional equivalent if serving in such a position outside the United States, in his or her capacity as a **Fiduciary** or **Administrator** of a **Plan**.

10.    **Plan** means any plan, fund or program, regardless of whether it is subject to regulation under Title I of ERISA or any part thereof, or meets the requirements for qualification under Section 401 of the Internal Revenue Code of 1986, as amended, and which is:

a.     a welfare plan, as defined in ERISA, sponsored solely by the **Policyholder** or sponsored jointly by the **Policyholder** and a labor organization, solely for the benefit of the employee(s) of the **Policyholder**,

b.     a pension plan, as defined in ERISA (other than an ESOP), sponsored solely by the **Policyholder** or sponsored jointly by the **Policyholder** and a labor organization, solely for the benefit of the employee(s) of the **Policyholder**, provided that prior to the inception date of this Policy, such plan has been reported in writing to the Insurer pursuant to the terms of the Application for this Policy or pursuant to the terms of any prior policy issued by the Insurer or the Application for such policy and the **Policyholder** shall have paid any premium required for such plan,

c.     a pension plan, as defined in ERISA (other than an ESOP), which, during the **Policy Period**, becomes sponsored solely by the **Policyholder** or sponsored jointly by the **Policyholder** and a labor organization, solely for the benefit of the employee(s) of the **Policyholder**,

d.     a plan which is both a welfare plan and a pension plan as defined in ERISA (other than an ESOP),

e.     a government-mandated program for unemployment insurance, social security or disability benefits solely with respect to a **Wrongful Act** as defined in Subsection III.D.11.b.,

f.     an ESOP which is included in the definition of **Plan** by written endorsement attached hereto, or

g.     any other plan, fund or program, including a multi-employer plan(s) solely with respect to a **Wrongful Act** as defined in Subsection III.D.11.c., which is included in the definition of **Plan** by written endorsement attached hereto.

Pursuant to the requirements of paragraphs a. and b. above, coverage under this Policy shall apply to any pension or welfare plan that was merged, sold, spun-off or terminated prior to or during the **Policy Period** with respect to **Wrongful Acts** that occurred prior to the date of such merger, sale or spin-off or prior to the final date of asset distribution of such plan. As a condition precedent to coverage with respect to any such pension or welfare plan, the **Policyholder** shall give written notice of such transaction to the Insurer as soon as practicable but in no event more than ninety (90) days after the effective date of such merger, sale, spin-off or termination.

Pursuant to the requirement of paragraph c. above, if the total assets of such newly sponsored **Plan** are greater than twenty-five (25) percent of the total consolidated assets of the existing **Plans** of the **Policyholder**, this Policy shall provide insurance for such plan for a period of ninety (90) days after the effective date of such sponsorship.

11.    **Wrongful Act** means:

a.     as respects a **Fiduciary**, a **Plan** or the **Policyholder**;

(i)    a violation of any of the responsibilities, obligations or duties imposed on **Fiduciaries** by **ERISA** with respect to a **Plan**, or

(ii)    any matter claimed against an **Insured** by reason of his, her or its status as a **Fiduciary**,

b.    as respects an **Administrator**:

(i)    any act error or omission in the performance of his or her administrative duties as defined in Subsection III.D.1., or

(ii)    any matter claimed against an **Administrator** by reason of his or her status as such, and

c.    as respects a **Insured Individual**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multi-employer plan as defined by **ERISA**, but only if such service is at the specific request of the **Policyholder** and such multi-employer plan is added pursuant to Subsection III.D.10.g., identified as a multi-employer plan and any required premium is paid.

## IV. Exclusions

A.    Exclusions Applicable To All Section I. Insuring Agreements:

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

1.    based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any fact, circumstance, transaction, event or **Wrongful Act** which before the Inception Date set forth in Item 2 of the Declarations, was the subject of any notice of claim, loss or notice of potential claim or potential loss given under any other policy of insurance of which this policy is a direct or indirect renewal or replacement;

2.    based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

a.    any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or

b.    any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**;

3.    for bodily injury, mental anguish, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof, but this exclusion shall not apply with respect to any actual or alleged mental anguish or emotional distress in a **Employment Practices Claim** for a **Wrongful Act**, solely as that term is defined in Section III.C.12., brought by an **Employee**;

4.    for:

a.    any nuclear reaction, radiation or contamination;

b.    the actual, alleged or threatened discharge, release, escape, seepage, migration, dispersal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or

c.    any direction or request that the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so (such cost hereinafter "Clean Up Costs");

however, this Exclusion IV. A. 4. shall not apply to the extent such **Claim**:

(a)    is made against a **Insured Individual**, otherwise covered under Section I. Insuring Agreement A, and the **Loss** incurred by such **Insured Individual** in connection with such **D&O Claim** is not permitted or required to be indemnified by the **Policyholder**, or the **Policyholder** is permitted or required to indemnify but does not do so by reason of Financial

Impairment;

(b)    is brought by or on behalf of any securities holder(s) of the **Policyholder** in their capacity as such, while acting totally independent of and without the solicitation, assistance, participation or intervention of the **Policyholder** or any **Insured Individual**; or

(c)    is brought by an **Employee** for **Retaliation**;

5.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

a.   the gaining of any profit, remuneration, or advantage to which the **Insured** was not legally entitled; or

b.   any criminal or deliberately fraudulent act, error or omission by an **Insured**;

if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or a document or written statement by an **Insured**.

With respect to exclusion A. 5. set forth above no fact pertaining to, knowledge possessed by or conduct by any **Insured Individual** shall be imputed to any other **Insured Individual**.

B.   Exclusions Applicable To Section I. Insuring Agreements A and D, Directors, Officers and Corporate Liability and Outside Executive Liability:

The following exclusions apply to Insuring Agreements A and D of this Policy:

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

1.   brought or maintained by or on behalf of any **Insured** except a **Claim**:

a.   that is a derivative action brought or maintained on behalf of the **Policyholder** by one or more persons who are **not Insured Individuals** and who bring and maintain the **Claim** totally independent of and without the solicitation, assistance, participation, or intervention of any **Insured**;

b.   that alleges a **Wrongful Act**, solely as that term is defined in Section III.C.12., and is brought by an **Employee**, but such **Claim** shall only be subject to coverage under Section I. Insuring Agreement B;

c.   brought or maintained by any **Insured Individual** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this Policy;

d.   brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for a **Policyholder**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

e.   brought or maintained by one or more **Insured Individuals** who have not served as directors, trustees, **Managers**, officers, or equivalent executives of the **Policyholder** within five (5) years immediately preceding the date the **Claim** is first made, and the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation, or intervention of the **Policyholder** or any **Insured Individual** not described in this paragraph e; or

f.   brought or maintained outside the United States, Canada and any common law jurisdiction;

2.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 and amendments thereto or similar provisions of any federal, state or local statutory law or common law or the equivalent law of any other country in connection with any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Policyholder**; or

3.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving the actual or alleged violation of any the Securities Act of 1933, Securities Exchange Act of 1934, Investment Act of 1940, any state "blue sky" securities laws; provided that this Exclusion B. 3. shall not apply to any D&O Claim arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction or series of transactions that are exempt from registration under the Securities Act of 1933 and any amendments thereto or any rules or regulations promulgated thereunder; or

4.   for any Third Party Claim for a Wrongful Third Party Act as such terms are defined in Section III C.

C.   Exclusions Applicable To Section I. Insuring Agreement A, Directors, Officers and Corporate Liability:

The following exclusions apply to Insuring Agreement A of this Policy.

The Insurer shall not be liable for Loss arising from any Claim made against the Policyholder:

1.   for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, service mark, trademark, trade secret or any other intellectual property rights;

2.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged contractual liability of the Policyholder under any express contract or agreement; or

3.   for the rendering of or failure to render any service to a customer or client.

D.   Exclusions Applicable to Section I. Insuring Agreement B, Employment Practices Liability:

The following exclusions apply to Insuring Agreement B. of this Policy.

The Insurer shall not be liable for Loss arising from any Claim made against any Insured:

1.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any action that relates to a collective bargaining agreement;

2.   based upon, arising from, or in consequence of the liability of others assumed by any Insured under any written or oral contract or agreement; provided that this Exclusion A. 2 shall not apply to the extent that an Insured would have been liable in the absence of such a contract or agreement;

3.   for an actual or alleged violation of the responsibilities, obligations or duties imposed by the following laws and any amendments thereto:

(a)  any law governing workers' compensation, unemployment insurance, social security, disability benefits or similar law;

(b)  the Employee Retirement Income Security Act of 1974 (except Section 510 thereof) or any law that governs any employee benefit arrangement, program, policy, plan or scheme of any type (whether or not legally required or whether provided during or subsequent to employment with the Policyholder);

(c)  the Fair Labor Standards Act or any law that governs wage, hour or payroll policies and practices, except the Equal Pay Act;

(d)  the National Labor Relations Act or any law that pertains to the rights of employees with respect to unions, unionizing, or collective activities in the workplace or any obligations of employers with respect to such employee activities;

(e)  the Worker Adjustment and Retraining Notification Act, or any law that governs any obligation of an employer to notify, discuss, or bargain with its employees or others in advance of any plant or facility closing, or mass layoff or any similar obligation;

(f)  the Consolidated Omnibus Budget Reconciliation Act of 1985;

(g) the Federal False Claims Act or any similar federal, state, or local statutory law or common law anywhere in the world; or

(h) the Occupational Safety and Health Act or any law that governs workplace safety and health;

including any other federal, state local or foreign statute or law similar to any statute or law described in (a) through (h) of this exclusion, or rules or regulations promulgated under any of such statutes or laws; provided however this Exclusion D. 3. shall not apply to any **Claim** for **Retaliation**;

4. made against a **Subsidiary** or an **Insured Individual** of such **Subsidiary** for any **Wrongful Employment Practices Act** committed, attempted, or allegedly committed or attempted during anytime when such entity was not a **Subsidiary**;

5. for any actual or alleged breach of any express contract between the **Policyholder** and an independent contractor of the **Policyholder**; or

6. for any actual or alleged charge of contempt of court or violation of a court order; or

7. based upon, arising from, or in consequence of any federal, state, or local statutory law or common law anywhere in the world that governs competition, monopolistic practices, or price fixing (including horizontal or other price fixing of wages, hours, salaries, compensation, benefits or any other terms and conditions of employment), including but not limited to the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1936, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or amendments to or regulations promulgated under any such law; or

E. Exclusions Applicable Solely To Loss other than **Defense Costs** under Insuring Agreement B

The following exclusions apply to Insuring Agreement B of this Policy.

With respect to **Employment Claims** not excluded by Section IV Exclusions D of the Policy, the Insurer shall only pay **Defense Costs**, and not other components of **Loss**, on account of any **Claim** made against any **Insured**, for:

1. amounts which constitute **Employment Benefits** due or to become due or the equivalent value of such **Benefits**; provided that this Exclusion E. 1. shall not apply to any **Employment Claim** for **Wrongful Termination**;

2. amounts which constitute costs associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state, or local statutory law or common law anywhere in the world, including but not limited to the Americans With Disabilities Act, the Civil Rights Act of 1964, or amendments to or rules or regulations promulgated under any such law;

3. the recovery of amounts owing under or assumed by any **Insured** pursuant to any express written employment contract or agreement with any **Employee**; provided, however, this exclusion shall not apply to the extent the **Insured** would be liable for such amounts in the absence of such contract or agreement; or

4. any request order (including the cost of compliance with such order) or agreement for non-monetary relief including injunctive relief, declaratory relief, restitution, or any other equitable remedy.

F. Exclusions Applicable to Section I. Insuring Agreement C, Fiduciary Liability:

The following exclusions apply to Insuring Agreement C of this Policy.

1. The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

a. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any act or omission in his, her or its capacity as a **Fiduciary** or **Administrator** of any plan,

fund or program other than a **Plan** as defined in this **Policy**, or by reason of his, her or its status as a **Fiduciary** or **Administrator** of such other plan, fund or program; or

    b.    based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving to any **Wrongful Act** as respects a **Plan** taking place at any time when the **Policyholder** did not sponsor such **Plan**.

2.    The Insurer shall only pay **Defense Costs**, and not **Indemnity Amounts**, for any **Claim** made against any **Insured** for:

    a.    the failure to collect contributions owed to any **Plan** from any employer unless such failure is due to the negligence of an **Insured**; or

    b.    **Benefits**, including that portion of any settlement or judgment equal to such **Benefits**, unless recovery of such **Benefits** is based on a **Wrongful Act** and is payable as a personal obligation of an **Insured Individual**.

## V.  LIMITS OF LIABILITY, RETENTION, DEFENSE AND SETTLEMENT

### A.  Limits of Liability

The Insurer's maximum aggregate liability for all **Loss** arising from all **Claims**, under all **Insuring Agreements**, first made during the **Policy Period** shall be the Limit of Liability set forth in Item 3(A) in the Declarations. As respects **Insuring Agreement C**, the Insurer's maximum aggregate liability for Internal Revenue Service fines, penalties and sanctions shall be the Sublimit of Liability set forth in Item 3(B) in the Declarations, which amount shall be part of and not in addition to the Limit of Liability set forth in Item 3(A) in the Declarations.

The Limits of Liability for the Extended Reporting Period, if exercised, shall be part of and not in addition to the Limits of Liability for the immediately preceding **Policy Period**. The purchase of the Extended Reporting Period shall not increase or reinstate the Limits of Liability, which shall be the maximum liability of the Insurer for such **Policy Period** and Extended Reporting Period, combined.

If the Limits of Liability are exhausted by payment of **Loss**, the Insurer's obligations under this Policy shall be completely fulfilled and extinguished.

All **Claims**, including all **D&O Claims, Employment Practices Claims, Third Party Claims** and **Fiduciary Claims**, arising from the same **Wrongful Act, Wrongful Third Party Act**, and all **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the earlier date that: (1) any of the **Claims** is first made against an **Insured** under this Policy or any prior policy, or (2) valid notice was given by the **Insureds** under this Policy or any prior policy of any **Wrongful Act, Wrongful Third Party Act**, or any fact, circumstance, situation, event, transaction or cause which underlies such **Claim**. Coverage under this Policy shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to the Insurer in accordance with the terms herein.

### B.  Retentions

The Insurer shall be liable for only that part of **Loss** arising from a **Claim** under Section I. Insuring Agreement A, B, C or D., which is excess of the Retention set forth in Item 4(A) in the Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk.

In the event that a **Claim** falls under more than one Section I. Insuring Agreement, the larger Retention set forth in Item 4 of the Declarations shall apply to such **Claim**.

### C.  Defense

The Insurer shall have both the right and the duty to defend and appoint counsel with respect to any **Claim** made against the **Insureds** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent. The **Insureds** shall have the right, at their own expense, to associate with the Insurer in the defense of any **Claim**, including but not limited to negotiating a settlement. However, the Insurer shall not be obligated to defend any **Claim** after the Limit of Liability set forth in Item 3(A) in the Declarations has been exhausted or after the rejection of a settlement offer as described below.

D.    Consent, Cooperation and Settlement

The **Insureds** shall not settle any **Claim**, select any defense counsel, incur any **Defense Costs**, admit or assume any liability, stipulate to any judgment, or otherwise assume any obligation without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, **Defense Costs**, assumed obligation, admission or stipulated judgment to which it has not consented or for which the **Insureds** are not legally obligated. The **Insureds** shall not knowingly take any action which increases the Insurer's exposure for **Loss** under this Policy. The **Insureds** shall provide the Insurer with all information, assistance and cooperation as the Insurer reasonably requests and shall do nothing that may prejudice the Insurer's potential or actual rights of recovery with respect to **Loss** paid on account of a **Claim**.

If the Insurer recommends a settlement within the Policy's applicable Limits of Liability which is acceptable to the claimant and the **Insureds** refuse to consent, then the Insurer's liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the Insurer could have settled such **Claim**, plus an additional fifty (50) percent of such amount, plus **Defense Costs** up to the date the **Insureds** refused to settle such **Claim**. However, in no event shall the Insurer's liability exceed the applicable Limits of Liability set forth in Item 3 (A), (B), or (C) in the Declarations.

VI.  AWARENESS PROVISION

A.    If during the **Policy Period** any **Insured** becomes aware of circumstances which could give rise to a **Claim**, and the **Insured** gives written notice of such circumstances to the Insurer during the **Policy Period**, then any **Claim** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period** in which the circumstances were first reported to the Insurer. No coverage shall be provided for fees and expenses incurred prior to the time such circumstances result in a **Claim**.

B.    The **Insureds** shall, as a condition precedent to exercising their rights hereunder:

1.    Include with any notice of circumstances a description of such circumstances, the nature of the potential **Wrongful Act**, the nature and extent of the potential damages, the names of the potential claimants, the identities of the potential defendants and the manner in which the **Insured** first became aware of such circumstances; and

2.    give the Insurer such additional information and cooperation as it may reasonably require.

VII. NOTICES

All notices under any provision of this Policy must be made in writing and delivered by prepaid express courier, certified mail or fax. Notices to the **Insureds** shall be given to the **Parent Company**. Notices to the Insurer shall be given to the appropriate party at the address set forth in Item 10 in the Declarations. Notices given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notices are sent, whichever is earlier.

VIII. GENERAL CONDITIONS

A.    Transactions That Impact Coverage under all Section 1. Insuring Agreements

1.    Acquisitions or Creations

a.    If, after the effective date of this Policy the **Policyholder**:

(i)    creates or acquires an entity;

(ii)   merges with another entity such that the **Policyholder** is the surviving entity; or

(iii)  assumes voting rights representing the present right to vote for election or to appoint more than fifty (50) percent of the directors or trustees of an entity (hereinafter (i)-(iii) of this subsection each a "Transaction");

then such entity and any subsidiaries shall be deemed to be a **Subsidiary**, only if the total number of employees in such entity and any subsidiaries prior to such Transaction does not exceed ten percent (10%) of the total number of **Employees** immediately prior to such Transaction.

b.    If, after the effective date of this Policy the **Policyholder** engages in a Transaction or acquires all or substantially all of the assets of another entity, and the total number of employees of the **Policyholder** after such acquisition exceeds a hundred and ten percent (110%) of the total number of **Employees** immediately prior to such acquisition, then this Policy shall provide insurance for such newly hired employees for a period of ninety (90) days after the effective date of such acquisition. At its sole option and upon submission of any and all information as it may require, the Insurer may, upon payment of any additional premium or modification of the provisions of this Policy that may be warranted, extend the insurance otherwise afforded through this subparagraph.

c.    Notwithstanding the provisions above, if the **Policyholder** engages in a Transaction or acquires all or substantially all of the assets of another entity and the total consideration paid exceeds ten (10) percent of the total consolidated assets of the **Policyholder** immediately prior to such Transaction or acquisition the **Policyholder** must give the Insurer full details of such Transaction or acquisition within 90 days of the effective date thereof, and the Insurer may require, in its sole discretion, additional terms, conditions and limitations of coverage and such additional premium in connection with the foregoing.

d.    There shall be no coverage for any **Wrongful Act** by such created, acquired or merged entity or by any persons or entities considered to be **Insureds** pursuant to paragraph (a) above, where such **Wrongful Act** occurred before the effective date of such creation, acquisition or merger.

2.    Acquisition of **Parent Company**

If, during the **Policy Period**, any of the following events occurs:

a.    the acquisition of the **Parent Company**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Company** into or with another entity such that the **Parent Company** is not the surviving entity; or

b.    the acquisition by any person, entity or group of persons or entities of the right to elect, appoint or designate at least fifty (50) percent of the directors of the **Parent Company**;

then coverage under this Policy shall continue until termination of the **Policy Period** and shall not be cancellable by the **Parent Company**, but only with respect to **Wrongful Acts** occurring prior to such merger, consolidation or acquisition. The **Parent Company** shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may require. However, coverage under this Policy shall cease as of the effective date of such event with respect to **Wrongful Acts** occurring after such event. The appointment by any state or federal official, agency or court of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Parent Company**, or the **Parent Company** becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, shall not be considered an acquisition within the meaning of this Subsection.

3.    Cessation of a **Subsidiary**

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of the **Policy Period**, but only with respect to **Wrongful Acts** occurring prior to the date such organization ceased to be a **Subsidiary**.

B.    Representations and Severability With Respect To Application

In granting coverage to any one of the **Insureds**, the Insurer has relied upon the statements made in the written Application for this Policy and all information provided to the Insurer and upon the statements in the written application and information submitted to another insurer with respect to prior coverage incepting as of the

Continuity Date, if any, set forth in Item 9 in the Declarations. All such statements and information are the basis of this Policy and shall be incorporated in and constitute part of this Policy.

In order to determine if coverage is available:

1.  only facts pertaining to and knowledge possessed by any **Executive Officer** shall be imputed to the **Policyholder**; and

2.  no declaration or statement in the Application or knowledge possessed by the **Policyholder** or any **Insured Individual** shall be imputed to any other **Insured Individual**. Such written Application(s) for coverage shall be construed as a separate Application for coverage by each **Insured Individual**.

C.  Cancellation/Non-Renewal

1.  The **Parent Company** may cancel this Policy by giving the Insurer advance written notice of cancellation.

2.  The Insurer may only cancel this Policy in the event of nonpayment of premium by giving the **Parent Company** written notice of cancellation at least twenty (20) days before the effective time of cancellation.

3.  Notice of cancellation shall state the effective time of cancellation. The **Policy Period** shall end at that time.

4.  If this Policy is cancelled, the Insurer shall send the **Parent Company** any premium refund as soon as practicable. If the **Parent Company** cancels, the refund shall be on the customary short rate basis. The return or tender of a return premium is not a condition precedent to the cancellation becoming effective at the time stated in the cancellation notice.

5.  If the Insurer decides not to renew this Policy, the Insurer shall provide written notice to the **Parent Company** at least sixty (60) days prior to the end of the **Policy Period**.

6.  If any controlling law requires a longer period of notice by the Insurer, the Insurer shall give such longer notice.

D.  Other Insurance

If any **Loss** arising from any **Claim** is insured by any other policy(ies) of insurance, prior or current, then this Policy shall apply only in excess of and will not contribute with the amount of any deductibles, retentions and limits of liability under such other policy(ies), whether such policy(ies) is stated to be primary, contributory, excess, contingent or otherwise, unless such policy(ies) is written to be specifically excess of this Policy by reference in such other policy(ies) to this Policy's Policy Number indicated in the Declarations.

The coverage afforded under Insuring Agreement D shall be specifically excess of any indemnification and insurance available to such **Insured Individual** from the **Outside Entity**.

E.  Territory

This Policy shall apply to **Claims** made against the **Insureds** anywhere in the world.

F.  Valuation and Currency

All premiums, limits, Retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Loss** is due.

G.  Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery, and the **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**.

H.   No Action Against Insurer

No action shall lie against the Insurer unless, as a condition precedent thereto, there has been full compliance with all the terms of this Policy. No person or organization shall have any right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or their legal representatives.

I.   Bankruptcy

Bankruptcy or insolvency of the Policyholder or of any Insured Individual shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

J.   Authorization

By acceptance of this Policy, the Parent Company agrees to act on behalf of the Insureds with respect to the giving and receiving of any notice provided for in this Policy (except the giving of notice to apply for any Extended Reporting or Runoff Period), the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements, and the Insureds agree that the Parent Company shall act on their behalf.

K.   Alteration and Assignment of Interest

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by an authorized representative of the Insurer. The Insureds agree that this Policy constitutes the entire agreement between the Insureds and the Insurer, or any of their agents or brokers. Notice to or knowledge possessed by the Insurer, the Insureds or any agent, broker or other person acting on behalf of the Insureds or Insurer shall not effect a waiver of or estop the Insurer or the Insureds from asserting any rights under this Policy.

L.   Headings

The descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

M.   Service of Suit

The Insurer agrees that in the event of its failure to pay any amount claimed to be due under this Policy, it, at the request of an Insured, shall submit to the jurisdiction of any court having competent jurisdiction within the United States of America, and all matters arising under this Policy shall be determined in accordance with the law and practice of such court.

The Insurer hereby designates the Commissioner, Director or Superintendent of Insurance, or similar official specified by law for that purpose, or her or his successor(s) in office, or the person designated in the following paragraph, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of an Insured arising from this Policy. It is further agreed that the Insurer shall abide by the final decision of any court having competent jurisdiction and in which such action, suit or proceeding is brought, including any court having competent appellate jurisdiction.

Upon receipt of process lawfully served, the Insurer designates the following person to whom the official designated in the above paragraph may mail such process:

Richard T. Gieryn, Jr.
11680 Great Oaks Way
Suite 400
Alpharetta, GA 30022

# EXHIBIT B

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. ___12-20756___ CR-ROSENBAUM

MAGISTRATE JUDGE
SNOW

18 U.S.C. § 371
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 2326
18 U.S.C. § 2



FILED by _____ D.C.

OCT 0 2 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. - MIAMI

UNITED STATES OF AMERICA

vs.

EDWARD MORRIS "NED" WEAVER,
LAWRENCE A. KAPLAN,
SCOTT M. DOUMAS,
MARK BENOWITZ,
RICHARD R. GOLDBERG,
RICHARD LINICK,
PAUL E. RAIA,
HOWARD S. STRAUSS,
WALLACE W. "WALLY" DiRENZO,
      and
JAMES P. ELLIS,
      a/k/a "Max Braddock,"
      a/k/a "Patrick Cosgrove,"
      a/k/a "Todd Parker,"

            Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At various times relevant to this Indictment:

1.      Multivend, LLC, d/b/a Vendstar ("Vendstar") sold vending machine business opportunities to customers throughout the United States, including in Miami-Dade, Broward, and Palm Beach Counties, within the Southern District of Florida. Vendstar was incorporated in Indiana. Vendstar's principal place of business was in Deer Park, New York.

2.      Defendant **EDWARD MORRIS "NED" WEAVER** was the president and chief executive officer of Vendstar. **WEAVER** oversaw Vendstar's advertising, promotion, and sales, approved which locating companies Vendstar recommended, and was notified of and involved in responding to customer complaints.

3.      Defendant **LAWRENCE A. KAPLAN** was the technical support manager for Vendstar. **KAPLAN** received and responded to customer complaints and reported directly to **EDWARD MORRIS "NED" WEAVER**.

4.      Defendant **SCOTT M. DOUMAS** was a sales representative and sales manager for Vendstar.

5.      Defendants **MARK BENOWITZ, RICHARD R. GOLDBERG, RICHARD LINICK, PAUL E. RAIA,** and **HOWARD S. STRAUSS** were sales representatives for Vendstar.

6.      Defendant **WALLACE W. "WALLY" DiRENZO** operated Nationwide Locating Company, a company Vendstar recommended its customers use to find locations for their vending machines. Nationwide Locating Company was based in North Palm Beach, Florida, in Palm Beach County, within the Southern District of Florida.

7.      Defendant **JAMES P. ELLIS,** a/k/a **"Max Braddock,"** a/k/a **"Patrick Cosgrove,"** a/k/a **"Todd Parker"** operated various locating companies Vendstar recommended

2

its customers use to find locations for their vending machines.  These companies included Vending Dreams, Priority Placements, Clear Vision Marketing, Map Marketing, and Secure Placement, which were based at various times in Illinois, Georgia, and Alabama.

## COUNT 1
### (Conspiracy: 18 U.S.C. § 371)

1.      Paragraphs 1 through 7 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From at least in or around May 2005, through on or about July 2, 2010, in Miami-Dade, Broward, and Palm Beach Counties, within the Southern District of Florida, and elsewhere, the defendants,

**EDWARD MORRIS "NED" WEAVER,**
**LAWRENCE A. KAPLAN,**
**SCOTT M. DOUMAS,**
**MARK BENOWITZ,**
**RICHARD R. GOLDBERG,**
**RICHARD LINICK,**
**PAUL E. RAIA,**
**HOWARD S. STRAUSS,**
**WALLACE W. "WALLY" DiRENZO,**
**and**
**JAMES P. ELLIS,**
**a/k/a "Max Braddock,"**
**a/k/a "Patrick Cosgrove,"**
**a/k/a "Todd Parker,"**

in connection with the conduct of telemarketing, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

3

(a)  to knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and to deposit and cause to be deposited matter to be sent and delivered by the United States Postal Service and a private and commercial interstate carrier, and to take and receive matter, and knowingly cause to be delivered by the United States Postal Service and a private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1341;

(b)  to knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.      It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by obtaining money from customers by means of materially false and fraudulent statements and representations and the concealment of material facts concerning, among other things, the expected profits of the business opportunities and the services that would be provided by Vendstar and the locating companies recommended by Vendstar.

4

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      Vendstar sold business opportunities to own and operate bulk candy vending machines, which for 25 cents dispensed a handful of loose candy.   Vendstar typically offered 20 to 30 vending machines for $9,995.  As part of the business opportunity package, Vendstar promised to provide the following:   vending machines, an initial supply of candy, assistance in finding locations for the vending machines, training, and ongoing customer assistance in how to operate a successful vending business.

5.      Vendstar placed advertisements on the Internet and in newspapers throughout the United States, including in the Southern District of Florida.   The advertisements suggested that a "local vending route" was available and that customers could earn $800 per day.

6.      Prospective customers who responded to the advertisements spoke by telephone with a Vendstar sales representative, including **SCOTT M. DOUMAS, MARK BENOWITZ, RICHARD R. GOLDBERG, RICHARD LINICK, PAUL E. RAIA,** and **HOWARD S. STRAUSS**.  During these telemarketing calls, the Vendstar sales representative described the business opportunity as a low-risk investment in which Vendstar would provide everything needed for the customer to be successful.   The Vendstar sales representative said all the customer would have to do is visit the vending machines occasionally to collect the money and put in new candy.

7.      Vendstar sent prospective customers by overnight delivery service a promotional packet that included glossy brochures, a CD, and a disclosure statement required by state and federal laws.   With the knowledge and approval of Vendstar's management, including

5

**EDWARD MORRIS "NED" WEAVER** and **LAWRENCE A. KAPLAN,** Vendstar's sales representatives routinely removed from the disclosure statements the front page, which contained warnings about the investment and encouraged the prospective customer to speak to an attorney and get other professional advice before purchasing the business opportunity.

8.     Vendstar's sales representatives, including **SCOTT M. DOUMAS, MARK BENOWITZ, RICHARD R. GOLDBERG, RICHARD LINICK, PAUL E. RAIA,** and **HOWARD S. STRAUSS,** provided the prospective customer with the telephone number of a locating company, encouraged the prospective customer to contact a locating company, assured the prospective customer that the locating company would find good locations for the vending machines, and touted supposed guarantees in which, if the customer's machines did not generate a certain amount of income, the locating company would relocate the machines, buy back the machines, or refund the difference between the guaranteed income and the actual income.

9.     Vendstar's sales representatives collectively recommended a variety of locating companies at different times, but recommended only one locating company to any individual prospective customer.  The locating companies recommended by Vendstar included the locating companies operated by **WALLACE W. "WALLY" DiRENZO, JAMES P. ELLIS,** and other co-conspirators, known and unknown to the Grand Jury.  The Vendstar sales representative notified the operator of the recommended locating company of the prospective customer and sometimes coached the operator of the locating company on what to say to the prospective customer.  Throughout the process, the Vendstar sales representative and locating company operator frequently exchanged information and coordinated their sales messages to the prospective customer.  Even though Vendstar's sales contract stated that Vendstar had no affiliation or

financial relationship with locating companies and that Vendstar had no involvement in securing locations, Vendstar's management, including **EDWARD MORRIS "NED" WEAVER** and **LAWRENCE A. KAPLAN**, knew that Vendstar's sales representatives worked closely with the locating companies to close sales and encouraged this practice.

10.     The operators of certain locating companies paid kickbacks to certain Vendstar managers and sales representatives to reward the Vendstar employees for recommending their locating company and to give the Vendstar employees an incentive to continue to recommend their locating company.  **WALLACE W. "WALLY" DiRENZO** was one of the locating company operators who paid kickbacks.  **LAWRENCE A. KAPLAN** and **SCOTT M. DOUMAS** were among the Vendstar managers and sales representatives who received kickbacks.

11.     The operators of the locating companies recommended by Vendstar, including **WALLACE W. "WALLY" DiRENZO** and **JAMES P. ELLIS**, stated that they would screen potential locations to ensure adequate foot traffic, that high-traffic locations could be found in the prospective customer's area, and that they would send professional "locators" with expertise in finding good locations to the customer's area to place the machines promptly.  The operators of the locating companies sometimes even claimed that high-traffic locations already had been found and were waiting in the prospective customer's area.  The operators of the locating companies also offered guarantees that appeared to minimize the risk of the investment, including at times guarantees in which the locating company would relocate the customer's machines, buy back the customer's machines, or refund the customer's investment if the business did not achieve a certain level of income.  The operators of the locating companies did not mention that their contracts

were written to make it virtually impossible for the customer to comply with the terms required to take advantage of these supposed guarantees.

12.     Vendstar sales representatives, including **RICHARD R. GOLDBERG** and **HOWARD S. STRAUSS,** at times told prospective buyers that they were not paid by commission.   In reality, Vendstar sales representatives were paid on commission.   Such payments were processed by a payroll company headquartered in Miami, Florida.

13.     Vendstar encouraged prospective customers to use credit cards and bank wires to purchase the business opportunity.   Vendstar deducted from its purchase price the amount customers paid directly to the locating company.

14.     The locating companies did not screen potential locations.   The locating companies did not have locations awaiting vending machines.   The locators sent by the locating companies to place machines were not professionals with special skills, tools, and expertise in finding good locations.   The locators placed the machines wherever they could as quickly as they could, often in businesses that had not consented to housing the machines and that soon demanded that the machines be removed.   The location companies did not honor their supposed guarantees. The vending machines generated little business.   Vendstar's customers lost nearly all if not all of their investments.

15.     Vendstar tried to get customers who had purchased the business opportunity to buy additional vending machines.   The Vendstar sales representative who was in charge of reorders was a co-conspirator known to the Grand Jury who hereinafter shall be referred to as "A.S."   A.S. attempted to persuade customers to order additional vending machines after the customer's first set of vending machines had been delivered, but before the customer had any face-to-face contact with

the locators and the fraudulent nature of the business began to become apparent.  A.S. told customers that the additional machines were available at a discount because another Vendstar customer in the area had recently backed out of a purchase.  A.S. falsely told customers that the locating company already had found locations for the machines involved in the canceled order and that the customer could place the additional machines in those locations if the customer acted quickly.

16.      **WALLACE W. "WALLY" DiRENZO, JAMES P. ELLIS**, and the operator of another locating company – a co-conspirator known to the Grand Jury who hereinafter shall be referred to as "J.P." – worked with A.S. on reorders and reiterated to customers the false information about a canceled deal and the availability of locations that were awaiting machines.  The operators of the locating companies sometimes spoke to customers one-on-one and sometimes during three-way conference calls that also involved A.S.

17.      During attempted reorders, A.S. and **JAMES P. ELLIS** sometimes used a variation of the canceled order story described above.   In these instances, A.S. and **ELLIS** falsely claimed that another Vendstar customer with a large vending route was moving out of the area and taking his vending machines with him.  A.S. and **ELLIS** falsely claimed that the customer targeted for the reorder could move the additional machines into the locations being vacated by the departing customer if the prospective reorder customer moved quickly to purchase additional machines.

18.      Vendstar management, including **EDWARD MORRIS "NED" WEAVER** and **LAWRENCE A. KAPLAN**, and Vendstar's sales representatives, including **SCOTT M. DOUMAS, MARK BENOWITZ, RICHARD R. GOLDBERG, RICHARD LINICK, PAUL**

9

E. RAIA, and HOWARD S. STRAUSS, knew about and approved the fraudulent reorder tactics that were used by A.S. and the operators of the locating companies.

19.    Many Vendstar customers complained to Vendstar about the quality of the machines, the quality of the candy Vendstar provided, the locations in which the machines were placed, the locating companies that Vendstar had recommended, the locators sent by the locating companies, and the lack of income generated by the vending machines.   Complaining customers spoke to LAWRENCE A. KAPLAN and sometimes also spoke to their sales representative and to EDWARD MORRIS "NED" WEAVER.   WEAVER and KAPLAN tried to lull the customers into continuing to believe the business was legitimate and tried to discourage the customers from further pursuing their complaints.   WEAVER and KAPLAN tried to make the complaining customers feel isolated by blaming the customers for the failure of their businesses, falsely claiming that Vendstar had not received such kinds of complaints before, and falsely stating that Vendstar's other customers were successful and satisfied.   WEAVER and KAPLAN also claimed Vendstar was not responsible for the locating companies' lack of performance and that Vendstar had fulfilled what the sales contract required.

20.    To fraudulently induce others to purchase the business opportunities, the defendants and their co-conspirators made, and caused others to make, numerous materially false statements, and omitted and concealed, and caused others to omit and conceal, numerous material facts, including, among others, the following:

<u>Materially False Statements</u>

a.    That customers who purchased the business opportunity would earn substantial profits;

      b.     That customers' vending machines would sell their entire stock of candy three to four times per year;

      c.     That customers would earn back their investment in one year or less;

      d.     That the Vendstar sales representative personally owned and operated a highly profitable vending machine route;

      e.     That the locating company Vendstar recommended would secure – and, in some cases, already had secured – high-traffic locations for the prospective customer's vending machines;

      f.     That the recommended locating company's locators were familiar with the customer's area and had expertise in finding good locations;

      g.     That the recommended locating company's locators would allow the customer to approve or reject each potential location;

      h.     That if the customer purchased additional machines, the customer could place those machines in locations that already had been secured for another Vendstar customer in the area who had canceled his order;

      i.     That Vendstar was not associated with the recommended locating company, even though Vendstar's sales representatives worked closely with the recommended locating companies to close deals and the operators of some locating companies paid kickbacks to certain Vendstar managers and sales representatives who recommended their locating company;

      j.     That the Vendstar sales representative was not paid by sales commission; and

k.      That Vendstar would assist the customer in operating the business for the lifetime of the business.

## Omission/Concealment of Material Facts

l.      That the candy Vendstar shipped to customers was often stale and rotten;

m.      That Vendstar received numerous complaints from previous customers who said the recommended locating company's locators dumped the machines anywhere, including in businesses that had not given permission for the machines to be placed, businesses that already had other Vendstar vending machines, and businesses that had few customers;

n.      That Vendstar received numerous complaints from previous customers about the lack of profitability of the business;

o.      That certain locating companies recommended by Vendstar regularly changed their names to create the appearance of having a clean record and to avoid association with past complaints;

p.      That the operators of certain locating companies recommended by Vendstar regularly used aliases to avoid association with previous complaints;

q.      That Vendstar continued to recommend that customers use locating companies operated by **JAMES P. ELLIS** after FBI agents interviewed Vendstar employees in 2009 as part of an investigation into **ELLIS'** locating practices;

r.      That locating companies that claimed to have already secured locations in a prospective customer's area had not already secured locations;

s.      That locating companies that claimed to offer various warranties rarely if ever honored the purported warranties; and

12

t.      That the disclosure statement Vendstar was required by law to send to prospective customers was supposed to include a front page that contained warnings about purchasing the business opportunity.

21.      As a result of the materially false statements and the omission and concealment of material facts, the defendants and their co-conspirators fraudulently induced the following individuals, among others, to purchase the business opportunity:   G.N. in New York, J.C. in the Southern District of Florida, G.S. in North Carolina, L.C. in Texas, M.N. in the Southern District of Florida, R.M. in Texas, H.S. in Michigan, K.E. in Massachusetts, D.B. in South Carolina, J.R. in Indiana, S.T. in the Southern District of Florida, C.M. in Florida, D.S. in Michigan, J.K. in California, T.R. in the Southern District of Florida, A.P. in Florida, P.G. in the Southern District of Florida, F.S. in the Southern District of Florida, A.K.S. in California, M.I. in Pennsylvania, J.J. in Tennessee, M.Y. in California, S.W. in Pennsylvania, G.M. in Louisiana, J.E. in Florida, D.D. in Missouri, B.B. in Missouri, M.C. in the Southern District of Florida, A.C. in New York, M.P. in California, D.A. in the Southern District of Florida, J.S. in Indiana, R.P. in New Jersey, K.G. in Mississippi, S.L. in Texas, and C.L.M. in Louisiana.

## OVERT ACTS

In furtherance of the conspiracy, and to effect its objects, at least one co-conspirator committed, and caused to be committed, within the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1.      On or about May 26, 2005, **SCOTT M. DOUMAS** spoke by telephone to prospective customer G.N. in New York, said he operated a profitable vending route of 100 machines, stated that G.N. would recover his investment within one year, and recommended that

G.N. have his machines placed by Vending Dreams, the locating company operated by **JAMES P. ELLIS.**

2.    On or about April 14, 2006, **EDWARD MORRIS "NED" WEAVER** sent a letter to customer G.N. in New York, who had complained to Vendstar about the unsatisfactory services provided by Vending Dreams, the locating company operated by **JAMES P. ELLIS** that had been recommended to G.N. by **SCOTT M. DOUMAS.**   In the letter to G.N., **WEAVER** said Vending Dreams' behavior was "despicable," but stated that Vendstar had "nothing to do with locating companies."

3.    On or about July 14, 2006, **SCOTT M. DOUMAS** spoke by telephone to prospective customer J.C. in the Southern District of Florida and said each vending machine would earn $100 per month.

4.    On or about December 6, 2006, **EDWARD MORRIS "NED" WEAVER** sent a letter to customer G.S. in North Carolina.   G.S. had requested a refund from **WEAVER** on the grounds that G.S.'s sales representative had exaggerated the amount of sales G.S.'s machines would make, A.S. had tried to sell additional machines by saying that a Vendstar customer in a nearby town had delayed his purchase, and the locating company recommended by G.S.'s sales representative was unable to find satisfactory locations for the machines in G.S.'s area.   In the letter to G.S., **WEAVER** refused to give G.S. a refund and said that Vendstar had "nothing to do with securing locations."

5.    On or about December 18, 2006, **EDWARD MORRIS "NED" WEAVER** sent a letter to customer G.S. in North Carolina in which **WEAVER** refused to give G.S. a refund, said Vendstar did not "work with the locating companies," and denied a "pattern of deception."

14

6.     On or about January 30, 2007, **SCOTT M. DOUMAS** spoke by telephone to prospective customer L.C. in Texas and recommended that L.C. speak to and hire J.P.'s locating company to place his machines.

7.     On or about February 13, 2007, **EDWARD MORRIS "NED" WEAVER** sent a letter to customer G.S. in North Carolina in which Weaver refused to give G.S. a refund and said Vendstar had "no affiliation with locating."

8.     On or about June 18, 2007, **MARK BENOWITZ** spoke by telephone to prospective customer M.N. in the Southern District of Florida, said he and his wife operated a profitable vending route, and claimed that Vendstar's customers were making lots of money.

9.     On or about June 29, 2007, **SCOTT M. DOUMAS** spoke by telephone to prospective customer R.M. in Texas, said he operated a profitable vending route of at least 100 machines, and recommended that R.M. speak to and hire J.P.'s locating company to place his machines.

10.    On or about September 5, 2007, **LAWRENCE A. KAPLAN** spoke by telephone to customer H.S. in Michigan, who had filed a complaint with the Michigan attorney general regarding his purchase of the business opportunity from Vendstar for approximately $9,854. When H.S. told **KAPLAN** that his Vendstar sales representative and J.P. had guaranteed profits that his business had not achieved, **KAPLAN** said Vendstar did not have any complaints, claimed he had never heard such kinds of complaints about the Vendstar sales representative involved in the sale to H.S., accused H.S. of committing perjury in his complaint to the Michigan attorney general, and warned H.S. to be worried because the Michigan attorney general would not take lightly the purportedly untruthful information in H.S.'s complaint.

11.     On or about September 6, 2007, **EDWARD MORRIS "NED" WEAVER** sent a letter to customer H.S. in Michigan, in which **WEAVER** accused H.S. of harassment, said H.S.'s complaint was fraudulent, and offered to pay H.S. a $1,000 refund and give him 300 pounds of candy if H.S. withdrew his complaint to the Michigan attorney general.

12.     On or about November 8, 2007, **SCOTT M. DOUMAS** spoke by telephone to prospective customer K.E. in Massachusetts, said he operated a profitable vending route of at least 100 machines, and recommended that K.E. speak to and hire J.P.'s locating company to place her machines.

13.     In approximately December 2007, **EDWARD MORRIS "NED" WEAVER** spoke by telephone to customer D.B. in South Carolina. D.B. told **WEAVER** that his Vendstar sales representative had recommended J.P. as a locator and that J.P.'s locating company was a "scam." **WEAVER** denied that Vendstar was affiliated with J.P.'s locating company and claimed that motivated Vendstar customers succeeded in the business.

14.     In approximately December 2007, **EDWARD MORRIS "NED" WEAVER** spoke by telephone to customer L.C. in Texas. L.C. told **WEAVER** that his sales representative, **SCOTT M. DOUMAS**, recommended J.P.'s locating company, that J.P. told L.C. that good locations were available in L.C.'s area, that J.P. guaranteed that L.C.'s vending machines would generate $2.50 in sales per day per machine, that the locators sent by J.P. were "shady characters at best," that the locations these locators found were unsatisfactory, and that J.P. threatened to sue L.C. after L.C. complained to the Better Business Bureau. **WEAVER** said things worked out for the majority of Vendstar customers and that he would not "own up to" any of the mistakes made by J.P.

16

15.    In approximately December 2007, **EDWARD MORRIS "NED" WEAVER** spoke by telephone to customer R.M. in Texas.    R.M. told **WEAVER** that his sales representative, **SCOTT M. DOUMAS**, had claimed to operate a profitable vending route, that **DOUMAS** had recommended J.P.'s locating company, that Vendstar sales representative A.S. said locations were available in R.M.'s area because another Vendstar customer had backed out of a deal, that the locations found by J.P.'s locating company were unsatisfactory, and that J.P. left R.M. a profane telephone message after R.M. complained to the Better Business Bureau. **WEAVER** said that less than 1% of Vendstar's customers complained and that he had not previously heard of the type of problems R.M. described.

16.    In approximately December 2007, **EDWARD MORRIS "NED" WEAVER** spoke by telephone to customer J.R. in Indiana.    J.R. told **WEAVER** that his Vendstar sales representative had claimed he operated 150 vending machines, that each vending machine collected more than $3 per day on average, and that J.P. said there already were 300 locations awaiting machines in J.R.'s county.    J.R. told **WEAVER** that A.S. persuaded J.R. to buy additional machines by saying that another Vendstar customer had backed out of a deal and that J.R. could place his machines in locations that already had been found for the customer who had backed out of the deal.    J.R. told **WEAVER** that the locators sent by J.P. knew nothing about locations that supposedly were awaiting vending machines and instead placed the machines in random, unsatisfactory locations.    **WEAVER** said he could count on one hand the number of times he had spoken to J.P.

17.    In approximately December 2007, **EDWARD MORRIS "NED" WEAVER** spoke by telephone to the operator of a locating company, a co-conspirator known to the Grand

17

Jury who hereinafter shall be referred to as J.B.  J.B. told **WEAVER** that Vendstar had power over the locating companies and that the locating companies would say whatever Vendstar wanted.  J.B. said he previously had warned **WEAVER** that the tactics **JAMES P. ELLIS** used when he was operating Vending Dreams would get Vendstar in trouble.  J.B. told **WEAVER** that **ELLIS** was using the name "Patrick Cosgrove" and was operating a company called Clear Vision. J.B. also told **WEAVER** that J.P. was breaking the law by telling potential Vendstar customers that she had pre-approved locations in their area and guaranteeing that the customers would earn a certain amount of money from their vending machines.  **WEAVER** said that what J.B. had said was news to him and said that Vendstar tried to distance itself from the locating companies.

18.     On or about April 17, 2008, **RICHARD LINICK** spoke by telephone to prospective customer S.T. in the Southern District of Florida, said he and his daughter operated a profitable vending route, and recommended that S.T. speak to and hire J.P. to place her machines.

19.     On or about July 2, 2008, **MARK BENOWITZ** spoke by telephone to prospective customer C.M. in Florida, predicted that C.M. would recover her investment within one year, and said finding good locations was easy.

20.     In approximately August 2008, **LAWRENCE A. KAPLAN** spoke by telephone to customer D.S. in Michigan.  When D.S. complained about the quality of the vending machines, the locating company, and the lack of business his vending machine were doing, **KAPLAN** said D.S.'s lack of earnings was "not our problem" and claimed that Vendstar had "hundreds of thousands of successful vendors."

18

21.     In approximately September 2008, **LAWRENCE A. KAPLAN** spoke by telephone to customer J.K. in California, who had left a voice mail complaint for **EDWARD MORRIS "NED" WEAVER.   KAPLAN** told J.K. not to bother **WEAVER** with complaints.

22.     On or about November 18, 2008, **JAMES P. ELLIS** sent under the name "Patrick Cosgrove" an email message to A.S. about the status of potential reorders.

23.     On or about January 21, 2009, **WALLACE W. "WALLY" DiRENZO**, within the Southern District of Florida, spoke by telephone to prospective customer T.R., also within the Southern District of Florida.   **DiRENZO** said T.R.'s area was a good place for a vending business, there were not many other vending machines in the area, T.R. would make lots of money, and T.R. would quickly recover his investment.

24.     On or about February 6, 2009, **PAUL E. RAIA** spoke by telephone to prospective customer A.P. in Florida, said he operated a profitable vending route of 300 machines, said Vendstar's customers were making lots of money, said A.P. could expect to recover her investment within one year, and recommended that A.P. speak to and hire **WALLACE W. "WALLY" DiRENZO** to place her machines.

25.     On or about February 10, 2009, a co-conspirator sent Vendstar's sales packet via FedEx to prospective customer P.G. in the Southern District of Florida.

26.     On or about February 10, 2009, **WALLACE W. "WALLY" DiRENZO**, within the Southern District of Florida, spoke by telephone to A.P., a Florida resident who had purchased the business opportunity from Vendstar a few days earlier.   **DiRENZO** said he had good locations for A.P. and that he would relocate without charge any machines that did poorly.

19

27.    In or around March 2009, **LAWRENCE A. KAPLAN** spoke by telephone to customer P.G. in the Southern District of Florida regarding complaints P.G. had about the business opportunity.

28.    On or about April 7, 2009, **RICHARD R. GOLDBERG** spoke by telephone to prospective customer F.S. in the Southern District of Florida, said each Vendstar machine would generate $3 per day, and said F.S. could expect to recover his investment within one year.

29.    On or about April 9, 2009, **HOWARD S. STRAUSS** spoke by telephone to prospective customer A.K.S. in California, said there already were locations in A.K.S.'s area awaiting machines, predicted A.K.S. would earn $2,000 per month, and recommended that A.K.S. speak to and hire J.B. to place his machines.

30.    On or about April 22, 2009, A.P. in Florida sent a report on her business via the U.S. Postal Service to **WALLACE W. "WALLY" DiRENZO** in the Southern District of Florida.

31.    On or about May 20, 2009, **EDWARD MORRIS "NED" WEAVER** told FBI agents who were investigating the locating practices of **JAMES P. ELLIS** that there was no relationship between Vendstar and any locating company.  **WEAVER** told the FBI agents that his last contact with **ELLIS** was in approximately late 2006.  **WEAVER** also told the FBI agents that he had heard rumors that **ELLIS** was using the name "Patrick Cosgrove" and said he had received a telephone call two months earlier from someone who sounded like **ELLIS**.

32.    On or about May 20, 2009, **LAWRENCE A. KAPLAN** told FBI agents who were investigating the locating practices of **JAMES P. ELLIS** that his last contact with **ELLIS** was approximately three years earlier and that he had no knowledge of any aliases used by **ELLIS**.

33.    On or about May 27, 2009, **RICHARD LINICK** spoke by telephone to prospective customer M.I. in Pennsylvania, said that each Vendstar machine would earn approximately $200 per year, and recommended that M.I. speak to and hire Secure Placement, the locating company operated by **JAMES P. ELLIS,** to place his machines.

34.    On or about May 29, 2009, **RICHARD R. GOLDBERG** spoke by telephone to prospective customer J.J. in Tennessee and said J.J. could expect to recover his investment within one year.

35.    On or about June 17, 2009, **LAWRENCE A. KAPLAN** sent an email message to Vendstar's management and sales representatives with a list of approved locating companies that included the companies operated by **JAMES P. ELLIS,** J.P., and **WALLACE W. "WALLY" DiRENZO.**

36.    On or about July 7, 2009, **RICHARD R. GOLDBERG** spoke by telephone to prospective customer M.Y. in California, said he operated a profitable vending route, stated M.Y. would recover his investment within one year, and recommended that M.Y. speak to and hire **JAMES P. ELLIS,** who used the alias "Todd Parker," to place M.Y.'s machines.

37.    On or about July 16, 2009, **JAMES P. ELLIS,** who used the alias "Todd Parker," spoke by telephone to S.W. in Pennsylvania, who had purchased the business opportunity from Vendstar a few days earlier.   **ELLIS** told S.W. that another Vendstar customer in S.W.'s area had just canceled his order because of a divorce, that **ELLIS** already had found 100 locations for that customer's machines, and that S.W. could have those locations if she purchased an additional 100 vending machines.

38.     On or about August 12, 2009, **PAUL E. RAIA** spoke by telephone to prospective customer G.M. in Louisiana, said he and his wife operated a profitable vending route of 300 machines, said G.M. could conservatively expect to earn $1,900 per month from the vending business, and recommended that G.M. speak to and hire **WALLACE W. "WALLY" DiRENZO** to place his machines.

39.     On August 19, 2009, customer G.M. in Lousiana sent a check via the U.S. Postal Service to **WALLACE W. "WALLY" DiRENZO** in the Southern District of Florida.

40.     On or about August 27, 2009, **HOWARD S. STRAUSS** spoke by telephone to prospective customer J.E. in Florida, said that the vending machines would average $60 to $80 in profits per month per machine, and recommended that J.E. speak to and hire **JAMES P. ELLIS**, who used the alias "Todd Parker," to place his machines.

41.     On or about September 16, 2009, **JAMES P. ELLIS**, who used the alias "Todd Parker," spoke by telephone to D.D. in Missouri, who had purchased the vending machine business opportunity from Vendstar a few days earlier.   **ELLIS** said another Vendstar customer in D.D.'s area was relocating his 200 machines to another state and D.D. could have those locations if he purchased additional vending machines.

42.     On or about September 18, 2009, **JAMES P. ELLIS**, who used the alias "Todd Parker," spoke by telephone to B.B. in Missouri, who had purchased the vending machine business opportunity from Vendstar a few days earlier.   **ELLIS** said another Vendstar customer in B.B.'s area was relocating his 200 machines to another state and B.B. could have those locations if she purchased additional vending machines.

43.      On or about November 5, 2009, **HOWARD S. STRAUSS** spoke by telephone to prospective customer M.C. in the Southern District of Florida and said Vendstar's customers were earning huge profits.

44.      On or about November 12, 2009, **PAUL E. RAIA** spoke by telephone to prospective customer A.C. in New York, said that Vendstar's customers were making lots of money, and said that A.C. would recover his investment once he sold the initial supply of candy Vendstar would provide as part of the business opportunity.

45.      On or about November 16, 2009, **LAWRENCE A. KAPLAN** spoke by telephone to E.P., the son of customer M.P. in California.  **KAPLAN** told E.P. that Vendstar would not cancel M.P.'s initial order even after E.P. explained that his mother was elderly, not strong enough to operate the vending machines, and had not understood what she was purchasing.

46.      On or about December 17, 2009, **RICHARD R. GOLDBERG** spoke by telephone to prospective customer D.A. in the Southern District of Florida, said the business opportunity was a fast way to make money, and said each machine would sell all its candy every month.

47.      On or about December 29, 2009, **RICHARD LINICK** spoke by telephone to prospective customer J.S. in Indiana, said the profits from his own vending route paid for his daughter's college tuition, and recommended that J.S. speak to and hire **JAMES P. ELLIS**, who used the alias "Todd Parker," to place her machines.

48.      On or about January 5, 2010, **JAMES P. ELLIS**, who used the alias "Todd Parker," and A.S. spoke by telephone to J.S. in Indiana.  **ELLIS** and A.S. said a father and son had recently canceled their order with Vendstar because the son was going into drug rehabilitation,

locations in J.S.'s area already had been found for the father and son, and J.S. could have those locations if she purchased additional vending machines.

49.     On or about February 1, 2010, **LAWRENCE A. KAPLAN** sent an email message to Vendstar's sales representatives with a list of approved locating companies that included the companies operated by **JAMES P. ELLIS**, J.P., and **WALLACE W. "WALLY" DiRENZO**.

50.     On or about February 12, 2010, **RICHARD R. GOLDBERG** sent an email message to **EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, MARK BENOWITZ, RICHARD LINICK, PAUL E. RAIA, HOWARD S. STRAUSS**, and other Vendstar personnel, advising them that J.P. had changed the name of her locating company.

51.     On or about February 12, 2010, **LAWRENCE A. KAPLAN** sent an email message to **MARK BENOWITZ, RICHARD LINICK, PAUL E. RAIA, HOWARD S. STRAUSS**, and other Vendstar personnel which attached a revised list of locating companies that included J.P.'s new company.

52.     On or about February 26, 2010, **RICHARD LINICK** spoke by telephone to prospective customer R.P. in New Jersey, said he operated a profitable vending route, claimed that none of Vendstar's customers ever had trouble recovering their investment, and recommended that R.P. speak to and hire **JAMES P. ELLIS**, who used the alias "Todd Parker," to place his machines.

53.     On or about March 22, 2010, **HOWARD S. STRAUSS** spoke by telephone to prospective customer K.G. in Mississipi, said he operated a profitable vending route, said K.G. could expect to earn $60 per week per machine, and recommended that K.G. speak to and hire J.P. to place his machines.

54.     On or about April 20, 2010, **PAUL E. RAIA** spoke by telephone to prospective customer S.L. in Texas, said he operated a profitable vending route of 300 machines, said Vendstar's customers were making lots of money, and said good locations were available in S.L.'s area.

55.     On or about June 9, 2010, **RICHARD LINICK** spoke by telephone to prospective customer C.L.M. in Louisiana, said he operated a profitable vending route, and recommended that C.L.M. speak to and hire **JAMES P. ELLIS**, who used the alias "Todd Parker," to place her machines.

All in violation of Title 18, United States Code, Sections 371 and 2326.

<u>**COUNTS 2-5**</u>
**(Mail Fraud: 18 U.S.C. § 1341)**

1.     Paragraphs 1 through 7 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From at least in or around May 2005, through on or about July 2, 2010, in Miami-Dade, Broward, and Palm Beach Counties, within the Southern District of Florida, and elsewhere, the defendants,

**EDWARD MORRIS "NED" WEAVER,**
**LAWRENCE A. KAPLAN,**
**MARK BENOWITZ,**
**PAUL E. RAIA,**
**and**
**WALLACE W. "WALLY" DiRENZO,**

in connection with the conduct of telemarketing, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were

25

false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did deposit and cause to be deposited matter to be sent and delivered by the United States Postal Service, and did deposit and cause to be deposited matter to be sent and delivered by a private and commercial interstate carrier, and did take and receive matter, and knowingly cause to be delivered by the United States Postal Service and a private and commercial interstate carrier, according to the direction thereon.

### PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was the purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by obtaining money from customers by means of materially false statements and representations and the concealment of material facts concerning, among other things, the expected profits of the business opportunities and the services that would be provided by Vendstar and the locating companies recommended by Vendstar.

### THE SCHEME AND ARTIFICE

4.      Paragraphs 4 through 21 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### USE OF THE MAILS

5.      On or about the dates specified as to each count below, the below-identified defendants, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, did deposit and cause to be deposited matter to be sent and delivered by the United States Postal

Service and a private and commercial interstate carrier, and did take and receive matter, and knowingly cause to be delivered by the United States Postal Service and a private and commercial interstate carrier, according to the directions thereon.

| COUNT | DEFENDANTS | APPROXIMATE DATE | DESCRIPTION OF ITEM |
|---|---|---|---|
| 2 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, MARK BENOWITZ, and WALLACE W. "WALLY" DiRENZO | July 3, 2008 | Money Order sent via U.S. Postal Service from C.M. in Jacksonville, Florida, to Nationwide Locating Company in North Palm Beach, Florida. |
| 3 | EDWARD MORRIS "NED" WEAVER and LAWRENCE A. KAPLAN | February 10, 2009 | Sales packet sent via FedEx from Vendstar in Deer Park, New York, to P.G. in Avon Park, Florida. |
| 4 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, PAUL E. RAIA, and WALLACE W. "WALLY" DiRENZO | April 22, 2009 | Report on business sent via U.S. Postal Service from A.P. in Ormond Beach, Florida, to Nationwide Locating Company in North Palm Beach, Florida. |
| 5 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, PAUL E. RAIA, and WALLACE W. "WALLY" DiRENZO | August 19, 2009 | Check sent via U.S. Postal Service from G.M. in Youngsville, Louisiana, to Nationwide Locating Company in North Palm Beach, Florida. |

In violation of Title 18, United States Code, Sections 1341, 2326, and 2.

## COUNTS 6-11
### (Wire Fraud: 18 U.S.C. § 1343)

1.      Paragraphs 1 through 7 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From at least in or around May 2005, through on or about July 2, 2010, in Miami-Dade, Broward, and Palm Beach Counties, within the Southern District of Florida, and elsewhere, the defendants,

**EDWARD MORRIS "NED" WEAVER,**
**LAWRENCE A. KAPLAN,**
**RICHARD R. GOLDBERG,**
**RICHARD LINICK,**
**and**
**HOWARD S. STRAUSS,**

in connection with the conduct of telemarketing, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

### PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was the purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by obtaining money from customers by means of materially false statements and representations and the concealment of material facts concerning, among other things, the expected profits of the business opportunities and the services that would be provided by Vendstar and the locating companies recommended by Vendstar.

## THE SCHEME AND ARTIFICE

4.     Paragraphs 4 through 21 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## USE OF THE WIRES

5.     On or about the dates specified as to each count below, the below-identified defendants, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more particularly described below:

| COUNT | DEFENDANTS | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| 6 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, and RICHARD LINICK | April 17, 2008 | Telephone call between RICHARD LINICK in Deer Park, New York, and S.T. in Davie, Florida. |
| 7 | EDWARD MORRIS "NED" WEAVER and LAWRENCE A. KAPLAN | January 26, 2009 | Telephone call between a Vendstar sales representative in Deer Park, New York, and T.R. in North Lauderdale, Florida. |
| 8 | EDWARD MORRIS "NED" WEAVER and LAWRENCE A. KAPLAN | March 2009 | Telephone call between LAWRENCE A. KAPLAN in Deer Park, New York, and P.G. in Avon Park, Florida. |

29

| COUNT | DEFENDANTS | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------------|------------------|-----------------------------------|
| 9 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, and RICHARD R. GOLDBERG | April 7, 2009 | Telephone call between **RICHARD R. GOLDBERG** in Deer Park, New York, and F.S. in Miami, Florida. |
| 10 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, and HOWARD S. STRAUSS | November 5, 2009 | Telephone call between **HOWARD S. STRAUSS** in Deer Park, New York, and M.C. in West Palm Beach, Florida. |
| 11 | EDWARD MORRIS "NED" WEAVER, LAWRENCE A. KAPLAN, and RICHARD R. GOLDBERG | December 17, 2009 | Telephone call between **RICHARD R. GOLDBERG** in Deer Park, New York, and D.A. in Miami, Florida. |

In violation of Title 18, United States Code, Sections 1343, 2326, and 2.

A TRUE BILL

_____
FOREPERSON

_____
WIFREDO FERRER
UNITED STATES ATTORNEY

_____
PATRICK JASPERSE
TRIAL ATTORNEY

_____
ADRIENNE FOWLER
TRIAL ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. _____ |
| vs. | |
| EDWARD MORRIS "NED" WEAVER, et al., | **CERTIFICATE OF TRIAL ATTORNEY*** |
| **Defendants.** | |
| _____/ | **Superseding Case Information:** |

**Court Division:** (Select One)

| | | |
|---|---|---|
| __X__ Miami | _____ Key West | |
| _____ FTL | _____ WPB | _____ FTP |

New Defendant(s)          Yes _____ No _____
Number of New Defendants     _____
Total number of counts        _____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:     (Yes or No)      __No__
   List language and/or dialect     _____

4. This case will take     __25__     days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

| | | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | | Petty | _____ |
| II | 6 to 10 days | _____ | | Minor | _____ |
| III | 11 to 20 days | _____ | | Misdem. | _____ |
| IV | 21 to 60 days | __X__ | | Felony | __X__ |
| V | 61 days and over | _____ | | | |

6. Has this case been previously filed in this District Court? (Yes or No)     __No__
   If yes:
   Judge: _____     Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?     (Yes or No)     __No__
   If yes:
   Magistrate Case No.     _____
   Related Miscellaneous numbers:     _____
   Defendant(s) in federal custody as of     _____
   Defendant(s) in state custody as of     _____
   Rule 20 from the     _____     District of     _____

   Is this a potential death penalty case? (Yes or No)     __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to  October 14, 2003?     _____ Yes   __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?     _____ Yes   __X__ No

_____
PATRICK JASPERSE
DOJ TRIAL ATTORNEY
Court No. A5500746

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**   <u>Edward Morris "Ned" Weaver</u>   **Case No:** _____

Count #:   1

_____   Conspiracy _____

_____   18 U.S.C. §§ 371 and 2326 _____

**\*Max Penalty:**   10 years' imprisonment _____


Counts #:   2 - 5

_____   Mail Fraud _____

_____   18 U.S.C. §§ 1341 and 2326 _____

**\*Max Penalty:**   25 years' imprisonment as to each count _____

Counts #:   6 - 11

_____   Wire Fraud _____

_____   18 U.S.C. §§ 1343 and 2326 _____

**\*Max Penalty:**   25 years' imprisonment as to each count _____

Count #:

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**   Lawrence A. Kaplan          **Case No:** _____

Count #:          1

_____          Conspiracy_____

_____          18 U.S.C. §§ 371 and 2326_____

**\*Max Penalty:**          10 years' imprisonment_____


Counts #:          2 - 5

_____          Mail Fraud_____

_____          18 U.S.C. §§ 1341 and 2326_____

**\*Max Penalty:**          25 years' imprisonment as to each count_____

Counts #:          6 - 11

_____          Wire Fraud_____

_____          18 U.S.C. §§ 1343 and 2326_____

**\*Max Penalty:**          25 years' imprisonment as to each count_____

Count #:

_____

_____

**\*Max Penalty:**_____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:** <u>Scott M. Doumas</u>          **Case No:** _____

Count #:          1

_____  <u>Conspiracy</u>_____

_____  <u>18 U.S.C. §§ 371 and 2326</u>_____

**\*Max Penalty:**     <u>10 years' imprisonment</u>_____

Counts #:

_____

_____

**\*Max Penalty:**_____

Counts #:

_____

_____

**\*Max Penalty:**_____

Count #:

_____

_____

**\*Max Penalty:**_____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Mark Benowitz                    **Case No:** _____

Count #:                1

                        Conspiracy

                        18 U.S.C. §§ 371 and 2326

**\*Max Penalty:**      10 years' imprisonment


Count #:                2

                        Mail Fraud

                        18 U.S.C. §§ 1341 and 2326

**\*Max Penalty:**      25 years' imprisonment

Count #:




**\*Max Penalty:**

Count #:




**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Richard R. Goldberg            **Case No:** _____

Count #:          1

_____   Conspiracy _____

_____   18 U.S.C. §§ 371 and 2326 _____

**\*Max Penalty:**   10 years' imprisonment _____


Counts #:          9, 11

_____   Wire Fraud _____

_____   18 U.S.C. §§ 1343 and 2326 _____

**\*Max Penalty:**   25 years' imprisonment as to each count _____

Count #:

_____

_____

**\*Max Penalty:**

Count #:

_____

_____

**\*Max Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   Richard Linick _____   **Case No:** _____

**Count #:**   1

_____   Conspiracy _____

_____   18 U.S.C. §§ 371 and 2326 _____

**\*Max Penalty:**   10 years' imprisonment _____


**Count #:**   6

_____   Wire Fraud _____

_____   18 U.S.C. §§ 1343 and 2326 _____

**\*Max Penalty:**   25 years' imprisonment _____

**Count #:** _____

_____

_____

**\*Max Penalty:** _____

**Count #:** _____

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   Paul E. Raia                         **Case No:** _____

Count #:                 1

_____        Conspiracy _____

_____        18 U.S.C. §§ 371 and 2326 _____

**\*Max Penalty:**        10 years' imprisonment _____


Counts #:                4 - 5

_____        Mail Fraud _____

_____        18 U.S.C. §§ 1341 and 2326 _____

**\*Max Penalty:**        25 years' imprisonment as to each count _____

Count #:

_____

_____

**\*Max Penalty:** _____

Count #:

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   Howard S. Strauss            **Case No:** _____

Count #:            1

_____   Conspiracy _____

_____   18 U.S.C. §§ 371 and 2326 _____

**\*Max Penalty:**   10 years' imprisonment _____

Count #:            10

_____   Wire Fraud _____

_____   18 U.S.C. §§ 1343 and 2326 _____

**\*Max Penalty:**   25 years' imprisonment as to each count _____

Count #:

_____

_____

**\*Max Penalty:** _____

Count #:

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Wallace W. "Wally" DiRenzo   **Case No:** _____

Count #:   1

_____   Conspiracy   _____

_____   18 U.S.C. §§ 371 and 2326   _____

**\*Max Penalty:**   10 years' imprisonment   _____


Counts #:   2, 4, 5

_____   Mail Fraud   _____

_____   18 U.S.C. §§ 1341 and 2326   _____

**\*Max Penalty:**   25 years' imprisonment as to each count

Count #:

_____

_____

**\*Max Penalty:** _____

Count #:

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   James P. Ellis, a/k/a "Max Braddock," a/k/a "Patrick Cosgrove," a/k/a "Todd Parker

**Case No:** _____

**Count #:**         1

Conspiracy

18 U.S.C. §§ 371 and 2326

**\*Max Penalty:**    10 years' imprisonment

**Count #:**

**\*Max Penalty:**

**Counts #:**

**\*Max Penalty:**

**Count #:**

**\*Max Penalty:**

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

# EXHIBIT C

EXHIBIT C

JENNER&BLOCK

October 25, 2012

Jenner & Block LLP          Chicago
1099 New York Avenue, NW   Los Angeles
Suite 900                  New York
Washington, DC 20001       Washington, DC
Tel 202-639-6000
www.jenner.com

**VIA FIRST-CLASS MAIL**

Matthew L. Jacobs
Tel 202 639-6096
Fax 202 661-4928
mjacobs@jenner.com

AXIS Financial Insurance Solutions Claims
Connell Corporate Park
300 Connell Drive
P.O. Box 357
Berkeley Heights, NJ 07922-0357

Re:   **Insured:**      **Multivend, LLC**
      **Insurer:**      **AXIS Insurance Company**
      **Matter:**       ***United States of America v. Weaver, et al.***
      **Policy No.:**   **Privatus Policy ENN 588818**

To Whom It May Concern:

We have been retained by Alpine Investors ("Alpine") to present formal notice of a claim as permitted under Section VII of Privatus Policy No. ENN 588818 issued by AXIS Insurance Company ("AXIS") to Multivend, LLC d/b/a Vendstar ("Multivend"), one of Alpine's former portfolio companies, for the policy period February 20, 2010 through February 20, 2014 ("AXIS Policy" or "Policy").

Multivend was a vending machine sales company, located in Deer Park, New York, and a former portfolio company of Alpine. Multivend ceased to be an operating company on or about the fall of 2010. Since at least 2011, the U.S. Department of Justice has been engaged in a confidential criminal investigation of Multivend and many of its directors, officers, and other employees based on allegations of wrongful practices by such individuals.

On October 10, 2012, an indictment was unsealed in the U.S. District Court for the Southern District of Florida, naming former Multivend directors and officers, Edward Morris "Ned" Weaver and Lawrence A. Kaplan, and other Multivend employees,[1] collectively the "Insured Individuals," on grand jury charges of conspiracy, mail fraud, and wire fraud in connection with allegations of improper telemarketing intended to increase the profits of Multivend. During the relevant time, Mr. Weaver served as the President and Chief Executive Officer of Multivend and Mr. Kaplan served as the General Manager of Technical Support, as well as the Director of Customer Relations at Multivend. LPS refers you to the enclosed indictment for a complete

---

[1] The other Multivend employees named in the indictment include: Scott M. Doumas; Mark Benowitz; Richard R. Goldberg; Richard Linick; Paul E. Raia; and Howard S. Strauss. These individuals were all sales representatives for Multivend during the relevant time.

October 25, 2012
Page 2

description of the allegations against Messrs. Weaver and Kaplan and the other employees named in the indictment.

The AXIS Policy provides a $5,000,000 limit of liability on behalf of Insured Individuals for:

> Loss . . . arising from any D&O Claim for a Wrongful Act, other than a Wrongful Act while serving in an Outside Position, first made against such Insured . . . during the Policy Period or Extended Reporting Period, if applicable, and reported in writing to the Insurer as soon as practicable after any of the Policyholder's Executive Officers first becomes aware of such Claim, but in no event later than sixty (60) days after the expiration of the Policy Period or Extended Reporting Period, if applicable.

(AXIS Policy at Sec. 1, Coverage A).[2]  We believe that the allegations in the indictment give rise to a D&O Claim for a Wrongful Act by Insured Individuals as those terms are defined in the AXIS Policy.  Messrs. Weaver, Kaplan, Doumas, Benowitz, Goldberg, Linick, Raia, and Strauss are all "Insured Individuals" under the AXIS Policy, defined as "one or more natural persons who are past, present or future:  (a) duly elected or appointed director(s), officer(s), trustee(s) or Manager(s) of the Policyholder . . . (c) Employees, other than independent contractors, who are named in any D&O Claim."  (AXIS Policy at Sec. III(B)(4)(a), (c)).  The indictment naming these Insured Individuals clearly constitutes a "D&O Claim," which is defined to include "a criminal investigation or proceeding against any Insured Individual commenced by:  (i) the return of an indictment, information, or similar proceeding."  (*Id.* at Sec. III(B)(2)(c)).  Moreover, the indictment contains a number of alleged Wrongful Acts by these Insured Individuals, defined as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by: (i) any Insured Individual in their capacity as such."  (*Id.* at Sec. III(B)(5)(a)).

AXIS is therefore obligated under the Policy to provide coverage for Loss arising from this covered D&O Claim.  Loss includes Defense Costs, defined as "reasonable and necessary legal fees and expenses . . . incurred by or on behalf of the Insureds in defending, settling, appealing or investigating Claims."  (*Id.* at Sec. III(A)(2) and (7)).[3]

The defendants named in the indictment were arraigned on Tuesday, October 23, 2012 at 11:00am before the U.S. District Court for the Southern District of Florida and released on unsecured bonds.  At the arraignment, the government indicated that it would begin providing the defendants with discovery within the next two to three weeks.  While a trial date has not yet been set, it is typical for cases of this nature and in this jurisdiction to be scheduled for trial within seventy (70) days of the arraignment date.  Many of the Insured Individuals have already retained defense counsel and are expected to begin incurring covered Defense Costs

---

[2] In addition, no retention would apply here because this is a non-indemnifiable Loss within Insuring Agreement A. (*Id.* at Declarations, Item 4(B)).  Since Multivend is no longer an operating company, it cannot indemnify its former directors, officers, and employees in connection with this Loss.

[3] Of note, Endorsement No. 1 significantly narrows the potential applicability of various exclusions in the Policy.

October 25, 2012
Page 3

immediately. We request that AXIS confirm its consent to the retention by the Insured Individuals of their selected defense counsel and to the reimbursement of covered Defense Costs as soon as possible given the expedited nature of this case.

Mr. Kaplan has retained Vincent Martinelli, Esq. at a retainer of $35,000 and an approximate rate thereafter of $500/hour. Mr. Martinelli is located at 2040 Victory Boulevard, Staten Island, NY 10314 and can be reached at (718) 667-0500.

Mr. Weaver has retained Martin Auerbach, Esq. at an hourly rate of $900 per hour. Mr. Auerbach is located at 1185 Avenue of the Americas, 31st Floor, New York, NY 10036 and can be contacted at (212) 704-4347. We understand that Mr. Auerbach provided AXIS with notice of this claim on behalf of his client, Mr. Weaver, on October 18, 2012.

Mr. Doumas has retained Peter Tomao, Esq. at an hourly rate of $550/hour. Mr. Tomao is located at 226 Seventh Street, Suite 302, Garden City, NY 11530 and can be contacted at (516) 877-7015.

Mr. Benowitz has retained Nicholas Kaizer, Esq. of Levitt & Kaizer, at an hourly rate of $550 per hour. Mr. Kaizer's office also may utilize an associate or associates, whose hourly rates range from $300 to $500 per hour, and a paralegal, whose hour rate is $125 per hour. Mr. Kaizer is located at 40 Fulton Street, 23rd Floor, New York, NY 10038 and can be reached at (212) 480-4000.

We understand these retainers and rates to be standard for this type of criminal matter. At this time, we do not yet know whether the other employees named in the indictment have also retained defense counsel, but will similarly provide this information as soon as it is available. In the meantime, please confirm AXIS' consent to the retention by the Insured Individuals of their selected defense counsel and to the reimbursement of covered Defense Costs.

We have no more particulars at this point other than what is disclosed by the indictment, but will keep you informed of any other developments with regard to the indictment, or the particulars that might surround any other potential circumstances or Claims against your Insured(s).

\* \* \*

Alpine, on behalf of itself, Multivend, and the Insured Individuals, reserves all rights under the law and in equity pursuant to the AXIS Policy as to coverage for the indictment.

We are prepared to discuss this matter with you in more detail at your earliest convenience.

October 25, 2012
Page 4


Please direct your acknowledgment of the receipt of this notice of claim, as well as future correspondence regarding this matter, to me.  Please also provide a copy of any correspondence to Chris Santa Maria at the address listed below.


Very truly yours,

Matthew L. Jacobs


MLJ
Enclosure

cc:     Chris Santa Maria
        Alpine Investors, LP
        Three Embarcadero Center, Suite 2330
        San Francisco, CA 94111

        Jan A. Larson, Esq.
        Jenner & Block, LLP

# EXHIBIT D

EXHIBIT D



KAUFMAN BORGEEST & RYAN LLP

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000   FAX: 914.449.1100   WWW.KBRLAW.COM

December 11, 2012

WAYNE E. BORGEEST
DIRECT: 914.449.1002
WBORGEEST@KBRLAW.COM

MATTHEW I. SCHIFFHAUER
DIRECT: 914.449.1080
MSCHIFFHAUER@KBRLAW.COM

**BY E-MAIL AND CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

**CONFIDENTIAL COMMUNICATION**

Martin J. Auerbach, Esq.
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
auerbach@mjaesq.com

Peter J. Tomao, Esq.
226 Seventh Street, Suite 302
Garden City, NY 11530
ptomao@tomaolaw.com

Vincent J. Martinelli, Esq.
Law Offices of Vincent J. Martinelli
2040 Victory Boulevard
Staten Island, NY 10314
vjmlaw@si.rr.com

Nicholas G. Kaizer, Esq.
Levitt & Kaizer
40 Fulton Street, 23rd Floor
New York, NY 10038
nkaizer@gmail.com

Francis X. Casale, Jr., Esq.
Law Offices of Francis X. Casale, Jr.
115 Broad Hollow Road, Suite 350
Melville, NY 11747
fxcesq@hotmail.com

Leonard P. Fenn, Esq.
DeFabio & Fenn, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
fennlawoffice@bellsouth.net

Sky E. Smith, Esq.
3059 Grand Avenue, Suite 310
Miami, FL 33133
cielo@bellsouth.net

Silvia B. Pinera-Vazquez, Esq.
Silvia B. Pinera-Vazquez, P.A.
1900 S.W. 3rd Avenue
Miami, FL 33129
spinera@aol.com

| Re: | Insured | : | Multivend, LLC |
|---|---|---|---|
| | Matter | : | *United States of America v. Weaver, et al.* |
| | Policy No. | : | Privatus Policy ENN588818 (the "Policy") |
| | Policy Period | : | February 20, 2010 - February 20, 2014 |
| | AXIS File No. | : | BH 80960 |
| | Our File No. | : | 481.075 |

NEW YORK CITY       WESTCHESTER       LONG ISLAND       NEW JERSEY       LOS ANGELES

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 2

Dear Counselors:

We represent the interests of AXIS Surplus Insurance Company ("AXIS") in connection with the captioned matter, which was submitted for coverage under Privatus Policy No. ENN588818 (the "Policy"). As you know, this matter involves an indictment (the "Indictment") filed on October 2, 2012, which names each of your respective clients and certain other individuals as defendants in a criminal action in the United States District Court for the Southern District of Florida.[1] AXIS was notified of the Indictment on October 12, 2012, and its rights were reserved while it conducted a coverage investigation.

This letter supplements AXIS's prior coverage communications and coveys AXIS's coverage determination with respect to the Indictment. AXIS has reviewed and investigated the allegations of the Indictment in conjunction with the terms, conditions and exclusions of the captioned Policy.[2] Based upon its investigation of the information presently available, AXIS has concluded that there is no coverage for the Indictment because this matter fails to trigger the relevant Policy Insuring Agreement, and is otherwise excluded from coverage under the Policy.

This letter is directed to your attention as the authorized contact for your respective client for these purposes. If you are not the authorized contact for your respective client as it pertains to insurance coverage, we request that you direct a copy of this letter to the appropriate representative and advise us who that is. In the event that you prefer that we forward this letter to any Insured and/or representative of any Insured directly, please let us know right away.

THE INDICTMENT[3]

As you know, the Indictment arises out of a bulk candy vending machine "business opportunity" that Multivend, LLC, d/b/a Vendstar ("Multivend" or "Vendstar") allegedly sold to customers across the United States. The Indictment names ten individuals as defendants, including the following former directors, officers, managers and/or employees of Multivend: (1) Edward M. ("Ned") Weaver; (2) Lawrence A. Kaplan; (3) Scott M. Doumas; (4) Mark Benowitz; (5) Richard R. Goldberg; (6) Richard Linick; (7) Paul E. Raia; and (8) Howard S. Strauss. According to the government, defendants engaged in a scheme to defraud customers across the country in connection with the vending machine "business opportunity."

In particular, the Indictment alleges that, from around May 2005 through July 2, 2010, defendants fraudulently induced customers to purchase the vending machine business opportunity by making materially false statements and concealing material facts concerning, among other things, "the expected profits of the business opportunities." The government alleges that defendants made the allegedly fraudulent statements and omissions in: (1) advertisements on the Internet and in newspapers throughout the United States, which

---

[1] *United States of America v. Weaver, et al.*, S.D. Fla. Case No. 12-cr-20756 (filed Oct. 2, 2012).

[2] No other applicable policies issued by AXIS, or any affiliated company, were either identified or considered in this analysis. If you assert a right to coverage under any other policy issued by AXIS or affiliated companies, please submit notice pursuant to the notice instructions contained in such policy.

[3] Please note that AXIS lends no credence to the allegations in the Indictment, and references them in this letter only to assist in explaining AXIS's coverage determination.

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 3

"suggested that a 'local vending route' was available and that customers could earn $800 per day"; (2) telemarketing calls with Vendstar sales representatives; and (3) a promotional packet sent to prospective customers that included glossy brochures, a CD, and a disclosure statement required by state and federal laws.  As against various combinations of the defendants, the Indictment sets forth one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, four counts of mail fraud in violation of 18 U.S.C. § 1341, and six counts of wire fraud in violation of 18 U.S.C. § 1343.

Based upon a September 27, 2012 letter from Mr. Auerbach, we understand that, prior to filing the Indictment, the Department of Justice sent an August 31, 2012 letter to Ned Weaver "advising him that he was a target of a federal grand jury investigation in the Southern District of Florida with respect to possible criminal violations, including mail fraud, wire fraud and conspiracy in connection with his activities at Multivend."  In this regard, Mr. Auerbach's September 27, 2012 letter, which did not enclose a copy of the target letter, purported to provide AXIS with "notice of circumstances that could give rise to a Claim under the Policy."  We presume that the target letter and the Indictment arise out of the same or related facts and circumstances.  Please inform us immediately if our assumption is incorrect.

THE POLICY

AXIS issued Privatus Policy Number ENN588818 to Multivend, LLC effective for Claims first made during the Policy Period of February 20, 2010 to February 20, 2014 (as amended by Endorsement No. 8) and reported in accordance with the Policy's terms.  The Policy reflects Limits of Liability of $5,000,000 for each Claim and in the maximum aggregate for the entire Policy Period, subject to a $25,000 per Claim Retention with regard to Insuring Agreements A and D.  Amounts that are not deemed covered Loss or Defense Costs, as defined by the Policy, are not a subject of coverage under the Policy nor credited toward the Retention or against the Limit and are solely the responsibility of the Insureds.

Please note that the Directors, Officers and Corporate Liability ("D&O") Insuring Agreement at Section I.(A) of the Policy is the only Insuring Agreement that is potentially applicable to this matter.  Due to the nature of the underlying facts and the allegations at issue, the Outside Executive Liability Insuring Agreement at Section I.(B) of the Policy is not potentially implicated by this matter.  To the extent that you believe that any Insuring Agreement of the Policy other than the D&O Insuring Agreement is potentially applicable to this matter, please advise the undersigned.

COVERAGE DETERMINATION

As a preliminary matter, we note that two of the defendants identified in the Indictment are not related to Multivend and are not Insureds under the Policy, including Wallace W. ("Wally") DiRenzo and James P. Ellis.  The Policy does not cover Messrs. DiRenzo or Ellis for any purpose.

Turning to the Insured Individuals – Messrs. Weaver, Kaplan, Doumas, Benowitz, Goldberg, Linick, Raia and Strauss – AXIS has considered the Indictment in conjunction with the terms

KAUFMAN BORGEEST & RYAN LLP

and conditions of the Policy and the outcome of its coverage investigation.[4]  For the reasons discussed below, the Indictment does not trigger the D&O Insuring Agreement, and is otherwise wholly excluded from coverage by virtue of the exclusion at Section IV.A.2. of the Policy.

Pursuant to Section I.(A) of the Policy, the D&O Insuring Agreement will only respond to D&O Claims "first made" against an Insured during the Policy Period of February 20, 2010 to February 20, 2014, among other requirements.  Section III.B.2. of the Policy provides, in relevant part, that "D&O Claim" means:

a.      a written demand against an **Insured** for monetary or non-monetary relief;

b.      a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by: . . .

   (ii)      the filing of a notice of charge, investigative order or like document; or
   (iii)     written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or

c.      a criminal investigation or proceeding against any **Insured Individual** commenced by:

   (i)      the return of an indictment, information or similar pleading[.]

Section V.A. of the Policy provides in pertinent part:

All **Claims**, including all **D&O Claims** . . . arising from the same **Wrongful Act, Wrongful Third Party Act**, and all **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the earlier date that:  (1) any of the **Claims** is first made against an **Insured** under this Policy or any prior policy, or (2) valid notice was given by the **Insureds** under this Policy or any prior policy of any **Wrongful Act, Wrongful Third Party Act**, or any fact, circumstance, situation, event, transaction or cause which underlies such **Claim**.  Coverage under this Policy shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to [AXIS] in accordance with the terms herein.

The term "Wrongful Act" is defined at Section III.B.5.a. of the Policy to include, among other things, "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by" any Insured Individual in their capacity as such, or the Policyholder (Multivend) with respect to Section I. Insuring Agreement A.  Pursuant to Section III.A.6. of the Policy, "Interrelated Wrongful Acts" means "any and all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes."

Here, the Indictment constitutes a D&O Claim under Section III.B.2.c.(i) of the Policy, and AXIS's coverage investigation has revealed a previous D&O Claim that arises from the same Wrongful Acts as, and/or Interrelated Wrongful Acts with, the Indictment.  In particular, on November 26, 2007, the Securities Division of the Office of the Attorney General of Maryland (the "Securities Division") sent a letter to Multivend, in which the Securities Division:  (1) made a

---

[4] Messrs. Weaver, Kaplan, Doumas, Benowitz, Goldberg, Linick, Raia and Strauss, as former directors, officers, Managers and/or employees of Multivend, all appear to fall within the definition of "Insured Individual" at Section III.B.4. of the Policy.

KAUFMAN BORGEEST & RYAN LLP

written demand for certain non-monetary relief, including that Multivend "immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents"; and (2) commenced an administrative proceeding against Multivend by providing written notice identifying Multivend as an entity "against whom a formal proceeding may be commenced."[5] As such, on November 26, 2007, the Securities Division made a D&O Claim against Multivend (which is an "Insured" under the Policy) under Section III.B.2.a. and/or III.B.2.b. of the Policy.

As noted above, the prior D&O Claim made by the Securities Division and the Indictment arise from the same Wrongful Acts and/or Interrelated Wrongful Acts. For example, both the Securities Division and the Indictment focus on alleged false statements and omissions of material fact concerning potential income, earnings and profitability of the Vendstar "business opportunity," which were allegedly made to potential customers during a substantially similar time period.[6] Moreover, the "common nexus" between the Wrongful Acts alleged in the Indictment and in the prior Maryland matter is that such Wrongful Acts were committed in connection with the exact scheme to defraud customers through the Vendstar bulk candy vending machine "business opportunity." Thus, pursuant to Section V.A. of the Policy, the prior D&O Claim made by the Securities Division and the Indictment "shall be deemed one Claim," and such Claim shall be deemed to be "first made" on November 26, 2007. Accordingly, because the Indictment does not constitute a D&O Claim "first made" against Insureds during the Policy Period of February 20, 2010 to February 20, 2014, the Indictment does not trigger the D&O Insuring Agreement and AXIS has no coverage obligations in connection with this matter. In this regard, we recommend that you immediately provide notice of the Indictment to any prior insurance carrier whose policy may respond to this matter.[7]

In addition, Section IV.A.2. of the Policy excludes coverage for Loss, which is defined at Section III.A.7 to include Defense Costs, arising from any Claim made against any Insured:

> based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

> a.   any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations [02/20/2008], or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or

---

[5] Ultimately, the Maryland Securities Division matter resulted in the entry of a December 15, 2009 "Consent Order," which describes this matter as an "Administrative Proceeding before the Securities Commissioner of Maryland" captioned *In re MultiVend, LLC, d.b.a. Vendstar* (Case No. 2007-0532).

[6] The Indictment alleges that the Wrongful Acts took place between May 2005 and July 2, 2010, and the Consent Order in the prior Maryland matter makes clear that the alleged Wrongful Acts took place between January 1, 2004 and December 15, 2009. Furthermore, according to a November 6, 2012 court filing in the pending criminal action, the government intends to offer "evidence of statements made by and conduct undertaken by the defendants . . . at Vendstar prior to May 1, 2005" as proof of "defendants' intent, knowledge, and *modus operandi*."

[7] Please note that, to the extent that notice of the Maryland Securities Division matter and/or the facts and circumstances surrounding that matter were provided to such prior insurance carrier(s) before the February 20, 2010 Inception Date of the AXIS Policy, the prior notice exclusion at Section IV.A.1. of the Policy may also apply to limit or bar coverage for the Indictment. AXIS reserves its rights in this regard.

---

KAUFMAN BORGEEST & RYAN LLP

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 6

  b.  any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**[.]

Here, on November 26, 2007, the Securities Division sent a letter to Multivend that made a demand for certain non-monetary relief and commenced an administrative proceeding and, therefore, the Securities Division matter constitutes a demand or other proceeding pending against any Insured (Multivend) prior to the February 20, 2008 Pending or Prior Claim Date. Moreover, as discussed above, the Indictment is based upon, arises out of, or involves: (1) the same Wrongful Acts, facts, circumstances or situations underlying or alleged in the previous Maryland Securities Division matter; and/or (2) Wrongful Acts that, together with the Wrongful Acts at issue in the prior Maryland Securities Division matter, constitute Interrelated Wrongful Acts. Accordingly, in addition to the fact that the Indictment does not trigger the D&O Insuring Agreement, Section IV.A.2. of the Policy provides another independent basis for AXIS's determination that there is no coverage for the Indictment.

Please note that even if the foregoing did not provide bases to exclude all coverage for the Indictment, there are several other Policy provisions that also might have applied to limit or bar coverage, including: (1) Section IV.A.5.a., as amended by Endorsement No. 1 [profit, remuneration, or advantage exclusion]; (2) Section IV.A.5.b., as amended by Endorsement No. 1 [criminal or deliberately fraudulent acts, errors or omissions exclusion]; and (3) Section VIII.D. [Other Insurance provision]. AXIS reserves its rights under these provisions as well.

Finally, please be aware that even if the Indictment did trigger the D&O Insuring Agreement and was not otherwise excluded from coverage, the Policy would not have covered any amounts that do not constitute "Loss" under the Policy. In this regard, we note that the definition of Loss at Section III.A.7. of the Policy provides that Loss does not include, among other things, "fines, penalties, or taxes imposed by law" and "matters uninsurable under the law pursuant to which this Policy shall be construed." Here, the Indictment alleges that the purpose of the alleged vending machine "business opportunity" scheme was for defendants to "unlawfully enrich themselves," and the nature of this matter connotes that the government may be seeking amounts that would fall outside the Policy definition of Loss, such as fines, penalties and/or uninsurable amounts (*e.g.*, restitution and/or disgorgement).

## SUMMARY

In sum, there is no coverage for the Indictment under the AXIS Policy and, accordingly, AXIS has no obligation to defend or indemnify Messrs. Weaver, Kaplan, Doumas, Benowitz, Goldberg, Linick, Raia or Strauss with regard to this matter. In view of the bases for this declination of coverage, AXIS does not set forth every potentially applicable Policy provision in this letter, but AXIS reserves the right to limit or deny coverage based on additional terms, conditions and exclusions mentioned and not mentioned in this letter. AXIS's rights remain reserved under the Policy, at law and in equity in connection with this matter, including the right to supplement this position.

KAUFMAN BORGEEST & RYAN LLP

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 7

Should you have any questions or additional information bearing on AXIS's coverage position, please do not hesitate to contact us.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Matthew I. Schiffhauer

cc:      *(via e-mail only)*

      Matthew Odalen
      AXIS Insurance – Professional Lines

# EXHIBIT E

EXHIBIT E

DOUGLAS F. GANSLER
*Attorney General*

KATHERINE WINFREE
*Chief Deputy Attorney General*

JOHN B. HOWARD, JR.
*Deputy Attorney General*



STATE OF MARYLAND
OFFICE OF THE ATTORNEY GENERAL
SECURITIES DIVISION

MELANIE SENTER LUBIN
*Securities Commissioner*

WRITER'S DIRECT DIAL NO.
Writer's E-mail
dcantone@oag.state.md.us

(410) 576-6368

November 26, 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Edward Weaver, President
Multi Vend, LLC
880 Grand Blvd.
Deer Park, NY 11729

Re:   **Multi Vend, LLC/Maryland File 2007-0532**

Dear Mr. Weaver:

It has come to the attention of the Securities Division of the Office of the Attorney General of Maryland (the "Division") that Multi Vend, LLC, d.b.a. Vendstar ("Multi Vend") may be offering and selling business opportunities in violation of the disclosure and anti fraud provisions of the Maryland Business Opportunities Sales Act, MD. CODE ANN., BUS. REG § 14-101, et seq. (2004 Repl. Vol. and Supp. 2006) (the "Maryland Business Opportunity Act").

As you may be aware, the Division has authority to investigate and take action against any person who violates, among other investor protection laws, the Maryland Business Opportunity Act. That law allows the Division to sue in civil court to seek a variety of remedies under the law, including an injunction, the appointment of a receiver, a freeze of assets, restitution, or a civil monetary penalty of $5,000 for each violation of the law.

In addition, a person who violates the antifraud provisions of the Maryland Business Opportunity Act is subject to criminal penalties for each violation, including a fine not exceeding $10,000 or imprisonment not exceeding 5 years, or both.

The Division has received information suggesting that Multi Vend may be offering and selling vending machine business opportunities in Maryland without providing a business opportunity disclosure statement as required by the Maryland Business Opportunity Act. The Division also has received information suggesting that Multi Vend makes unlawful earnings

Edward Weaver, President
Multi Vend, LLC
November 26, 2007
Page 3

representations about the Vendstar business opportunity.

So that we may determine the extent of your activities and your compliance with the Maryland Business Opportunity Act, please forward to me, within fifteen (15) days of your receipt of this letter, the following information and materials related to the period January 1, 2004 to the present (the "applicable period):

1. Names, addresses, and telephone numbers of all Maryland residents who purchased a Vendstar business opportunity during the applicable period, and the amount of fee each person paid;

2. Names, addresses and telephone numbers of all sales representatives and employees retained by Multi Vend to solicit Maryland residents to purchase a Vendstar business opportunity;

3. All promotional and marketing literature about the Vendstar business opportunity distributed in the media, or sent directly to any Maryland residents;

4. All advertisements for the Vendstar Business Opportunity that Multi Vend or any sales representative of Multi Vend placed in Maryland in any print media, including newspaper and "pennysavers";

5. All written agreements, contracts, or invoices between Multi Vend and all Maryland residents who purchased a Vendstar business opportunity;

6. All versions of business opportunity disclosure statements distributed to Maryland residents regarding the Vendstar business opportunity;

7. All acknowledgments of receipt forms showing the dates all Maryland residents received a business opportunity disclosure statement from Multi Vend;

8. All complaints or requests for a refund that Multi Vend has received from any person with a Maryland address;

9. All documents indicating any Maryland residents who waived their right to receive, or otherwise agreed to receive, a business opportunity disclosure statement from Multi Vend at or earlier than the date required under the Maryland Business Opportunity Act;

Edward Weaver, President
Multi Vend, LLC
November 26, 2007
Page 3

10. All documents containing claims of actual or potential income, earnings, revenue or "profit margin" related to the Vendstar business opportunity made or sent to any Maryland residents;

11. All documents containing substantiation of all claims of actual or potential income, earnings, revenue or "profit margin" related to the Vendstar business opportunity made or sent to any Maryland residents; and

12. All documents reflecting actual earnings, income, revenue and profit margins earned by buyers of the Vendstar business opportunity.

The Division further requests that Multi Vend acknowledge in writing that it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents, pending the outcome of this inquiry. **Please confirm whether the company agrees to voluntarily cease offering and selling the Vendstar business opportunity this State and with Maryland residents at this time.**

Your prompt and complete response to this letter within the time specified is appreciated. Failure to respond may result in more formal legal action by the Division.

If you have any questions regarding this matter, please call me.

Sincerely yours,

Dale E. Cantone
Assistant Attorney General

# EXHIBIT F

EXHIBIT F

SPERTUS

LANDES &

UMHOFER
LLP

BY EMAIL AND U.S. MAIL

January 18, 2013

Mr. Wayne E. Borgeest
Kaufman Borgeest & Ryan LLP
200 Summit Lake Drive
Valhalla, NY 10595
wborgeest@kbrlaw.com

Re:   USA v. Weaver, 12-20756 CR-ROSENBAUM
      Policy No.: Privatus Policy ENN588818

Dear Mr. Borgeest,

As you know, we represent Edward M. Weaver in the above-referenced
matter. We write in response to your letter dated December 11, 2012, in which your
client AXIS Surplus Insurance Company ("AXIS") denied coverage for the defense
of the Indictment previously tendered to AXIS on Mr. Weaver's behalf. As explained
more fully below, we believe AXIS's coverage decision is incorrect. As such, we ask
AXIS to reconsider and reverse its opinion.

AXIS'S COVERAGE DETERMINATION

Your December 11, 2012 denial letter sets forth that:

Pursuant to Section I.(A) of the Policy, the D&O Insuring Agreement
will only respond to D&O Claims "first made" against an Insured
during the Policy Period of February 20, 2010 to February 20, 2014,
among other requirements. Section III.B.2. of the Policy provides, in
relevant part, that "D&O Claim" means:

a. a written demand against an **Insured** for monetary or non-
monetary relief;

Spertus, Landes & Umhofer, LLP
1990 South Bundy Drive, Suite 705
Los Angeles, CA 90025
ph: 310.826.4700 • fax: 310.826.4711
www.spertuslaw.com

James W. Spertus • jim@spertuslaw.com
Ezra D. Landes • ezra@spertuslaw.com
Matthew Umhofer • matthew@spertuslaw.com
Amy M. Hinkley • amy@spertuslaw.com

Julia Livingston • julia@spertuslaw.com
Suzanne S. Obeda • suzie@spertuslaw.com
Dolly K. Hansen • dolly@spertuslaw.com

SPERTUS
LANDES &
UMHOFER
LLP

> b. a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by: . . .
>
>> (ii) the filing of a notice of charge, investigative order or like document; or
>>
>> (iii) written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or
>
> c. a criminal investigation or proceeding against any **Insured Individual** commenced by:
>
>> (i) the return of an indictment, information or similar pleading[.]

(Denial Letter 4).

AXIS contends that "on November 26, 2007, the Securities Division of the Office of the Attorney General of Maryland (the "Securities Division") sent a letter to Multivend, in which the Securities Division: (1) made a written demand for certain non-monetary relief, including that Multivend 'immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents;' and (2) commenced an administrative proceeding against Multivend by providing written notice identifying Multivend as an entity 'against whom a formal proceeding may be commenced.'" (Denial Letter 4-5). According to AXIS, "[a]s such, on November 26, 2007, the Securities Division made a D&O Claim against Multivend (which is an 'Insured' under the Policy) under Section III.B.2.a. and/or III.B.2.b. of the Policy." (Denial Letter 5).

As further set forth in your denial letter, AXIS asserts two different reasons for its coverage position related to the purported D&O Claim made on November 26, 2007. First, AXIS argues that the purported D&O Claim precludes coverage for a defense of the instant Indictment, filed on October 2, 2012, pursuant to Section V.A. of the Policy, which provides in pertinent part:

SPERTUS
LANDES &
UMHOFER
LLP

January 18, 2013
Page 3

V.    LIMITS OF LIABILITY, RETENTION, DEFENSE AND
      SETTLEMENT

A.    Limits of Liability . . .

All **Claims**, including all **D&O Claims** . . . arising from the same
**Wrongful Act, Wrongful Third Party Act,** and all **Interrelated
Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be
deemed to be first made on the earlier date that: (1) any of the **Claims**
is first made against an **Insured** under this Policy or any prior policy,
or (2) valid notice was given by the **Insureds** under this Policy or any
prior policy of any **Wrongful Act, Wrongful Third Party Act,** or any
fact, circumstance, situation, event, transaction or cause which
underlies such **Claim**. Coverage under this Policy shall apply only
with respect to **Claims** deemed to have been first made during the
**Policy Period** and reported in writing to [AXIS] in accordance with
the terms herein.

AXIS asserts that:

[T]he prior D&O Claim made by the Securities Division and the
Indictment arise from the same Wrongful Acts and/or Interrelated
Wrongful Acts.  For example, both the Securities Division and the
Indictment focus on alleged false statements and omissions of material
fact concerning potential income, earnings and profitability of the
Vendstar "business opportunity," which were allegedly made to
potential customers during a substantially similar time period.
Moreover, the "common nexus" between the Wrongful Acts alleged in
the Indictment and in the prior Maryland matter is that such Wrongful
Acts were committed in connection with the exact scheme to defraud
customers through the Vendstar bulk candy vending machine
"business opportunity."

(Denial Letter 5).

AXIS therefore argues that "pursuant to Section V.A. of the Policy, the prior
D&O Claim made by the Securities Division and the Indictment 'shall be deemed one
Claim,' and such Claim shall be deemed to be 'first made' on November 26, 2007.
Accordingly, because the Indictment does not constitute a D&O Claim 'first made'
against Insureds during the Policy Period of February 20, 2010 to February 20, 2014,

SPERTUS
LANDES &
UMHOFER
LLP

the Indictment does not trigger the D&O Insuring Agreement and AXIS has no coverage obligations in connection with this matter." (Denial Letter 5).

Next, AXIS argues that coverage for a defense is also precluded under the exclusion set forth in Section IV.A.2. of the Policy, under which AXIS "shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:"

> based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:
>
> a.   any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations [02/20/2008], or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or
>
> b.   any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**[.]

As set forth in your denial letter, AXIS argues that:

> On November 26, 2007, the Securities Division sent a letter to Multivend that made a demand for certain non-monetary relief and commenced an administrative proceeding and, therefore, the Securities Division matter constitutes a demand or other proceeding pending against any Insured (Multivend) prior to the February 20, 2008 Pending or Prior Claim Date.  Moreover, as discussed above, the Indictment is based upon, arises out of, or involves: (1) the same Wrongful Acts, facts, circumstances or situations underlying or alleged in the previous Maryland Securities Division matter; and/or (2) Wrongful Acts that, together with the Wrongful Acts at issue in the prior Maryland Securities Division matter, constitute Interrelated Wrongful Acts.  Accordingly, . . . Section IV.A.2. of the Policy provides another independent basis for AXIS's determination that there is no coverage for the Indictment."

(Denial Letter 6).

SPERTUS
LANDES &
UMHOFER
LLP

January 18, 2013
Page 5

### MR. WEAVER'S RESPONSE TO AXIS' COVERAGE DETERMINATION

AXIS's coverage position is based entirely on the flawed proposition that the November 26, 2007 letter (1) constitutes a "demand for certain non-monetary relief" and (2) "commenced an administrative proceeding against Multivend by providing written notice identifying Multivend as an entity 'against whom a formal proceeding may be commenced.'" However, since the Securities Division's letter did not make any demand or provide any such notice, AXIS must reverse its coverage position and immediately defend Mr. Weaver against the Indictment.

AXIS mischaracterizes the contents of the Securities Division's letter. The Securities Division's letter makes it clear that it is simply requesting certain "information and materials" from Multivend "[s]o that we may determine the extent of your activities and your compliance with the Maryland Business Opportunities Act." (Securities Division Letter 2). As a matter of law, such a request to Multivend that it voluntarily provide the Securities Division with "information and materials" does not constitute a "demand for non-monetary relief." In fact, in a case involving subpoenas and a search warrant served on AXIS's insured (documents that clearly have more legal effect than the Securities Division's letter in this case), AXIS took a contrary position and argued that coverage was <u>not</u> triggered because subpoenas and search warrants do <u>not</u> constitute "demands for non-monetary relief," and the court in that case <u>agreed</u> with AXIS's position. *Diamond Glass v. Twin City Fire Ins. Co.*, 2008 WL 4613170, at *4 (S.D.N.Y. Aug. 18, 2008).

In *Diamond Glass*, in which AXIS was a co-defendant with Twin City Fire Insurance Co. and "concurred with TCFI's coverage position" (*id.* at *2), the district court rejected plaintiff-insured Diamond Glass's broad interpretation of the policy term "demands for non-monetary relief" and held that the plain meaning of this term demands a more narrow construction. *Id.* at *4. The court there held that "relief" specifically refers to "redress or benefit . . . that a party asks of a court," and that "subpoenas and search warrants do not fit within this meaning of the term 'relief.'" Similarly, in the instant case, the Securities Division's letter was merely a request to Multivend that it voluntarily produce documents, and did not relate to a request made of a court. If subpoenas and search warrants do not rise to the level of a "demand for non-monetary relief," surely a letter seeking a voluntary production of information and materials "so that we may determine the extent of your activities and your compliance with the Maryland Business Opportunity Act" also does not rise to the level of a "demand" for "relief."

Many other cases have also held that a letter like the Securities Division letter relied upon by AXIS in this case does not qualify as a "demand for non-monetary

SPERTUS
LANDES &
UMHOFER
LLP

relief." In *Evanston Insurance Co. v. GAB Business Services, Inc.*, 521 N.Y.S.2d 692 (N.Y. App. Div. 1987), a "30-day notice of deficiencies in performance sent by a client to an insurance adjusting company" was described by the court as follows:

> On December 22, 1978, while GAB was insured by American Home, RTD sent to GAB a 30–day notice demanding that a broad spectrum of performance deficiencies be corrected, including adjusters carrying excessive caseloads, insufficient supervisory personnel, inadequate establishment and adjustment of reserve levels, and failure to include relevant data on monthly computer printouts. RTD demanded that specified steps be taken to correct the deficiencies within 30 days, and warned that if that were not accomplished, RTD would consider exercising its option to cancel the contract. This letter did not assert that GAB had caused financial or other damages to RTD, it did not assert or refer to the existence of a claim for damages, and it did not include a reservation of rights to claim damages.

*Id.* at 693. The court held that this letter did not constitute a "claim" within the meaning of the policy, and held:

> We do not believe the letter can be so construed, as it contains no mention of damages or compensation. The letter merely contained statements of dissatisfaction with certain aspects of GAB's past performance, a demand for future performance in accordance with the contract, and a warning that failure to correct the deficiencies listed might result in cancellation of the contract for cause as defined in the contract.

*Id.* at 695.

The letter described in *Evanston Insurance Co.* is far more "demanding" than the Securities Division's letter in the instant case. The Securities Division's letter does not contain any "statements of dissatisfaction" regarding Multivend. The letter merely states that the "Division has received information suggesting that Multi Vend may be offering" business opportunities without providing a business opportunity disclosure statement. Moreover, unlike the letter in *Evanston Insurance Co.*, the Securities Division's letter did not "demand[] that specified steps be taken to correct the deficiencies" because the Securities Division had not yet determined if there were any deficiencies. The Securities Division's letter simply requested "information and materials" so that the Securities Division could determine whether it had a claim against Multivend or if Multivend was in compliance with the regulations. Similar to

SPERTUS
LANDES &
UMHOFER
LLP

January 18, 2013
Page 7

the letter in *Evanston Insurance Co.*, the Securities Division "did not assert that [Multivend] had caused financial or other damages" and the Securities Division "did not assert or refer to the existence of a claim for damages, and it did not include a reservation of right to claim damages." As was the case in *Evanston Insurance Co.*, the letter in this case contains "no mention of damages or compensation" or any mention of any claims whatsoever.

Similarly, in *In re Ancillary Receivership of Reliance Ins. Co.*, 55 A.D.3d 43 (N.Y. App. Div. 2008), the court there held that a letter sent to a policyholder requesting information and materials did not amount to a "claim" or "demand" and the court recognized that a claim or demand is not made where a party merely requests information and materials in order to determine whether there exists a claim. In *Ancillary Receivership*, an attorney for employees suing for unpaid tips and bonuses sent the insured a letter requesting "13 sets of relevant documents and information as well as insurance information" so that counsel could "make a reasonable inquiry into the facts before filing a pleading with the courts." *Id.* at 44, 52. The court there held that:

> Counsel's letter to plaintiff falls far short of a demand for money or services or even the expression of a present intent to initiate legal proceedings. Any action that might have been contemplated in pursuit of the employees' claim is implicitly conditioned upon the outcome of counsel's investigation of its merit. Thus, the letter received by plaintiff is not "an assertion of a legally cognizable damage, . . . a type of demand that can be defended, settled and paid by the insurer."

*Id.* at 47.

In the instant case, the Securities Division's letter also does not assert the "type of demand that can be defended, settled and paid by the insurer," and in *Diamond Glass*, AXIS confirmed that such a letter does not trigger a claim that entitles its insured to a defense. The *Ancillary Receivership* court further held that "the subject letter requesting documents and information in support of counsel's 'inquiry into the facts' does not suffice to state a demand for payment so as to warrant the conclusion that a claim arose at such time." *Id.* at 49. The *Ancillary Receivership* court also noted:

> While the disputed letter certainly conveys the suggestion that a lawsuit was being contemplated, it also states unequivocally that counsel was seeking information in connection with his obligation to determine whether legal action was warranted. Moreover, the letter

SPERTUS
LANDES &
UMHOFER
LLP

January 18, 2013
Page 8

does not even state that the purpose of any such action would be the recovery of civil damages, merely alleging that the Yale Club's actions variously "constitute criminal violations, as well as civil violations of RICO and the New York State Labor Law, and fraud and conversion."

The language in the Securities Division's letter is less conclusory and accusatory than the language of the letter sent to the insured in *Ancillary Receivership*. In *Ancillary Receivership*, the letter at issue, which did not amount to a claim or demand, declared that the insured's conduct did in fact "constitute criminal violations, as well as civil violations," whereas the Securities Division's letter simply asserts that "a person who violates the antifraud provisions of the Maryland Business Opportunity Act" is subject to criminal and civil penalties. The Securities Division's letter does not reach any conclusions or claim an ability to conclude that Multivend engaged in any wrongdoing. The letter is merely requesting document "so that [it] may determine the extent of [Multivend's] activities and [Multivend's] compliance" with the Act.

In your December 11, 2012 denial letter, AXIS attempts to argue that the Securities Division "made a written demand for certain non-monetary relief" because in addition to requesting documents from Multivend, which was the primary purpose of the letter, the Securities Division also made a demand that Multivend "immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents." However, the sentence quoted in your December 11, 2012 letter is not accurate and is taken out of context. The entire paragraph in the Securities Division's letter reads as follows:

> The Division further requests that Multi Vend acknowledge in writing that it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland resident, <u>pending the outcome of this inquiry</u>. Please confirm whether the company agrees to <u>voluntarily cease</u> offering and selling the Vendstar business opportunity [in] this State and with Maryland residents <u>at this time</u>.

(Securities Division Letter 3).

This statement is not a "demand" as AXIS contends, and it does not qualify as a demand under the authorities cited above. The Securities Division simply asked Multivend to "voluntarily," temporarily refrain from offering the Vendstar business opportunity to Maryland residents until the Securities Division had the opportunity to review the requested materials. The request fully contemplates that Multivend will be able to resume offering the Vendstar business opportunity once the inquiry is

SPERTUS
LANDES &
UMHOFER
LLP

January 18, 2013
Page 9

completed.  Once again, the request "did not assert that [Multivend] had caused financial or other damages" nor did it "refer to the existence of a claim for damages" (*Evanston Insurance Co.*, 521 N.Y.S.2d at 693), and the request to voluntarily and temporarily cease offering the business opportunity to certain residents "pending the outcome of the inquiry" is not a "redress or benefit . . . that a party asks of a court." *Diamond Glass*, 2008 WL 4613170, at *4.

Finally, it is simply false for AXIS to assert that the Securities Division's letter "commenced an administrative proceeding against Multivend by providing written notice identifying Multivend as an entity 'against whom a formal proceeding may be commenced.'"  The Securities Division's letter does not provide any such notice.  Apparently, AXIS is relying entirely on the concluding sentence of the letter, which informs Multivend that "Failure to respond may result in more formal legal action by the Division."  This sentence in no way constitutes notice that the Securities Division intends to commence formal administrative proceedings against Multivend for violations of the Maryland Business Opportunities Act.  The Securities Division merely states that "failure to respond" to the letter "may" require the Securities Division to obtain the information and materials requested through "formal legal action," such as by serving a subpoena, which under *Diamond Glass*, would not even trigger a claim.  Even if Multivend failed to respond to the letter, and the Securities Division pursued its option of obtaining the requested information and materials through "formal legal action," any formal "administrative proceedings" against Multivend would still be "implicitly conditioned upon the outcome of [the Securities Division's] investigation."  *In re Ancillary Receivership of Reliance Ins. Co.*, 55 A.D.3d at 47.  If anything, the concluding sentence of the letter, further confirms that the Securities Division's "informal" request for information and materials from Multivend is not a "demand for certain non-monetary relief" as that phrase is defined by the authorities cited above.

Also, contrary to AXIS's assertion, the Securities Division's letter does not allege any "Wrongful Act" by Multivend, as that term is defined in the Policy.  At most, the Securities Division's letter asserts that it "received information suggesting" that Multivend "may be offering and selling business opportunities in violation" of the Maryland Business Opportunity Act.  The Securities Division itself, however, makes it perfectly clear in its letter that the Securities Division is not making any allegations against Multivend, and the decision as to whether or not it intends to make allegations against Multivend will be reserved until the Securities Division has reviewed the information and materials that it is informally requesting Multivend to voluntarily provide.  Consequently, since the Securities Division does not allege any "Wrongful Act" by Multivend, the Indictment also does not involve any "Interrelated Wrongful Acts," as that term is defined in the Policy.  Moreover, there is not a

SPERTUS
LANDES &
UMHOFER
LLP

January 18, 2013
Page 10

"common nexus," as AXIS argues, between the information that is the subject of the Securities Division letter and the Indictment. The Securities Division's letter relates solely to Multivend's compliance with specific provisions of the Maryland Business Code that are not the subject of the Indictment. The Securities Division's letter relates solely to the activities of Multivend and does not relate to the activities of Mr. Weaver or any of the individuals named in the Indictment. The activities for which information and materials were sought by the Securities Division regarding Multivend only, and not Mr. Weaver, cannot be causally related or connected to the activities alleged in the Indictment because the Indictment does not allege any acts in the State of Maryland or involving any Maryland residents.

Additionally, Mr. Weaver notes that AXIS's reliance on Section V.A. of the Policy is misplaced. The language cited in your letter that is found in Section V.A. of the Policy relates only to the number of limits of liability available to the Insured. AXIS cannot rely on that language for a purpose other than for which it was intended, and its intended purpose does not even apply since Mr. Weaver is not attempting to obtain an additional limit of liability through his tender of the Indictment.

AXIS has deliberately misconstrued the Securities Division's November 26, 2007 letter in numerous ways in order to deny Mr. Weaver coverage for the defense of the Indictment. AXIS's conduct is in "gross disregard" of Mr. Weaver's interests and constitutes bad faith on the part of AXIS. Also, it appears that AXIS sold Multivend a policy in bad faith since it knew or should have known of the grounds for which it now claims coverage should be denied. Mr. Weaver's trial will begin in September 2013, and Mr. Weaver needs the resources that were promised to him by AXIS in order to defend himself at trial. Mr. Weaver will suffer tremendous harm if AXIS does not immediately reverse its prior coverage decision and begin to defend Mr. Weaver. Please inform me by the close of business on January 25, 2013, whether AXIS will provide coverage for the defense of the Indictment. This letter is no way constitutes a waiver of any rights, remedies, claims or defenses, legal or equitable, that my client may have, all of which are expressly reserved.

Sincerely yours,

James W. Spertus

# EXHIBIT G

**EXHIBIT G**



KAUFMAN BORGEEST & RYAN LLP

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000   FAX: 914.449.1100   WWW.KBRLAW.COM

February 19, 2013

WAYNE E. BORGEEST
DIRECT: 914.449.1002
WBORGEEST@KBRLAW.COM

MATTHEW I. SCHIFFHAUER
DIRECT: 914.449.1080
MSCHIFFHAUER@KBRLAW.COM

BY E-MAIL AND CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

CONFIDENTIAL COMMUNICATION

James W. Spertus
Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
jim@spertuslaw.com

Jane W. Moscowitz
Moscowitz & Moscowitz, P.A.
1111 Brickell Avenue, Suite 2050
Miami, FL 33131
jmoscowitz@moscowitz.com

Vincent J. Martinelli, Esq.
Law Offices of Vincent J. Martinelli
2040 Victory Boulevard
Staten Island, NY 10314
vjmlaw@si.rr.com

Nicholas G. Kaizer, Esq.
Levitt & Kaizer
40 Fulton Street, 23rd Floor
New York, NY 10038
nkaizer@gmail.com

Francis X. Casale, Jr., Esq.
Law Offices of Francis X. Casale, Jr.
115 Broad Hollow Road, Suite 350
Melville, NY 11747
fxcesq@hotmail.com

Leonard P. Fenn, Esq.
DeFabio & Fenn, P.A.
2333 Brickell Avenue, Suite A-1
Miami, FL 33129
fennlawoffice@bellsouth.net

Sky E. Smith, Esq.
3059 Grand Avenue, Suite 310
Miami, FL 33133
cielo@bellsouth.net

Silvia B. Pinera-Vazquez, Esq.
Silvia B. Pinera-Vazquez, P.A.
1900 S.W. 3rd Avenue
Miami, FL 33129
spinera@aol.com

| Re: | Insured | : | Multivend, LLC |
|---|---|---|---|
| | Matter | : | *United States of America v. Weaver, et al.* |
| | Policy No. | : | Privatus Policy ENN588818 (the "Policy") |
| | Policy Period | : | February 20, 2010 - February 20, 2014 |
| | AXIS File No. | : | BH 80960 |
| | Our File No. | : | 481.075 |

NEW YORK CITY          WESTCHESTER          LONG ISLAND          NEW JERSEY          LOS ANGELES

Dear Counselors:

As you know, we represent the interests of AXIS Surplus Insurance Company ("AXIS") in connection with the captioned matter, which is a criminal indictment (the "Indictment") filed in the United States District Court for the Southern District of Florida.[1]  On behalf of AXIS, this will further respond to various prior communications in which certain of the Insureds disagree with aspects of AXIS's coverage determination and request that AXIS reconsider its position.  This letter supplements, and does not replace, AXIS's prior communications in this matter, including our letter of December 11, 2012.

Having considered the points raised in all of your prior correspondence in conjunction with the terms and conditions of the Policy, the facts available to AXIS and the relevant case law, AXIS concludes that all factors support AXIS's position.  Accordingly, for the reasons set forth herein and in all earlier correspondence, AXIS maintains that there is no coverage (defense or indemnity) available under the Policy for the Indictment.

<u>THE INSUREDS' POSITION LETTERS</u>

We are in receipt of the following letters requesting that AXIS reconsider its coverage determination in respect of the Indictment:  (1) a January 18, 2013 letter sent by James Spertus, Esq. on behalf of Edward Weaver (the "Spertus Letter"); (2) a January 18, 2013 letter sent by Leonard Fenn, Esq. on behalf of Richard Linick (the "Fenn Letter"); (3) a January 22, 2013 letter sent by Mr. Fenn on behalf of Mr. Linick; (4) a January 22, 2013 letter sent by Sky Smith, Esq. on behalf of Paul Raia; (5) a January 22, 2013 letter sent by Jane Moscowitz, Esq. on behalf of Scott Doumas; (6) a January 22, 2013 letter sent by Nicholas Kaizer, Esq. on behalf of Mark Benowitz; and (7) a January 31, 2013 letter sent by Silvia Pinera-Vazquez, Esq. on behalf of Howard Strauss.

On behalf of Mr. Linick, Mr. Fenn's January 22, 2013 letter purports to adopt the arguments set forth in the Spertus Letter.  On behalf of Messrs. Raia, Doumas, Benowitz and Strauss, respectively, the letters from Ms. Smith, Ms. Moscowitz, Mr. Kaizer and Ms. Pinera-Vazquez purport to adopt the arguments set forth in the Spertus Letter and in portions of the Fenn Letter.[2]  Additionally, Mr. Kaizer's letter states that Mr. Benowitz joins "in the arguments for coverage contained in the letters requesting coverage dated October 25, 2012 (Matthew Jacobs, Esq.), and November 15, 2012 (Jan Larson, Esq.)."[3]

---

[1] *United States of America v. Weaver, et al.*, S.D. Fla. Case No. 12-cr-20756 (filed Oct. 2, 2012).

[2] We note that the Fenn Letter asserts certain arguments that are purportedly "personal to Mr. Linick." In this regard, we understand that Messrs. Raia, Doumas, Benowitz and Strauss only adopt the arguments set forth in the Fenn Letter to the extent that such contentions are common to all of the Insured Individuals named as defendants in the Indictment.

[3] The October 25, 2012 letter from Mr. Jacobs and the November 15, 2012 letter from Ms. Larson do not assert any arguments for coverage that are unique to or different from the arguments set forth in the Insureds' various position letters (which are addressed below). As such, AXIS does not believe that any further response to Mr. Jacobs or Ms. Larson's prior correspondence is necessary.

---

## AXIS'S COVERAGE POSITION

### The Indictment Does Not Trigger the D&O Insuring Agreement

After considering the points raised in the Insureds' position letters, AXIS maintains its determination that the Indictment fails to trigger the Directors, Officers and Corporate Liability ("D&O") Insuring Agreement at Section I.(A) of the Policy.  The D&O Insuring Agreement will only respond to D&O Claims "first made" against an Insured during the Policy Period of February 20, 2010 to February 20, 2014, among other requirements.  Section III.B.2. of the Policy provides, in pertinent part, that "D&O Claim" means:

> a.   a written demand against an **Insured** for monetary or non-monetary relief;
>
> b.   a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by: . . .
> > (ii)   the filing of a notice of charge, investigative order or like document; or
> > (iii)  written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or
>
> c.   a criminal investigation or proceeding against any **Insured Individual** commenced by:
> > (i)   the return of an indictment, information or similar pleading[.]

Section V.A. of the Policy provides in pertinent part:

> All **Claims**,[4] including all **D&O Claims** . . . arising from the same **Wrongful Act**, **Wrongful Third Party Act**, and all **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the earlier date that:  (1) any of the **Claims** is first made against an **Insured** under this Policy or any prior policy, or (2) valid notice was given by the **Insureds** under this Policy or any prior policy of any **Wrongful Act**, **Wrongful Third Party Act**, or any fact, circumstance, situation, event, transaction or cause which underlies such **Claim**.  Coverage under this Policy shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to [AXIS] in accordance with the terms herein.

The term "Wrongful Act" is defined at Section III.B.5.a. of the Policy to include, among other things, "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by" any Insured Individual in their capacity as such, or the Policyholder (Multivend, LLC) with respect to Section I. Insuring Agreement A.  Pursuant to Section III.A.6. of the Policy, "Interrelated Wrongful Acts" means "any and all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes."

As AXIS explained in its December 11, 2012 letter, the Indictment constitutes a D&O Claim under the Policy, and this D&O Claim arises from the same Wrongful Acts as, and/or Interrelated Wrongful Acts with, a previous D&O Claim that was first made against an Insured (Multivend, LLC) by the Securities Division of the Office of the Attorney General of Maryland

---

[4] Pursuant to Section III.B.1. of the Policy, the term "Claim" is defined to mean "any D&O Claim."

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 4

(the "Securities Division") on November 26, 2007.  Thus, pursuant to Section V.A. of the Policy, the prior D&O Claim made by the Securities Division and the Indictment "shall be deemed one Claim," and such Claim shall be deemed to be "first made" on November 26, 2007.  Accordingly, the Indictment does not trigger the Policy's D&O Insuring Agreement because it does not constitute a D&O Claim "first made" against an Insured during the Policy Period of February 20, 2010 to February 20, 2014.

### The Securities Division Matter Is a "D&O Claim"

As a preliminary matter, the Fenn Letter does not dispute that the prior Maryland Securities Division matter is a D&O Claim made against an Insured under the Policy, Multivend, LLC ("Multivend").  The Spertus Letter, however, appears to assert that the Securities Division matter does not constitute a D&O Claim under Section III.B.2.b.(iii) ("Subsection b.(iii)") and/or III.B.2.a. ("Subsection a.") of the Policy.  AXIS respectfully disagrees with the position set forth in the Spertus Letter.

Contrary to the contentions in the Spertus Letter, the prior Securities Division matter falls squarely within the clear and unambiguous language of Subsection b.(iii) of the Policy's "D&O Claim" definition.  Subsection b.(iii) defines the term D&O Claim to include "an administrative or regulatory proceeding against any Insured commenced by . . . written notice or subpoena from an authority identifying such Insured as an entity or person against whom a formal proceeding may be commenced."  As an initial matter, it cannot be disputed that the Securities Division commenced an administrative or regulatory proceeding against Multivend, which is an Insured under the Policy.[5]  Under New York law, a government agency investigation that targets an insured entity, such as the Securities Division matter, constitutes an "administrative or regulatory proceeding" for purposes of a D&O Liability policy's "claim" definition.  *See, e.g., MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 159-60 (2d Cir. 2011) (finding that a New York Attorney General's investigation was a "regulatory proceeding" under a D&O policy's "claim" definition).  Ultimately, as the Spertus Letter conspicuously fails to acknowledge, the Securities Division matter resulted in the entry of a December 15, 2009 "Consent Order," which describes this matter as an "Administrative Proceeding Before the Securities Commissioner of Maryland" captioned *In re Multivend, LLC d.b.a. Vendstar* (Case No. 2007-0532).

Moreover, both the caption ("Re: Multi Vend, LLC/Maryland File 2007-0532") and content of the "written notice" that commenced the Maryland administrative or regulatory proceeding – the Securities Division's November 26, 2007 letter – demonstrate that Multivend was identified as a target of a government agency investigation that could have (and, in fact, did) lead to a "formal proceeding" against Multivend.  For example, the Securities Division's November 26, 2007 letter specifically:

- Asserts that Multivend "may be offering and selling business opportunities in violation of the disclosure and anti fraud provisions" of the Maryland Business Opportunity Act;
- States that the Securities Division "has authority to investigate and take action against" any person who violates the Maryland Business Opportunity Act;

---

[5] Pursuant to Section III.B.3. of the Policy, the term "Insured" is defined to include both "the Insured Individual and the Policyholder."  The Policy defines the term "Policyholder" to mean Multivend and its "Subsidiary(ies)," and, therefore, Multivend is an "Insured" under the Policy.

- Makes specific inquiries into Multivend's offers and sales of the Vendstar business opportunity – the activities that the Securities Division's letter states constituted the alleged violations of the Maryland Business Opportunity Act;
- References various civil remedies that the Securities Division is entitled to seek for violations of the Maryland Business Opportunity Act (certain of which the Securities Division ultimately did obtain through the December 15, 2009 Consent Order); and
- Demands that Multivend "immediately cease all offers and sales of the Vendstar business opportunity" – which, again, were the activities that constituted the alleged violations of the Maryland Business Opportunity Act.

In view of the foregoing and other facts available to AXIS, it is clear that the Securities Division's November 26, 2007 letter commenced the prior Maryland administrative or regulatory proceeding by identifying Multivend as an entity "against whom a formal proceeding may be commenced." Accordingly, the prior Securities Division matter constitutes a "D&O Claim" under Subsection b.(iii) of the Policy's D&O Claim definition.

In contending that the Securities Division matter does not constitute a D&O Claim under Subsection b.(iii), the Spertus Letter omits critical facts, relies upon inapposite case law and misinterprets the plain language of Subsection b.(iii) of the Policy's D&O Claim definition. The Spertus Letter asserts that the Securities Division matter is not a D&O Claim under Subsection b.(iii) because the November 26, 2007 letter does not provide notice that the Securities Division "intends" to commence a formal administrative proceeding against Multivend. However, the plain and unambiguous language of Subsection b.(iii) does not require written notice that an authority "intends" to commence a formal proceeding before an administrative or regulatory proceeding will constitute a D&O Claim under the Policy. In this regard, AXIS directs you to the language of Subsection b.(iii), which only requires written notice identifying an Insured as an entity "against whom a formal proceeding *may be commenced*" (emphasis added).

The Spertus Letter further asserts that – in taking the position that the Securities Division matter constitutes a D&O Claim under Subsection b.(iii) – "[a]pparently, AXIS is relying entirely on the concluding sentence of the [Securities Division's November 26, 2007] letter, which informs Multivend that 'Failure to respond may result in more formal legal action by the Division.'" As an initial matter, this argument fails because it is based on the incorrect premise that Subsection b.(iii) of the D&O Claim definition requires that an authority provide written notice that it "intends" to commence a formal proceeding against an Insured. In any event, the Spertus Letter's argument misinterprets AXIS's position and disregards numerous relevant facts and circumstances surrounding the Securities Division's November 26, 2007 letter. As discussed above, the caption and content of the Securities Division's letter make clear that Multivend received written notice identifying it as an entity "against whom a formal proceeding *may be commenced*" (emphasis added).

Nor is there any merit to the Spertus Letter's contention that the Securities Division matter does not constitute a D&O Claim under Subsection b.(iii) because "any formal 'administrative proceedings' against Multivend would still be 'implicitly conditioned upon the outcome of the Securities Division's investigation.'" This argument, like the other arguments in the Spertus Letter concerning Subsection b.(iii), is bereft of any support in the plain language of the Policy.[6]

---

[6] We also note that the case that the Spertus Letter cites in support of this argument, *In re Ancillary Receivership of Reliance Ins. Co.*, 863 N.Y.S.2d 415 (App. Div. 2008), lends no support to the Insureds'

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 6

Subsection b.(iii) of the D&O Claim definition clearly contemplates that coverage for an "administrative or regulatory proceeding," such as a government agency investigation that targets an insured entity, will attach before any "formal proceeding" has been commenced. Significantly, with respect to formal proceedings, Subsection b.(iii) uses the phrase "may be commenced," and not the phrase "has been commenced." Given the express language of Subsection b.(iii) and the facts demonstrating that the Securities Division's November 26, 2007 letter identified Multivend as an entity "against whom a formal proceeding may be commenced," the prior Maryland Securities Division matter constitutes a D&O Claim under Subsection b.(iii) of the Policy's D&O Claim definition.

AXIS further disagrees with the Spertus Letter's contention that the Securities Division matter does not meet Subsection a. of the Policy's D&O Claim definition.[7] As an initial matter, AXIS fails to see the relevance of the arguments in the Spertus Letter based on the premise that the Securities Division's November 26, 2007 letter requested that Multivend "provide the Securities Division with 'information and materials.'" To clarify, AXIS has never asserted that a demand to produce documents or information constitutes a demand for "non-monetary relief." As we previously explained, the Securities Division's November 26, 2007 letter included a demand that Multivend "acknowledge in writing that it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents." This is precisely the type of "written demand for non-monetary relief" that courts have held trigger D&O policy "claim" definitions similar to that of Subsection a. of the AXIS Policy. *See, e.g., Employers' Fire Ins. Co. v. ProMedica Health System, Inc.*, 2011 WL 6937488, at *5 (N.D. Ohio Dec. 31, 2011) (holding that a "claim" was made under a D&O policy where the Federal Trade Commission demanded that an insured entity enter into an agreement that had an injunctive effect).

The Spertus Letter's reliance on *Diamond Glass Companies, Inc. v. Twin City Fire Insurance Co.*, 2008 WL 4613170 (S.D.N.Y. Aug. 18, 2008), is misplaced. In that case, the court found that grand jury subpoenas, which were not accusatory in nature and sought only documents and testimony from an insured entity's custodian of records and employees, did not demand "non-monetary relief" for purposes of a D&O policy's claim definition. *Id.* at **1, 4. In sharp contrast, the Securities Division's November 26, 2007 letter was not a grand jury subpoena, specifically alleged wrongdoing by Multivend (*i.e.*, was accusatory in nature), and, perhaps most significantly, was not limited to a demand for Multivend to "produce documents or appear to testify."[8] Indeed, the holding of *Diamond Glass Companies* is inapposite here given that the Securities Division's November 26, 2007 letter demanded "non-monetary relief" in the form of Multivend's written acknowledgment that "it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents."

---

position since the policy at issue there did not define the term "claim." Thus, the court in that case had no opportunity to, and did not, address a "claim" definition similar to that of Subsection b.(iii) of the AXIS Policy.

[7] As noted above, Subsection a. defines the term "D&O Claim" to include "a written demand against an Insured for monetary or non-monetary relief."

[8] Given that the prior Maryland Securities Division matter and the *Diamond Glass Companies* case involved markedly different sets of facts and circumstances, AXIS strongly disagrees with the Spertus Letter's assertions that AXIS "took a contrary position" in the *Diamond Glass Companies* case where AXIS Reinsurance Company was a co-defendant.

---

KAUFMAN BORGEEST & RYAN LLP

Nor does the Spertus Letter's cherry-picking of the court's reasoning in *Diamond Glass Companies* – a case where the court did not construe the phrase "written demand" – support the Insureds' contention that the Securities Division's request for Multivend to "cease all offers and sales" is not a "demand" under Subsection a. In this regard, the Spertus Letter asserts that the Securities Division did not make a "demand" because the relief sought in its November 26, 2007 letter "is not a 'redress or benefit . . . that a party asks of a court.'" However, the language that the Spertus Letter quotes was used by the *Diamond Glass Companies* court in interpreting the phrase "non-monetary relief," not in construing the phrase "written demand." *See id.* at \*4. Contrary to counsel's argument, therefore, *Diamond Glass Companies* does not limit the applicability of Subsection a. of the AXIS Policy's claim definition to situations where a claimant requests non-monetary relief from a court (*e.g.*, in a complaint). Indeed, the plain language of Subsection a. merely requires that non-monetary relief be sought in a "written demand," and not in a court proceeding. *See Quanta Lines Ins. Co. v. Investors Capital Corp.*, 2009 WL 4884096, at \*13 (S.D.N.Y. Dec. 17, 2009) (finding that a policy that defined "claim," in part, to include "a demand received by any Insureds" did not even require "that a lawsuit or other proceeding be threatened").

Furthermore, in selectively quoting from *Diamond Glass Companies*, the Spertus Letter fails to recognize that the Securities Division's demand for Multivend to "immediately cease all offers and sales" falls squarely "within a reasonable reading" of the meaning of the term "non-monetary relief" postulated by the court in that case. *See Diamond Glass Companies*, 2008 WL 4613170, at \*4. As the Spertus Letter fails to mention, in interpreting the phrase "non-monetary relief," the court in *Diamond Glass Companies* noted that "Black's Law Dictionary defines 'relief' as 'the redress or benefit, *esp. equitable in nature* (such as *injunction* or specific performance), that a party asks of a court.'" *Id.* (emphasis added). The Securities Division's demand for Multivend to acknowledge in writing that it will immediately cease all offers and sales "certainly is a type of injunctive relief" since it "had the practical effect, and purpose, of a temporary restraining order" on the wrongs complained of in the Securities Division's November 26, 2007 letter. *See Employers' Fire Ins. Co.*, 2011 WL 6937488, at \*5. Moreover, the November 26, 2007 letter makes clear that the Securities Division has the authority to "sue in civil court" to seek this type of injunctive relief. Accordingly, even assuming that *Diamond Glass Companies* has any applicability here, that case does not alter the conclusion that the Securities Division's November 26, 2007 letter constitutes a "written demand for . . . non-monetary relief" under Subsection a. of the Policy's D&O Claim definition.

AXIS further disagrees with the Spertus Letter's contention that the November 26, 2007 letter "did not make any demand" since the November 26, 2007 letter "simply asked Multivend to 'voluntarily,' temporarily refrain from offering the Vendstar business opportunity." First, there is no factual support for the speculation that the Securities Division's letter "fully contemplates that Multivend will be able to resume offering the Vendstar business opportunity once the inquiry is completed." Second, even if there was, this is irrelevant since a claimant's request for an insured to enter into an agreement that has "the practical effect, and purpose, of a *temporary* restraining order" constitutes a "demand for non-monetary relief." *Employers' Fire Ins. Co.*, 2011 WL 6937488, at \*5 (emphasis added). In other words, the Securities Division's demand for Multivend to "immediately cease all offers and sales" was a "D&O Claim" under Subsection a., irrespective of whether or not the Securities Division would ultimately seek to prevent Multivend from engaging in the allegedly wrongful conduct on a permanent basis. *See Quanta Lines Ins. Co.*, 2009 WL 4884096, at \*12 (holding that a "claim" that was quickly determined to be meritless and

withdrawn was nevertheless a "claim" under the insurance policy at issue).[9]  Finally, the Securities Division's use of the words "voluntarily" and/or "request" do not alter the conclusion that the November 26, 2007 letter made a "written demand."  *See, e.g., id.* at *13 (holding that a letter that "merely requested" that the insured "contact [the claimant] directly to make arrangements to reimburse" the claimant met a policy "claim" definition that required a "demand"); *Employers' Fire Ins. Co.*, 2011 WL 6937488, at *5 (finding that a "claim" was made under a D&O policy where the Federal Trade Commission requested that the insured enter into a "hold separate agreement"); *cf. MBIA Inc.*, 652 F.3d at 161 (finding coverage where the SEC conducted an investigation "by way of oral request rather than subpoena or other formal process" since the SEC "believed that [the insured] would fully comply on a voluntary basis").

Finally, the other cases relied upon in the Spertus Letter in support of the Insureds' argument that the Securities Division matter does not meet Subsection a. of the Policy's D&O Claim definition are easily dispensed with.  In particular, the Spertus Letter is misplaced in citing to *In re Ancillary Receivership of Reliance Insurance Co.* and *Evanston Insurance Co. v. GAB Business Services, Inc.*, 521 N.Y.S.2d 692 (App. Div. 1987), as examples of cases that have "held that a letter like the Securities Division letter relied upon by AXIS in this case does not qualify as a 'demand for non-monetary relief.'"  The policy at issue in *Evanston Insurance Co.* defined "claim" as a "demand received by the Insured *for money or services*," 521 N.Y.S.2d at 692 (emphasis added); and the policy at issue in *In re Ancillary Receivership of Reliance Insurance Co.* did not define the term "claim," which the court there interpreted to mean "a demand received by the Insured *for money or services*," 863 N.Y.S.2d 415 at **2-3 (emphasis added).  Contrary to the assertions in the Spertus Letter, therefore, it is clear that the courts in those cases were not required to, and did not, address language similar to that of Subsection a. of the AXIS Policy's "D&O Claim" definition, which requires a "written demand for . . . *non-monetary relief*" (emphasis added).

Accordingly, for the reasons set forth above and in all prior correspondence, the Maryland Securities Division matter constitutes a "D&O Claim" under Section III.B.2.a. and/or III.B.2.b. of the Policy.

### The Securities Division Matter Involves a "Wrongful Act"

The Spertus Letter contends that since the Securities Division's November 26, 2007 letter "does not allege any 'Wrongful Act' by Multivend, the Indictment also does not involve any 'Interrelated Wrongful Acts,' as that term is defined in the Policy."  AXIS respectfully disagrees with this position.

There is no basis for the Spertus Letter's assertion that the Securities Division's November 26, 2007 letter "makes it perfectly clear . . . that the Securities Division is *not* making any allegations against Multivend."  Contrary to the Insureds' position, the Securities Division's letter satisfies the "Wrongful Act" definition at Section III.B.5.a. of the Policy since it expressly alleges a "misstatement, misleading statement, act [and/or] omission" by Multivend.  For example, the Securities Division's letter alleges that Multivend was "offering and selling business

---

[9] Nevertheless, it is worth noting that the December 15, 2009 Consent Order (which the Spertus Letter fails to reference) unequivocally demonstrates that the Securities Division did ultimately obtain an order requiring that Multivend "permanently cease and desist" and "refrain" from the wrongful activities alleged in the Securities Division's November 26, 2007 letter.

opportunities," and that Multivend "makes unlawful earnings representations about the Vendstar business opportunity." Moreover, given these allegations and other allegations in the Securities Division's letter, the Securities Division demands that Multivend "immediately cease all offers and sales" of the business opportunity. Indeed, if the Securities Division's letter did not allege any "misstatement, misleading statement, act [or] omission" by Multivend (*i.e.*, a "Wrongful Act"), as the Spertus Letter incorrectly contends, then there would be no basis or reason for the Securities Division's demand that Multivend "immediately cease" such Wrongful Acts.

Furthermore, the use of the phrases "may" and "has received information suggesting" in the Securities Division's November 26, 2007 letter does not alter the conclusion that the Securities Division's letter alleges a "Wrongful Act." In asserting the foregoing argument, the Spertus Letter selectively quotes from the Securities Division's letter and ignores the explicit allegations of Wrongful Acts set forth by the Securities Division, including those discussed above. In any event, the Spertus Letter's argument fails as a matter of law. *See, e.g., Employers' Fire Ins. Co.*, 2011 WL 6937488, at *6 (declaring that if there is a distinction between "'an investigation *to determine whether*' there has been a Wrongful Act and an 'alleged' Wrongful Act," such a distinction "is without a difference") (emphasis added); *cf. MBIA Inc.*, 652 F.3d at 155, 160 (finding coverage under a D&O policy for an SEC investigation "*into whether*" an insured entity "engaged in securities fraud, accounting misstatements [or] reporting misstatements") (emphasis added); *Quanta Lines Ins. Co.*, 2009 WL 4884096, at **3, 21 (referring to "the allegations" involved in a North Carolina "Securities Division investigation" that included a telephone call and letter "requesting certain information" from the insured).

Finally, it is important to note that, in arguing that "the Securities Division does not allege any 'Wrongful Act,'" the Spertus Letter again omits any reference to the December 15, 2009 Consent Order. As noted above, the Securities Division matter ultimately resulted in the entry of the Consent Order, which, like the Securities Division's November 26, 2007 letter, alleged Wrongful Acts by Multivend. For example, the Consent Order alleges that Multivend made unlawful representations and materially misleading statements concerning the "income and earnings potential" of the Vendstar business opportunity. Moreover, the Consent Order states that the Securities Commissioner "has determined that MultiVend violated," among other things, the anti-fraud provisions of the Maryland Business Opportunity Act.[10] Given the foregoing, it is clear that the prior Maryland matter involved an alleged "Wrongful Act" by Multivend.

### The Indictment and the Securities Division Matter are a Single Claim

After considering the points raised in the Spertus and Fenn Letters, AXIS maintains that the prior Maryland Securities Division matter and the Indictment arise from the same Wrongful Acts and/or Interrelated Wrongful Acts, and, therefore, "shall be deemed one Claim" under Section V.A. of the Policy.[11] As AXIS explained in its December 11, 2012 letter, the Indictment and the

---

[10] For example, the Consent Order states that Multivend violated, MD. CODE ANN., BUS. REG. § 14-120, which provides that: "[i]n connection with an offer to sell or sale of a business opportunity, a person may not make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading."

[11] As noted above, Section III.A.6. of the Policy defines the term "Interrelated Wrongful Acts" to mean "any and all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event,

prior Maryland matter both involve the exact same scheme to defraud customers through the Vendstar bulk candy vending machine "business opportunity."  Significantly, the core Wrongful Acts alleged in both the Indictment and the Maryland matter are false statements and omissions of material fact made to prospective customers concerning potential income, earnings and profitability of the Vendstar "business opportunity."[12]  Furthermore, the Indictment and the Maryland Consent Order make clear that the alleged Wrongful Acts at issue in both of these matters took place during a substantially similar time period, with an overlap of *at least* two years and eight months.[13]  Therefore, the Indictment and the prior Maryland matter both arise from certain of the same Wrongful Acts, or, at minimum, from "Interrelated Wrongful Acts."

In conclusory fashion, the Fenn and Spertus Letters argue that the Indictment and the prior Maryland matter do not arise from "Interrelated Wrongful Acts" since these matters involve different legal theories, different injured investors, different defendants and/or the conduct of different Insureds.  These factors, even if true, do not alter the conclusion that the Indictment and the Maryland matter arise from "Interrelated Wrongful Acts."  Indeed, in interpreting Interrelated Wrongful Acts provisions similar to that of Section III.A.6. of the AXIS Policy, New York courts have declared that "nothing in the Policy requires that a claim involve precisely the same parties, legal theories, 'Wrongful Acts,' or requests for relief."  *Seneca Ins. Co. v. Kemper Ins. Co.*, 2004 WL 1145830, at *8 (S.D.N.Y. May 21, 2004); *see Zahler v. Twin City Fire Ins. Co.*, 2006 WL 846352, at *8 (S.D.N.Y. Mar. 31, 2006) (holding that a shareholder class action alleging securities fraud and an ERISA class action alleging breach of fiduciary duty were interrelated even though the underlying claims were substantively distinct).  Rather, a prior Claim is interrelated with a subsequent Claim under the AXIS Policy where, as here, the *underlying facts and circumstances* demonstrate that the Claims share a "sufficient factual nexus."  *See Seneca Ins. Co.*, 2004 WL 1145830, at **6-7; *cf. Zuneshine v. Executive Risk Indem., Inc.*, 1998 WL 483475, at **4-5 (S.D.N.Y. Aug. 17, 1998) (finding that there was a "sufficient factual nexus" between a noteholders' lawsuit alleging misrepresentations made in private communications by six insureds and a shareholders' lawsuit alleging misrepresentations made in public disclosures by four of the same six insureds).

---

transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes."

[12] Indeed, numerous additional facts and circumstances alleged in the prior Maryland matter and in the Indictment further demonstrate the link between these two matters. For example, the Indictment and the December 15, 2009 Maryland Consent Order both assert allegations regarding: (1) misleading newspaper advertisements that "suggested that a 'local vending route' was available and that customers could earn $800 per day"; (2) misrepresentations in certain specified promotional materials sent to prospective customers (such as brochures and CDs) concerning the potential income, earnings and profitability of the Vendstar "business opportunity"; and (3) inadequate disclosure statements provided to potential customers.

[13] The Maryland Consent Order alleges that the Wrongful Acts took place between January 1, 2004 and at least January 1, 2008, and the Indictment alleges that the Wrongful Acts took place between "at least" May 2005 and July 2, 2010. According to a November 6, 2012 court filing in the pending criminal action, the government intends to offer "evidence of statements made by and conduct undertaken by the defendants . . . at Vendstar prior to May 1, 2005" as proof of "defendants' intent, knowledge, and *modus operandi*." This court filing – which confirms that the conduct at issue in the pending criminal action does, in fact, pre-date May 2005 – further demonstrates the temporal overlap between the Wrongful Acts alleged in the Indictment and the Wrongful Acts alleged in the prior Maryland matter.

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 11

AXIS further disagrees with the Fenn Letter's argument that the Indictment and the prior Maryland matter do not arise from Interrelated Wrongful Acts since they "cover a different time period." Contrary to this assertion, the Indictment and the Maryland Consent Order make clear the alleged Wrongful Acts at issue in both of these matters took place during a substantially similar time period, with an overlap of at least two years and eight months (*at least* May 1, 2005 through *at least* January 1, 2008). Furthermore, the plain language of the "Interrelated Wrongful Acts" definition at Section III.A.6. of the Policy does not require exact factual overlap, but instead applies where there is a "common nexus" of *any* fact or circumstance, or series of logically connected facts or circumstances. Thus, it is immaterial that Multivend may have "ceased all challenged actions" in Maryland as of January 1, 2008 due to the intervention of the Securities Division, while the misrepresentations that clearly underlie both matters persisted elsewhere until July 2010. *See Zuneshine*, 1998 WL 483475, at **4-5 (finding that there was a "sufficient factual nexus" where a shareholders' lawsuit involved a series of additional misrepresentations beyond those alleged in a noteholders' lawsuit), *aff'd* 182 F.3d 902 (2d Cir. 1999).

The Fenn Letter also asserts that the "Policy does not support a denial of coverage as claimed" because: (1) "the Policy distinguishes between an Insured Individual and an Insured, creating two classes of insureds"; and (2) the Policy's D&O Claim definition "similarly distinguishes between criminal investigations against an Insured Individual and civil or administrative actions against any Insured, *i.e.*, Multivend, a company and therefore not an Insured Individual." These contentions fail because they are entirely lacking in support in the plain language of the AXIS Policy. First, it is irrelevant that the Securities Division matter and the Indictment trigger different portions of the Policy's D&O Claim definition since Section V.A. of the Policy plainly states that "*all* Claims, including *all* D&O Claims . . . arising from . . . *all* Interrelated Wrongful Acts shall be deemed one Claim" (emphasis added). Second, Section III.A.6. of the Policy clearly states, in pertinent part, that "Interrelated Wrongful Acts means *any and all* Wrongful Acts . . ." (emphasis added). Thus, "any and all Wrongful Acts," irrespective of whether they are allegedly committed by an Insured Individual or the Policyholder, will constitute "Interrelated Wrongful Acts" where, as here, there is a "sufficient factual nexus" between such Wrongful Acts.

In the Fenn Letter, counsel also argues that the prior Maryland Securities Division matter was not a "Claim against Mr. Linick, so coverage may not be denied on such grounds." Similarly, Mr. Kaizer's and Ms. Smith's January 22, 2013 letters assert that Messrs. Benowitz and Raia, respectively, were not parties to the prior Maryland matter. AXIS fails to see the relevance of these arguments. Again, the Maryland matter is a D&O Claim against Multivend and the Indictment is a D&O Claim against the Insured Individuals, and Section V.A. of the Policy clearly and unambiguously includes "*all* Claims, including *all* D&O Claims" (emphasis added) for purposes of deeming D&O Claims to be "one Claim" under the Policy. Consistent with this language of the AXIS Policy, the case law makes it abundantly clear that a prior Claim and a subsequent Claim need not "involve precisely the same parties" to be deemed one Claim. *See, e.g., Seneca Ins. Co.*, 2004 WL 1145830, at *8; *Zuneshine*, 1998 WL 483475, at **4-5.

Nor do the additional arguments raised in the Fenn Letter that are purportedly "personal to" Richard Linick "mandate coverage for Mr. Linick." In this regard, the Fenn Letter asserts that: (1) Mr. Linick was not employed by Multivend "in November 2007 when the Maryland administrative complaint was first filed"; (2) Multivend "ceased all challenged actions" in Maryland "prior to Mr. Linick beginning employment with the company in 2008"; and (3) "Mr.

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 12

Linick cannot be criminally responsible for any of the actions that form the basis of the Maryland complaint" because they "took place prior to the time that [Mr. Linick] joined a charged conspiracy." These arguments, even if true, fail because they are all based on the same incorrect and/or irrelevant premises as the various arguments addressed above.  Again, "nothing in the Policy requires that a claim involve precisely the same parties, legal theories, 'Wrongful Acts,' or requests for relief." *Seneca Ins. Co.*, 2004 WL 1145830, at *8.

Finally, the Spertus Letter's argument that Section V.A. of the Policy "relates only to the number of limits of liability available to the Insured" is bereft of any support in the plain language of the Policy.  In this regard, AXIS directs you to the relevant language of Section V.A., which:  (1) expressly delineates the circumstances under which a Claim shall be deemed "first made against an Insured under this Policy *or any prior policy*" (emphasis added); and (2) plainly states that "[c]overage under this Policy shall apply only with respect to Claims deemed to have been first made during the Policy Period."  To the extent that the Spertus Letter's contention is premised on the heading of Section V.A. ("Limits of Liability"), this argument also fails.  In this respect, Section VIII.L. of the Policy expressly provides that: "[t]he descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage."

For the reasons discussed above and in all earlier correspondence, pursuant to Section V.A. of the Policy, the prior D&O Claim made by the Securities Division and the Indictment "shall be deemed one Claim," and such Claim shall be deemed to be "first made" on November 26, 2007. Accordingly, because the Indictment does not constitute a D&O Claim "first made" against Insureds during the Policy Period of February 20, 2010 to February 20, 2014, AXIS maintains that it has no coverage obligations in connection with the Indictment.

<u>Section IV.A.2. of the Policy Applies to Exclude Coverage for the Indictment</u>

As AXIS explained in its December 11, 2012 letter, Section IV.A.2. of the Policy provides another independent basis for AXIS's determination that there is no coverage available for the Indictment.  None of the Insureds' position letters, including the Spertus and Fenn Letters, expressly dispute AXIS's determination that Section IV.A.2. applies to wholly exclude coverage for the Indictment.  Section IV.A.2. excludes coverage for Loss, which is defined at Section III.A.7. of the Policy to include Defense Costs, arising from any Claim made against any Insured:

> based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:
>
> a.   any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations [02/20/2008], or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or
>
> b.   any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**[.]

Notwithstanding the Insureds' failure to specifically address the above-referenced provision, AXIS notes that the arguments raised in the Insureds' position letters concerning the Policy's D&O Insuring Agreement do not have any bearing on the applicability of Section IV.A.2.  First,

although the Spertus Letter contends that the prior Maryland Securities Division matter is not a "D&O Claim" under the Policy, the clear and unambiguous language of Section IV.A.2. does not require that a prior matter constitute a D&O Claim for the exclusion to apply.  Instead, Section IV.A.2. requires that a "demand" or "other proceeding" be pending against any Insured on or prior to February 20, 2008.  As discussed above, on November 26, 2007, the Securities Division sent a letter to Multivend that made a demand and commenced a proceeding, and, thus, a "demand" or "other proceeding" against any Insured (Multivend) was pending as of February 20, 2008.  Accordingly, even if the Maryland matter did not constitute a "D&O Claim" under the Policy, Section IV.A.2. would still apply to wholly exclude coverage for the Indictment.

Second, although the Insureds' various position letters assert the Insured Individuals named as defendants in the indictment were not parties to the prior Maryland matter, these contentions are equally irrelevant with respect to the applicability of Section IV.A.2.  As noted above, Section IV.A.2. bars coverage for "*any* Claim made against *any Insured*" (*i.e.*, the Indictment against the Insured Individuals) that has one of many possible enumerated relationships with "*any* demand . . . or other proceeding pending . . . against *any Insured*" on or prior to February 20, 2008 (*i.e.*, the prior Maryland matter against Multivend) (all emphasis added).

Finally, although the Fenn and Spertus Letters contend that the Indictment and the prior Maryland matter do not arise from "Interrelated Wrongful Acts," the Insureds' arguments in this regard only pertain to subsection b., and not subsection a., of Section IV.A.2. of the Policy.  While AXIS maintains that the Indictment and the Maryland matter do, in fact, arise from Interrelated Wrongful Acts for the reasons discussed above, the language of Section IV.A.2. clearly phrases subsections a. and b. *in the alternative*.  In other words, even if the Indictment and the Maryland matter did not arise out of "Interrelated Wrongful Acts" under the Policy, this factor would not render Section IV.A.2. inapplicable because the Indictment "clearly bears *one* of the several possible relationships" with the prior Maryland matter that are described in Section IV.A.2. (including subsection a.).  *See Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 525 F. Supp. 2d 370, 376 (S.D.N.Y. 2007) (holding that an insurer properly denied coverage under an exclusion containing similar language to that of Section IV.A.2. of the AXIS Policy), *aff'd* 330 Fed. Appx. 5 (2d Cir. 2009); *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *21 (finding that an exclusion similar to that of Section IV.A.2. of the AXIS Policy applied to exclude coverage where a claim "in any way involve[d] the allegations" in a North Carolina Securities Division investigation and summary order to cease and desist).  It is also important to note that courts within the Second Circuit have routinely upheld the applicability of exclusions containing language similar to that of Section IV.A.2. of the AXIS Policy.  *See, e.g., Quanta Lines Ins. Co.*, 2009 WL 4884096; *Pereira*, 525 F. Supp. 2d 370; *Zuneshine*, 1998 WL 483475.

For the reasons discussed above and in all prior correspondence, Section IV.A.2. of the Policy provides an independent basis to wholly exclude coverage for the Indictment.  Thus, even assuming, *arguendo*, that the Indictment triggers the D&O Insuring Agreement, there would still be no coverage under the Policy for this matter since it falls entirely within an independent exclusionary clause.  Accordingly, AXIS maintains that it has no coverage obligations in connection with the Indictment.

<u>AXIS'S RESPONSE TO MR. KAIZER'S LETTER</u>

In his January 22, 2013 letter, Mr. Kaizer refers to the Insured and Mark Benowitz's former employer as "Alpine Investors d/b/a Multivend."  To clarify, although Multivend, LLC is a former

portfolio company of Alpine Investors ("Alpine"), Multivend is a separate entity from Alpine. The only entities that constitute "Insureds" under the Policy are the Policyholder (Multivend) and its "Subsidiary(ies)." Alpine is not an "Insured" under the Policy since Alpine is a separate entity from Multivend and does not meet the definition of "Subsidiary" at Section III.A.16. of the Policy. Accordingly, the Policy does not cover Alpine for any purpose, Alpine holds no rights under the Policy, and AXIS has no obligations to Alpine.

We understand that certain of the Insured Individuals may be current or former employees of Alpine or a similarly situated non-insured entity (in addition to their respective capacities at Multivend). AXIS has previously requested information from Alpine's counsel (Jenner & Block LLP) as to: (1) whether Alpine is obligated to indemnify Messrs. Weaver, Kaplan, Doumas, Benowitz, Goldberg, Linick, Raia and/or Strauss for amounts that they have incurred or will incur in respect of the Indictment; and (2) whether Alpine has advanced or intends to advance amounts incurred and/or to be incurred by any of the Insured Individuals in respect of the Indictment. At this time, AXIS requests that the Insured Individuals advise AXIS as to the details of any indemnification and/or advancement that has been provided and/or will be provided by Alpine or any similarly situated entity in connection with the Indictment. AXIS also requests information as to whether any of the Insured Individuals has requested or received such indemnification and/or advancement from any entity in connection with the Indictment.

Please note that even if the Indictment did trigger the D&O Insuring Agreement and was not otherwise excluded from coverage, in no event would the AXIS Policy respond to indemnify or reimburse Alpine or any similarly situated non-insured entity for any Loss or Defense Costs paid or indemnified by such entity(ies). Furthermore, this matter may be a subject of coverage under a D&O or E&O Liability policy issued to Alpine and/or any similarly situated entity. In this regard, AXIS continues to reserve its rights under the "Other Insurance" provision at Section VIII.D. of the Policy. Given that AXIS has no coverage obligations at this time in connection with the Indictment, AXIS urges each of the Insured Individuals to protect their interests – to the extent that they have not already done so – by seeking any alternative coverage, indemnification, and/or advancement that may be available to them.

<u>AXIS'S RESPONSE TO THE INSUREDS' REMAINING ARGUMENTS</u>

Recognizing that their position has no foundation in the plain language of the Policy, in fact or applicable law, the Insureds' position letters resort to the desperate arguments that coverage is "illusory" and that AXIS has acted in "bad faith." AXIS disagrees with these contentions as well.

In conclusory fashion, the Spertus Letter asserts that AXIS's conduct "constitutes bad faith on the part of AXIS" and Mr. Kaizer's January 22, 2013 letter asserts that AXIS's "denial of coverage is a bad-faith denial of a lawful claim for defense coverage." As an initial matter, the Insureds do not, and cannot, offer any facts to support their baseless accusations of "bad faith." In any event, "New York does not recognize the tort of bad faith denial of insurance coverage." *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*, 2005 WL 1676704, at *3 (S.D.N.Y. July 19, 2005); *Graves Bros., Inc. v. Nat'l Fire & Marine Co.*, 2007 WL 189540, at *2 (W.D.N.Y. Jan 23, 2007).

Equally meritless are the Insureds' contentions that "a policy issued well after the Maryland incident either contemplated coverage or was issued in bad faith." In this regard, the Fenn Letter argues that AXIS "did not specifically exclude or even mention that any subsequent

KAUFMAN BORGEEST & RYAN LLP

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 15

claims determined to be related to the Maryland claim would be excluded" under the Policy. Contrary to these assertions, the Policyholder (Multivend) purchased a Policy from AXIS that contains an unambiguous "Interrelated Wrongful Acts" provision and an unambiguous exclusion at Section IV.A.2., both of which make clear that the Policy will not respond to Claims under the circumstances presented in this case. *See Seneca Ins. Co.*, 2004 WL 1145830, at **5, 9 (declaring that an "interrelated wrongful acts" definition similar to that of Section III.A.6. of the AXIS Policy was unambiguous); *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *21 (finding that a policy exclusion similar to that of Section IV.A.2. of the AXIS Policy was unambiguous).  The mere fact that the Insureds now face the reality that a particular Claim, the Indictment, is not covered by virtue of these clear and unambiguous Policy provisions, which Multivend bargained for, in no way supports the conclusion that "AXIS sold Multivend a policy in bad faith." Further, courts have rejected arguments similar to those raised by the Insureds here on the ground that "New York does not recognize an independent tort for insurer bad faith." *See, e.g., Graves Bros., Inc.*, 2007 WL 189540, at **2-3 (dismissing a bad faith claim against an insurer premised on the insurer's alleged failure to act "in good faith in the writing and selling of its policies").

AXIS further disagrees with the Fenn Letter's contention that "if the application process did not request information regarding pre existing claims or [Multivend's] claims history then the existence of any such claims was not material to the underwriting process and may not be the basis for denying a current claim." AXIS fails to see the relevance of this argument in light of the fact that there is no coverage for the Indictment by virtue of Policy provisions that plainly do not require "materiality" (or even reference the Policy Application). Notably, AXIS has never sought rescission of the Policy, or asserted a misrepresentation defense, premised on non-disclosures in the Policy Application.

Nevertheless, it is important to note that when provided with the opportunity to disclose the Securities Division matter to AXIS when AXIS first came on risk with respect to Multivend, Multivend failed to do so. Specifically, in the Application for the 2008/09 AXIS policy, signed on February 19, 2008, Multivend answered "no" when asked "has the Policyholder or any director, officer or other proposed Insured been involved in any . . . investigation by the U.S. Securities and Exchange Commission, or *similar state* or foreign *agency*?" (emphasis added).[14] The Securities Division's November 26, 2007 letter leaves no doubt that Multivend (the Policyholder) had, in fact, come under investigation by a state agency similar to the SEC approximately three months before the foregoing question was answered in the negative in the Application. Presumably, in hopes of avoiding a higher premium, Multivend took an ill-advised gamble not to tell AXIS about the Maryland matter and negotiate less restrictive versions of the Interrelated Wrongful Acts provision and/or the exclusion at Section IV.A.2 of the Policy. AXIS cannot be held to blame now that the Insured Individuals have lost the benefit of any potential insurance coverage for the Indictment as a result of Multivend's strategy backfiring.

Finally, there is no merit to the Fenn Letter's contention that "the existing Maryland claim would in fact render any coverage under the Policy unattainable." This assertion simply overlooks the fact that the Policy would respond to a whole host of other types of Claims, notwithstanding the Policy provisions that serve to preclude coverage for this particular Claim.  Moreover, in upholding Interrelated Wrongful Acts provisions similar to that of the AXIS Policy and exclusions similar to Section IV.A.2. of the Policy, New York courts have consistently rejected arguments like those raised in the Fenn Letter. *See, e.g., Pereira v. Gulf Ins. Co.*, 330 Fed. Appx. 5, 6 (2d

---

[14] See question 5.(c) to Appendix I to Application for 2008/09 AXIS policy.

Confidential Communication
Multivend, LLC
AXIS Ref. BH 80960; our 481.075
Page 16

Cir. 2009) (finding that a policy's "prior litigation" exclusion was not "so broad as to be meaningless or to defeat the parties' intentions"); *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *21 (rejecting an insured's argument that "the breadth of the exclusion renders the coverage of the policy illusory); *Zahler*, 2006 WL 846352, at **6-7 (applying a "broadly" defined "interrelated wrongful act" definition to exclude coverage because it would lead to a result that is "clearly disfavored under New York law" not to do so); *Zuneshine v. Executive Risk Indem. Co.*, 182 F.3d 902, at *2 (2d Cir. 1999) (declaring that it was "in no way unfair to enforce the result that the unambiguous language" of a policy's "pending litigation" exclusion barred coverage). Indeed, if the Policy covered the Indictment, despite the related facts and circumstances underlying the prior Maryland matter, then Section IV.A.2. of the Policy and "the Interrelated Wrongful Act provision . . . would be rendered meaningless, and [the Insureds] would have gotten more than they bargained for" in their contract with AXIS. *See Zahler*, 2006 WL 846352, at *7.

CONCLUSION

In sum, for the reasons set forth herein and in all earlier correspondence, AXIS maintains that it has no obligation to defend or indemnify Messrs. Weaver, Kaplan, Doumas, Benowitz, Goldberg, Linick, Raia or Strauss with respect to the Indictment. Accordingly, AXIS's disclaimer of coverage for this matter remains in full force and effect.

Please note that this letter supplements and incorporates AXIS's coverage positions in this matter as set forth in AXIS's prior correspondence, including its letter of December 11, 2012. This position is necessarily based on the information provided to date, and AXIS reserves its right to further supplement its position should circumstances warrant. Nothing left unsaid should be construed as agreement with any specific statement or misstatement in your prior correspondence, and none of the statements herein, or anything left unsaid, should be construed as a waiver of any rights or defenses that AXIS may have under the Policy, at law, or in equity, all of which remain expressly reserved.

Should you have any questions concerning anything stated in this letter or any aspect of AXIS's position, please do not hesitate to contact us.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Matthew J. Schiffhauer

cc:     (via e-mail only)

        Matthew Odalen
        AXIS Insurance – Professional Lines

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____George H. Wu_____ and the assigned

Magistrate Judge is _____Ralph Zarefsky_____ .

The case number on all documents filed with the Court should read as follows:

## CV13-6439-GW(RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.


Clerk, U. S. District Court


_____September 3, 2013_____          By _C. Sawyer_____
Date                                          Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] Western Division<br>312 N. Spring Street, G-8<br>Los Angeles, CA 90012 | ☐ Southern Division<br>411 West Fourth St., Ste 1053<br>Santa Ana, CA 92701 | ☐ Eastern Division<br>3470 Twelfth Street, Room 134<br>Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

Name & Address:
SPERTUS, LANDES & UMHOFER, LLP
James W. Spertus (SBN 159825)
1990 South Bundy Drive, Ste. 705
Los Angeles, California 90025
Tel: (310) 826-24700; Fax: (310) 826-4711

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

EDWARD M. WEAVER, an individual,

PLAINTIFF(S)

v.

AXIS SURPLUS INSURANCE COMPANY, an
Illinois corporation,

DEFENDANT(S).

CASE NUMBER

**CV13- 6439 GW(RZx)**

**SUMMONS**

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _James W. Spertus_, whose address is _Spertus, Landes & Umhofer, LLP, 1990 S. Bundy Dr., Ste. 705, Los Angeles, CA 90025_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _September 3, 2013_

By _____
          Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

EDWARD M. WEAVER, an individual

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

AXIS SURPLUS INSURANCE COMPANY, an Illinois corporation

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

James W. Spertus, Matthew D. Umhofer, Ezra D. Landes
SPERTUS, LANDES & UMHOFER, LLP
1990 South Bundy Dr., Suite 705, Los Angeles, California 90025
Tel: (310) 826-4700; Fax: (310) 826-4711

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $** Exceeding $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
(1) Breach of Insurance Contract (Duty to Defend); (2) Breach of Implied Covenant of Good Faith and Fair Dealing (Insurance Bad Faith); (3) Declaratory Relief.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☒ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY: Case Number: _____ **CV13- 6439**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | State of Ohio |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | State of Georgia |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE: September 2, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |