UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EDWARD M. WEAVER,

                              Plaintiff,

        -against-

AXIS SURPLUS INSURANCE COMPANY,

                              Defendant.
-----------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★    OCT 3 0 2014    ★

**LONG ISLAND OFFICE**

**ORDER**
13-CV-7374 (SJF)(ARL)

FEUERSTEIN, J.

On September 3, 2013, plaintiff Edward M. Weaver ("Weaver" or "plaintiff")

commenced this action against Axis Surplus Insurance Company ("Axis" or "defendant")

seeking a declaratory relief and monetary damages stemming from Axis's failure to defend

Weaver in a criminal action under an insurance policy issued by Axis to Weaver. Now before

the Court is: (1) Weaver's Motion for Partial Summary Judgment; (2) Axis's Cross-Motion for

Summary Judgment; and (3) Weaver's Letter Motion to Strike Axis's Reply in Support of its

Cross-Motion for Summary Judgment.

        For the reasons that follow, Weaver's Motion for Partial Summary Judgment is denied,

Axis's Cross-Motion for Summary Judgment is granted and Weaver's Letter Motion to Strike

Axis's Reply in Support of its Cross-Motion for Summary Judgment is denied.

I.      Factual Background[1]

        A.      The Policy

        From 2004 until 2010, plaintiff Edward M. Weaver served as the President and Chief

---

[1]      The facts are taken from the undisputed assertions set forth in Plaintiff's Statement of Material
Facts Pursuant to Local Rule 56.1 Statement ("Pl. 56.1 Stmt.") [Docket Entry No. 44-1], the affidavit of
James W. Spertus in support of Plaintiff's motion for partial summary judgment ("Spertus Aff.") [Docket

Executive Officer of Multivend, LLC d/b/a Vendstar ("Multivend"), a now-defunct vending

machine sales company with a principal place of business in Deer Park, New York. Pl. 56.1

Stmt. ¶ 1; Spertus Aff., Ex. A (Defendant Axis's Amended Answer to Complaint [Docket Entry

No. 11] ¶ 1); Def. 56.1 Stmt. ¶¶ 1-2; Schiffahuer Aff., Ex. A (the "Complaint" or "Compl."

[Docket Entry No. 1] ¶ 1). In 2010, Defendant Axis issued Privatus Policy Number ENN588818

to Multivend (the "Policy"). The Policy had a Policy Period of February 20, 2010 through

February 20, 2014 (as extended by Endorsement No. 8). Pl. 56.1 Stmt. ¶ 2; Spertus Aff., Ex. C

(the Policy); Def. 56.1 Stmt. ¶ 22; Schiffhauer Aff., Ex. B (the Policy).

The Policy provides that it is "written on a claims made and reported basis and covers

only claims first made against the insureds during the policy period or the extended reporting

period, if applicable, and reported in writing to the insurer within the time and pursuant to terms

[therein]." Policy, at 1 (Declarations). Pursuant to Section I.A. of the Policy, Axis agreed to

pay:

> all **Loss**[2] on behalf of any **Insured** arising from any **D&O Claim** for a **Wrongful Act**, other than a **Wrongful Act** while serving in an **Outside Position**, first made against such **Insured**…during the **Policy Period** or Extended Reporting Period, if applicable, and reported in writing to the Insurer as soon as practicable after any of the **Policyholder's Executive Officers** first becomes aware of such **Claim** but in no event later than sixty (60) days after the expiration of the **Policy Period** or Extended Reporting Period, if applicable.
>
> Policy § I.A.

---

Entry No. 44-1] and the exhibits attached thereto, Defendant's Rule 56.1 Statement of Material Facts ("Def. 56.1 Stmt.") [Docket Entry No. 45-3], the affidavit of Matthew I. Schiffhauer in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Schiffahuer Aff.") [Docket Entry No. 45-1] and the exhibits attached thereto, and my review of the record. Unless otherwise noted, each fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record. As to each motion, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir. 2005).

[2]       Terms appearing in bold-faced type are bolded and defined in the Policy.

Section V.A. of the Policy states:

All **Claims**, including all **D&O Claims**...arising from the same **Wrongful Act, Wrongful Third Party Act**, and all **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the earlier date that: (1) any of the **Claims** is first made against an **Insured** under this Policy or any prior policy, or (2) valid notice was given by the **Insureds** under this Policy or any prior policy of any **Wrongful Act, Wrongful Third Party Act**, or any fact, circumstance, situation, event, transaction or cause which underlies such **Claim**. Coverage under this Policy shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to the Insurer in accordance with the terms herein.

*Id.* § V.A.

Section IV.A.2 of the Policy includes the following exclusion:

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**...based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving: a. any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations, or any **Wrongful Act**, fact, circumstance or situation alleged therein; or b. any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**.

*Id.* § IV.A.2. The "Pending and Prior Claim" Date for the Policy is February 20,

2008. *Id.* at 1, Item 8. The Policy defines Claim to mean "any D&O Claim." *Id.* §

III.B.1. "D&O Claim" is defined as:

    a.  a written demand against an **Insured** for monetary or non-monetary relief;
    b.  a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by: (i) the service of a complaint or similar pleading; (ii) the filing of a notice of charge, investigative order or like document; or (iii) written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or
    c.  a criminal investigation or proceeding against any **Insured Individual** commenced by: (i) the return of an indictment, information, or similar pleading; or (ii) written notice or subpoena from an authority identifying such **Insured Individual** as an individual against whom a formal proceeding may be commenced.

*Id.* § III.B.2.

B.     The Criminal Indictment Against Weaver

On October 2, 2012, a criminal indictment was filed in the United States District Court for the Southern District of Florida, charging Weaver, among others, with conspiracy, mail fraud and wire fraud in connection with the operation of Multivend (the "Indictment"). Spertus Aff., Ex. F (the Indictment); Schiffhauer Aff., Ex. E (the Indictment). The Indictment alleges that defendants made "materially false and fraudulent statements and representations" and concealed "material facts concerning, among other things, the expected profits of the business opportunities and the services that would be provided by Vendstar and the locating companies recommended by Vendstar" in order to "fraudulently induce others to purchase the business opportunities." Indictment, at 4, 10. The Indictment alleges that the false statements defendants made to prospective customers included, *inter alia*, "[t]hat customers who purchased the business opportunity would earn substantial profits" (*Id.* at 10) and "[t]hat customers would earn back their investment in one year or less." *Id.* at 11. The Indictment also alleges that the defendants omitted or concealed, *inter alia*, the fact that "Vendstar received numerous complaints from previous customers about the lack of profitability of the business." *Id.* at 12.

The Indictment states that "Vendstar placed advertisements on the Internet and in newspapers throughout the United States...suggest[ing] that a 'local vending route' was available and that customers could earn $800 per day." *Id.* at 5. The Indictment alleges that Vendstar sent prospective customers "a promotional packet that included glossy brochures, a CD, and a disclosure statement required by state and federal law" (*Id.* at 5), but that with the knowledge and approval of Vendstar's management, including plaintiff, "Vendstar's sales representatives routinely removed from the disclosure statements the front page, which contained

4

warnings about the investment and encouraged the prospective customer to speak to an attorney and get other professional advice before purchasing the business opportunity." *Id.* at 5-6.

C.     Axis's Denial of Coverage

On September 27, 2012, Weaver's counsel advised Axis that Weaver had received a letter from the United States Department of Justice identifying him as "a target of a federal grand jury investigation in the Southern District of Florida with respect to possible criminal violations including mail fraud, write fraud and conspiracy in connection with his activities at Multivend." Def. 56.1 Stmt. ¶ 35; Schiffhauer Aff., Ex. G. Axis responded by letter dated October 23, 2012 stating that Axis was "evaluating and investigating the materials submitted (including the Indictment) and the coverage issues in this matter." Spertus Aff., Ex. G; Schiffhauer Aff., Ex. H.

On December 11, 2012, Axis sent a letter to Weaver denying coverage based upon: (1) Section V.A. of the Policy which excluded coverage because the Indictment was not a claim "first made" during the Policy Period as it arose from the same Wrongful Acts as, and/or Interrelated Wrongful Acts as a prior Claim, a November 26, 2007 letter from the Securities Division of the Office of the Attorney General of Maryland (the "Division") to Multivend that contained a written demand for non-monetary relief and commenced an administrative proceeding against Multivend (the "2007 Maryland AG Letter"); and (2) Section IV.A.2 of the Policy which excluded coverage because the 2007 Maryland AG Letter constituted a demand or other proceeding against Multivend prior to the February 20, 2008 Pending or Prior Claim Date and the Indictment was based upon, arose out of, or involved the same Wrongful Acts, or the facts, circumstances or situations underlying the 2007 Maryland AG Letter; and/or Wrongful Acts that, together with the Wrongful Acts at issue in the 2007 Maryland AG Letter, constituted Interrelated Wrongful Acts. Spertus Aff., Ex. D; Schiffhauer Aff., Ex. J.

5

On January 18, 2013, Weaver's counsel responded to Axis's December 11, 2012 letter and requested that Axis reconsider and reverse its decision to deny coverage. Pl. 56.1 Stmt. ¶ 19; Spertus Aff., Ex. I; Def. 56.1 Stmt. ¶ 38; Schiffhauer Aff., Ex. K. On February 19, 2013, Axis responded to Weaver's January 18, 2013 letter and confirmed its denial of coverage for the Indictment. Spertus Aff., Ex. J; Schiffhauer Aff., Ex. L.

D.      The 2007 Maryland AG Letter[3]

The 2007 Maryland AG Letter was issued to Multivend by the Division and stated that "it ha[d] come to the attention of the [Division] that Multi Vend [sic], LLC, d.b.a Vendstar ("Multi Vend") [sic] may be offering and selling business opportunities in violation of the disclosure and antifraud provisions of the Maryland Business Opportunities Sales Act." Spertus Aff., Ex. H (the 2007 Maryland AG Letter), at 1; Schiffhauer Aff., Ex. C (the 2007 Maryland AG Letter), at 1. The 2007 Maryland AG Letter further stated that the Division had received information "suggesting that Multi Vend [sic] may be offering and selling vending machine business opportunities in Maryland without providing a business opportunity disclosure statement as required by the Maryland Business Opportunity Act" (2007 Maryland AG Letter, at 1), and "suggesting that Multi Vend [sic] makes unlawful earnings representations about the Vendstar business opportunity." *Id.* at 1-2. The Division requested certain "information and materials" so

---

[3]      The Maryland Securities Commissioner issued a Consent Order on December 15, 2009 in an administrative proceeding captioned *In the Matter of Multivend, LLC, d.b.a. Vendstar* (Case No. 2007-0532), naming Multivend as the "Respondent." Def. 56.1 Stmt. ¶ 7; Schiffhauer Aff., Ex. D (the "Consent Order"). The parties dispute the relevance of the Consent Order to the present dispute. *Compare* Docket Entry No. 46 (Plaintiff's Combined Reply Memorandum of Law in Support of Motion for Partial Summary Judgment and Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl. Reply Mem.")), at 2 ("Consent Order is irrelevant because it was entered after the Policy's February 20, 2008 "Pending and Prior Claim Date") with Def. Mem., at 15, n. 6 ("Weaver's assertion that the Consent Order 'has nothing to do with this dispute' is equally incorrect."). Because the issue before the Court is whether the 2007 Maryland AG Letter bars coverage under the Policy for Weaver's Criminal Action (as defined herein), the Court need not resolve the parties' dispute as to the relevance of the Consent Order.

that it "may determine the extent of [Multivend's] compliance with the Maryland Business Opportunity Act." *Id.* at 2-3. The Division "further request[ed] that Multi Vend [sic] acknowledge in writing that it will immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents, pending the outcome of this inquiry." *Id.* at 3. The 2007 Maryland AG Letter notified Multivend that "[f]ailure to respond may result in more formal legal action by the Division." *Id.*

II.    Procedural History

On September 3, 2013, Weaver initiated this action against Axis in the United States District Court for the Central District of California, seeking a declaration that Axis is required to defend Weaver against the Indictment and damages for Axis's breach of contract (duty to defend) and breach of implied covenant of good faith and faith dealing. *See generally* Complaint. On October 18, 2013, Axis filed its answer [Docket Entry No. 9] and a motion to transfer venue to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1404(a) [Docket Entry No. 10], where the criminal case against Weaver captioned *United States v. Weaver, et al.*, No. 2-13-cr-00120 is currently pending (the "Criminal Action").

On December 27, 2013, the United States District Court for the Central District of California granted Axis's motion and transferred the case to this Court. Subsequently, plaintiff moved for partial summary judgment on the first cause of action for breach of insurance contract (duty to defend) and on the third cause of action for a declaratory judgment that defendant is required to defend plaintiff. [Docket Entry No. 44 (Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pl. Mem."))]. Defendant opposed plaintiff's motion

7

for partial summary judgment and cross-moved for summary judgment on all claims.[4] [Docket Entry No. 45 (Defendant's Memorandum of Law in Support of its Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Mem."))].

The relevant facts are not in dispute and the parties' respective motions for summary judgment raise the same issue for the Court: whether the Policy requires Axis to defend Weaver in the Criminal Action. As described by the plaintiff in his opposition to defendant's motion to transfer this case, "this insurance dispute involves a single issue that can be resolved on summary judgment." [Docket Entry 12 (Pl. Opp. to Motion to Transfer), at 1].

III.    Discussion

    A.    Choice of Law

The Policy at issue in this case does not contain a choice of law provision. With respect to the breach of contract claim, and conversely the declaratory judgment claim, the parties have not raised a choice of law issue and both rely upon New York law in support for their respective positions.[5] Therefore, the Court will rely upon New York law for those claims. *See Tehran–*

---

[4]    Plaintiff has moved to strike Defendant's reply in support of its cross-motion for summary judgment, alleging that "the Reply Brief was not limited to the Second Cause of Action (Breach of Implied Covenant of Good Faith and Fair Dealing) but instead was a sur-reply to Mr. Weaver's reply briefing in support of Mr. Weaver's Motion." [Docket Entry No. 48 (Letter Motion to Strike Reply in Support of Defendant's Cross-Motion for Summary Judgment ("Letter Motion to Strike")), at 2]. Contrary to plaintiff's allegations, defendant's cross-motion for summary was not a partial motion and was not limited to the second cause of action, but rather applied to all three causes of action. *See generally* Def. Mem. (arguing both that Axis is entitled to summary judgment because the Policy does not cover Weaver's criminal action and that Weaver's second cause of action for bad faith must be dismissed). Because parties are entitled to replies on cross-motions for summary judgment, the Court denies the Letter Motion to Strike.

[5]    *See, e.g.*, Def. Mem., at 12, n. 4 ("it appears that the parties agree that New York law controls in this action"); Pl. Mem., at 9 (discussing standards applicable to the motion "[u]nder New York law"); Pl. Mem. at 14 (arguing that a Sixth Circuit case "is consistent with the holdings of New York courts"); Pl. Reply Mem., at 16, n. 2 (referring to "New York state cases cited by Mr. Weaver in support of his position"). The Court notes, and has considered, that both parties have cited to case law from other

*Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir. 1989) (where parties' briefs relied on New York law, court applied New York law "under the principle that implied consent to use a forum's law is sufficient to establish choice of law"); *Larsen v. A.C. Carpenter, Inc.,* 620 F. Supp. 1084, 1103 (E.D.N.Y. 1985), *aff'd,* 800 F.2d 1128 (2d Cir. 1986) (where parties did not raise the choice of law issue, their "silence couple with their general citation to [the] forum's law (federal and state) suggest[ed] a tacit agreement" and implied consent to "an adjudication under [the] forum's jurisprudence").[6]

B.     Standard of Review

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir. 2012) (internal

---

jurisdictions because, as plaintiff has suggested, "the case law on the issue to be decided in this action is extremely limited." Pl. Opp. to Motion to Transfer, at 14.

[6]     The parties have noted a single substantive conflict between New York law and California law with regard to plaintiff's breach of the implied covenant of good faith and fair dealing claim, however, for the reasons set forth *infra* in Section III.F., the Court need not conduct a choice of law analysis because it finds that plaintiff's good faith and fair dealing claim fails under the law of either state.

quotation marks omitted); *see also Crown Day Care LLC v. Dep't of Health and Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (quotation marks and citation omitted); *see also Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252) (alterations in original). In order to defeat summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citations omitted).

Where the Court is considering multiple motions for summary judgment, "the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment." *Quanta Lines Ins. Co. v. Investors Capital Corp.*, No. 06-civ-4624, 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) (citing *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most

10

favorable to the non-moving party for each cross-motion for summary judgment)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

C.     Interpretation of Insurance Contracts Under New York Law

Construction of an insurance policy "is governed by the rules of construction applicable to contracts generally." *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992). Under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02-civ-10088, 2004 WL 1145830, at *4 (S.D.N.Y. May 21, 2004) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co*, 309 F.3d 76, 83 (2d Cir. 2002)). "[T]he [m]ere assertion by one that contract language means something to him [or her], where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *ABM Mgmt. Corp. v. Harleysville Worcester Ins. Co.*, 112 A.D.3d 763, 764, 977 N.Y.S.2d 330 (App. Div. 2013) (citations and quotations omitted). Summary judgment may be granted where the words of a contract convey a definite and precise meaning without ambiguity. *Seiden Assocs., Inc. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir. 1992).

In interpreting an insurance contract, the Court must first determine "whether the contract is unambiguous with respect to the question disputed by the parties." *Int'l Multifoods Corp.*, 309 F.3d at 83. Contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v.*

11

*Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). Contract language is ambiguous where it could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide,* 110 F.3d 898, 906 (2d Cir. 2007) (citations and quotations omitted). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs.,* 959 F.2d at 428. "'If the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of *contra proferentem,* which generally provides that where an insurer drafts a policy 'any ambiguity in [the]...policy should be resolved in favor of the insured.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.,* 225 F.3d 270, 276 (2d Cir. 2000) (citing *McCostis v. Home Ins. Co.,* 31 F.3d 110, 113 (2d Cir.1994)).

D.    Section V.A. bars Coverage Because the Indictment is a Claim "First Made" Prior to the Inception of the Policy Period.

Defendant argues that its denial of coverage of Weaver's Criminal Action was proper under two sections of the Policy, the first of which is Section V.A., which defendant alleges bars coverage because the Criminal Action and the 2007 Maryland AG Letter are one Claim arising from Interrelated Wrongful Acts, which was first made on November 26, 2007, prior to the inception of the Policy Period. Def. Mem., at 2. Plaintiff argues that Section V.A. does not bar coverage because the 2007 Maryland AG Letter is not a "Claim", and that even if it did constitute a "Claim," it did not raise any "Wrongful Acts" as that term is defined in the Policy. Pl. Mem., at 1.

To determine whether Section V.A. of the Policy applies to bar coverage of the Criminal

Action, the Court must determine: (1) whether the 2007 Maryland AG Letter constitutes a

"Claim," and (2) if the 2007 Maryland AG letter constitutes a "Claim," whether the Criminal

Action and the 2007 Maryland AG Letter are Claims arising from the same Wrongful Act,

Wrongful Third Party Act, or Interrelated Wrongful Acts.

### 1. 2007 Maryland AG Letter is a Claim Under Section III.B.2.a. Because it is a Written Demand for Non-Monetary Relief

One definition of a "Claim" under the Policy is: "a written demand…for monetary or

non-monetary relief." Policy § III.B.2.a. The parties dispute the whether the 2007 Maryland AG

Letter is a "demand for non-monetary relief." *See* Pl. Mem., at 11-16; Pl. Reply Mem., at 4-16;

Def. Mem., at 16-22; [Docket Entry No. 47 (Defendant's Reply Memorandum in Further

Support of its Cross-Motion for Summary Judgment ("Def. Reply Mem.")), at 6-9]. The terms

"demand" and "non-monetary" relief are undefined in the Policy, and plaintiff argues that "to the

extent that the undefined Policy term[] 'demand'…[is] ambiguous, such ambiguity[y] must be

resolved in Mr. Weaver's favor." Pl. Mem., at 23. Therefore, before deciding whether the 2007

Maryland AG Letter is a "written demand for non-monetary relief," the Court must decide

whether the term "demand" is ambiguous.

### a. The Term "Demand" is not Ambiguous

"Courts that have sought to define that which constitutes a demand…have tended to rely

upon opaque dictionary definitions." *Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 245-46 (2d Cir.

1996); *see also Gershman v. Barted Realty Corp.*, 22 Misc.2d 461, 462 (N.Y. Sup. Ct. Kings

Cnty. Jan. 28, 1960) (defining "demand" as "a requisition or request to do a particular thing

specified under a claim of right on the part of the person requesting" (citing Bouvier's Law

Dictionary [Rawle's 3d rev.])); *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal.

13

App. 4th 1387, 1392 (Cal. Ct. App. 2008) (in the context of an insurance policy, looking to "[t]he plain and ordinary meaning of 'demand'," which is "a request for something under an assertion of right or an insistence on some course of action" (citing Webster's 3d New Internat. Dict. (2002) p. 598)). These dictionary definitions are helpful guidance, but in order "to distinguish between a demand and a mere request which carries no legal consequences...it is necessary to look to the purpose of a demand." *Gil Enters., Inc.*, 79 F.3d at 246.

The Second Circuit has found that "a demand is intended to trigger certain rights and obligations...In order to prompt such rights and obligations, it is necessary that the party upon whom the demand is being made be put on notice that those legal obligations have been triggered.... [T]he gravamen of a legal demand is its notice providing function." *Id.* at 246. In *Gil Enters., Inc. v. Delvy*, the Second Circuit held that it is not necessary that a demand "instruct [the recipient] of the specific consequences of failing [to comply]." *Id.* Nor is it necessary to "use the specific language 'demand'" (*id.* at 245) or "indicate that [one] [is] making a 'demand.'" *Id.* at 246. In that case, the Court found that what was required for the letter to constitute a "demand" was that it "be sufficiently imperative as to put [the recipient] on notice that it was more than a mere request for information." *Id.*

Viewing the term "demand" "in the context of the [the Policy]" and in light of "the customs, practices, usages and terminology as generally understood in the particular trade or business," the Court finds the term "demand" is not ambiguous. *Lightfoot*, 110 F.3d at 906 (citations and quotations omitted). It means "a requisition or request to do a particular thing specified under a claim of right on the part of the person requesting" (*Gershman*, 22 Misc.2d at 462), which puts the recipient "on notice that those legal obligations have been triggered." *Gil Enters., Inc.*, 79 F.3d at 246.

14

b. The 2007 Maryland AG Letter is a Written Demand for Non-Monetary Relief

In this case, the 2007 Maryland AG Letter meets the definition of a "demand" because it is a request for relief under a claim of right and puts Multivend on notice that legal obligations have been triggered.

The 2007 Maryland AG Letter requests relief, specifically that Multivend provide it certain documents and that Multivend cease all offers and sales of the Vendstar business opportunity, under a claim of right, stating that if Multivend does not comply, the Division may proceed accordingly with "more formal legal action." 2007 Maryland AG Letter, at 2. While phrased as a "request" for Multivend's compliance, the implication of the Division's "request" is that if Multivend fails to comply, the Division will exercise its authority to take "more formal legal action" to secure this relief. Plaintiff's suggestion that 2007 Maryland AG Letter is not a "demand" because it "simply request[ed] information and materials" (Pl. Mem., at 19) and sought "a voluntary production of information and materials 'so that [the Division] may determine the extent of [Multivend's] activities and [its] compliance with the Maryland Business Opportunity Act" (Pl. Mem., at 16) mischaracterizes the contents and the spirit of the 2007 Maryland AG Letter, as well as the meaning of the term "demand." It is true that "a request for information or an explanation" is not enough to constitute a claim, which requires, "in short, a specific demand for relief." *Windham Solid Waste Mgmt. Dist. v. Nat'l Cas. Co.*, 146 F.3d 131, 134-35 (2d Cir. 1998) (finding that a claim was made prior to the policy period when the insured received letters alleging wrongdoing and demanding specific relief). However, even a writing phrased as a "request," such as the 2007 Maryland AG Letter, can constitute a "demand" where it is a request to do a particular thing specified under a claim of right. *See Gershman*, 22 Misc.2d

15

at 462 ("The demand may be couched in the customarily-used polite language of the day.") (citations and quotations omitted).

The 2007 Maryland AG Letter puts Multivend on notice that legal obligations have been triggered by specifically referring to the Division's authority "to sue in civil court to seek a variety of remedies under the law, including an injunction, the appointment of a receiver, a freezer of assets, restitution, or a civil monetary penalty of $5,000 for each violation of the law" as well as the "criminal penalties" for such violations. 2007 Maryland AG Letter, at 1. These statements make clear that if Multivend does not cooperate, "more formal legal action" (2007 Maryland AG Letter, at 2) may be taken by the Division. *See Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*, 951 F. Supp. 2d 826, 835 (D. Md. 2013) (holding that letter from counsel to company was a "written demand against any Insured for monetary or non-monetary relief" because, among other reasons, the letter's statement that the employee would settle his employment discrimination claim for a certain amount made clear that a lawsuit was a possibility because "[t]he corollary is that, if [the employer] did not pay the amount demanded, [the employee's] legal claim against [the employer] would move forward").

The demand in 2007 Maryland AG Letter is for "non-monetary relief." In examining insurance policies, courts have defined "relief" according to its common usage: "[t]he redress or benefit, esp. equitable in nature (such as injunction or specific performance), that a party asks of a court. Also termed *remedy*... '[R]emedy' means "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." *Diamond Glass Companies, Inc. v. Twin City Fire Ins. Co.*, No. 06-civ-13105, 2008 WL 4613170, at *4 (S.D.N.Y. Aug. 18, 2008) (citing Black's Law Dictionary at 1317, 1320 (8th ed. 2004)). Contrary to Plaintiff's assertion, the 2007 Maryland AG Letter did not "simply request information and materials to determine whether

16

Multivend [was] in compliance with the Act" (Pl. Mem. at 19), but it also demanded non-monetary relief that was equitable in nature because it requested that Multivend "immediately cease all offers and sales of the Vendstar business opportunity to Maryland residents." 2007 Maryland AG Letter, at 2. Where a policy defines a "claim" to include a written demand for monetary *and* non-monetary relief, a writing need not mention damages being sought to be defined as a claim so long as non-monetary relief is requested. *See Federal Insurance Co. v. Illinois Funeral Director's Association*, No. 09-civ-1634, 2010 WL 5099979, at *6 (N.D. Ill. Dec. 8, 2010) (finding letter from a governmental agency that contained "no mention of damages being sought" but "undisputedly identifie[d] various forms of nonmonteary relief the [governmental agency] was seeking" including a demand to "rectify" the underfunding of a trust to be "a written demand for nonmonetary relief"). A request to cease all offers and sales of business opportunity, which threatens court-ordered relief should the requested relief not be granted, is a demand for non-monetary relief. *See St. Paul Mercury Ins. Co. v. RMG Capital Corp.*, No. SACV 12-450, 2012 WL 2069677, at *4-5 (C.D. Cal. June 7, 2012) (interpreting "demand for non-monetary relief" to mean an expression of an "entitlement to, or threat to seek, court-ordered relief of any-kind" should the party not comply with the demand).

Similar letters requesting specific relief have been found to be claims. In *Seneca Ins. Co. v. Kemper Ins. Co.*, a letter requesting relief was found to be a "claim" under a policy which defined claim to mean, among other things, "a written demand against any Insured for monetary damages or other relief." *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02-civ-10088, 2004 WL 1145830 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005). In *Seneca*, the letter at issue alleged a violation of antitrust laws, requested a meeting to "seek a possible resolution of this matter" and stated that if such meeting did not occur, counsel would "proceed accordingly

17

on [his client's] behalf." *Id.* at *5. The *Seneca* court held this letter to be a "a written demand for monetary damages or other relief," and thus a "Claim" because "[a]lthough counsel did not specifically state that the purpose of [the] meeting was to demand monetary damages or other relief, the implication is that counsel requested the meeting for this reason." *Id.*[7] Similarly, in *Quanta Lines Ins. Co. v. Investors Capital Corp.*, the Court found that a letter from counsel for an investor to the company containing allegations of negligent supervision of a broker constituted "a demand" and thus a "Claim." *Quanta Lines Ins. Co. v. Investors Capital Corp.*, 2009 WL 4884096, at *12-14 (S.D.N.Y. Dec. 17, 2009).

Although Plaintiff relies on the Sixth Circuit case *Employers' Fire Ins. Co. v. ProMedica Health Sys. Inc.*, 524 Fed. Appx. 241 (6th Cir. 2013) that case is distinguishable from the case before this Court.[8] In *ProMedica*, the policy at issue

---

[7]      Plaintiff's attempt to distinguish *Seneca Ins. Co.* because the letter in that case "expressly alleged that certain conduct by the insured constituted a restraint on competition in violation of federal and state antitrust laws and...alleged that [the client] sustained actual and direct damages as a consequence of these actions" (Pl. Reply Mem., at 10) is unavailing because neither the Policy nor Second Circuit case law, requires that a "written demand for non-monetary relief" be connected to a wrongdoing or allege actual or direct damages. *See* Policy § III.B.2; *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 439 (2d Cir. 1995) ("[a] third person's assertion of liability is a claim, moreover, whether or not there is reason to believe that there actually is liability. Unless the assertion is made in circumstances so unusual that they negate the possibility of a formal proceeding involving defense costs as well as liability, virtually any assertion of an exposure to liability within the risks covered by an insurance policy is a claim.").

[8]      The other cases relied upon by plaintiff can be distinguished from the present case because they concern policies that define "claim" differently than the Policy at issue here and/or concern requests for information that do not also include a specific demand for relief. *See Evanston Insurance Co. v. GAB Business Services, Inc.*, 132 A.D.2d 180 (N.Y. App. Div. 1987) (letter containing "no mention of damages or compensation" held not to be a claim under a policy defining "claim" as a demand "for money or services"); *Matter of Reliance Ins. Co.*, 55 A.D.3d 43 (N.Y. App. Div. 2008) (letter containing request for information but no specific request for relief found not to be a claim, which the court defined as "a demand for money or services"); *Diamond Glass v. Twin City Fire Ins. Co.*, No. 06-civ-13105, 2008 WL 4613170 (S.D.N.Y. Aug. 18, 2008) (subpoenas requesting information without any assertion of liability or specific request for monetary or non-monetary relief held not to be a demand for monetary damages or non-monetary relief); *Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Ins. Co.*, No. 10-civ-0167, 2011 WL 6756971 (N.D.N.Y. Dec. 22, 2011) (letter requesting information held not to be "claim" under a policy defining "claims" as a "demand received...for money" because the letter

18

defined a "claim" as, in part, "a written demand for monetary, non-monetary or injunctive relief...against an Insured for a Wrongful Act." *Employers' Fire Ins. Co. v. ProMedica Health Sys. Inc.*, 524 Fed. Appx. 241, 243 (6th Cir. 2013). The Sixth Circuit held that a "claim" did not arise until the FTC commenced an administrative action against ProMedica because the FTC's earlier actions in August 2010 (the FTC's August 2010 actions"),[9] did not "actually allege[] wrongdoing" and therefore the "'Wrongful Act' required to meet the fourth element of the Policy's definition of a "claim" was not present." *ProMedica*, 524 Fed. Appx. at 251. The *ProMedica* Court's holding on this point is not relevant to the dispute at issue here because the Policy at issue here, unlike the one in *ProMedica*, does not require a "Wrongful Act" in the definition of a "Claim." *See* Policy § III.B.2. The *ProMedica* Court went on the state that even if it were to find the existence of a "Wrongful Act," the FTC's August 2010 actions would not be held to be "written demands" seeking "monetary, non-monetary, or injunctive relief," because none of those actions sought "relief." *ProMedica*, 524 Fed. Appx. at 251.[10] This is

---

contained "neither an explicit or implicit demand for monetary relief nor a request for meeting to discuss monetary or other relief").

[9]     The FTC's actions in August 2010 included: (1) an August 6, 2010 letter marking the transition to "full-phase" investigation; (2) an August 9, 2010 resolution authorizing the use of compulsory process in connection with the investigation; and (3) subpoenas and CIDS issued on August 13, 2010 and August 25, 2010.

[10]     The *ProMedica* court did not decide whether the FTC's letter requesting that ProMedica agree to a Hold Separate Agreement limiting ProMedica's integration of the hospital while the FTC investigated was a "written demand" for "non-monetary" relief because it found that even assuming it was, it still failed to satisfy the fourth element of a "claim" under that Policy's definition because it "did not seek to redress the 'Wrongful Act' at issue." *ProMedica*, 524 Fed. Appx. at 252. Again, the Policy at issue here does not require that the relief seek to redress the Wrongful Act at issue. The *ProMedica* Court also held that the Hold Separate Agreement did not meet another prong of that policy's "claim" definition because it "was not a 'written demand' for an injunction" because it "was a contract by which ProMedica voluntarily entered into an agreement with the FTC." *ProMedica*, 524 Fed.Appx. at 252. This holding also has no bearing on the case here, where the Policy does not define a claim to include a demand for

19

inapposite to the 2007 Maryland AG Letter which clearly sought non-monetary relief:

that Multivend cease all offers and sales of the Vendstar business "opportunity."

Because the 2007 Maryland AG Letter is a written demand for non-monetary

relief, it constitutes a "Claim" under the plain language of the Policy. *See* Policy §

III.B.2.a.[11]

> 2. The 2007 Maryland AG Letter and the Criminal Action Arise From Interrelated Wrongful Acts

Because the 2007 Maryland AG Letter constitutes a "Claim" under the Policy, the Court

must now determine whether the 2007 Maryland AG Letter and the Criminal Action are Claims

"arising from the same **Wrongful Act, Wrongful Third Party Act,** and all **Interrelated**

**Wrongful Acts.**" Policy § V.A.

The Policy defines **Interrelated Wrongful Acts** to mean "any and all **Wrongful Acts**

that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series

of casually or logically connected facts, circumstances, situations, events, transactions or

causes." *Id.* § III.A.6. The relevant portion of the Policy's **Wrongful Act** definition is: "any

actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of

duty by... any **Insured Individual** in their capacity as such." *Id.* § III.B.5. Therefore, to

determine whether Section V.A. applies, the Court must decide: (1) whether the 2007 Maryland

---

"injunctive relief" and where the writing at issue is not a contract into which the parties mutually entered, but a demand for non-monetary relief by a governmental agency.

[11]     Because the Court finds that the 2007 Maryland AG Letter is a "D&O" Claim under Section III.B.2.a of the Policy, it need not address the parties' arguments regarding subsection b.iii. of Section III.B.2, which defines "D&O Claim" as "a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by...written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced." Policy § III.B.2.b.iii.

AG Letter arises from a "Wrongful Act"[12]; and (2) if the 2007 Maryland AG Letter arises from a "Wrongful Act," whether it is one that has "as a common nexus any fact, circumstance, situation, event, transaction, cause or series of casually or logically connected facts, circumstances, situations, events, transactions or causes" to the Criminal Action, so that the two Claims arise from Interrelated Wrongful Acts. Policy § III.A.6.

      a.  The 2007 Maryland AG Letter States Allegations of a Wrongful Act

Defendant argues that Section V.A. applies because the 2007 Maryland AG Letter involves a "Wrongful Act" that arises from "Interrelated Wrongful Acts" with the Criminal Action. Def. Mem., at 22-26; Def. Reply Mem., at 9-17. Plaintiff contends that the 2007 Maryland AG Letter "does not make any 'allegations' and therefore does not raise any 'Wrongful Acts'" and that even if it did, it does not "share a sufficient factual nexus" with the Criminal Action. Pl. Reply Mem., at 20-27; Pl. Mem., at 20. Plaintiff argues that under the Sixth Circuit's opinion in *ProMedica*, the 2007 Maryland AG Letter "does not arise from a Wrongful Act because the letter does not contain any 'allegations' and in the underlying Policy, a Wrongful Act requires, at a minimum, that an 'allegation' be made." Pl. Reply Mem., at 21. Plaintiff relies on the Sixth Circuit's holding in *ProMedica* to argue that the "there is a distinction between determining whether there has been a Wrongful Act and alleging a Wrongful Act, and the former does not constitute allegations of a Wrongful Act." Pl. Reply Mem., at 21 (citing *ProMedica*, 524 Fed. Appx. at 247-48).

However, in *ProMedica*, the Court cautioned that "[t]he use of the word 'whether' *does not always or necessarily* mean that there is no allegation of wrongdoing" and the use of the word must be "viewed in context" to determine whether a writing contains allegations of

---

[12]     The parties do not contest whether the Criminal Action alleges a "Wrongful Act."

wronging. *ProMedica*, 524 Fed. Appx. at 248 (emphasis added).[13] The 2007 Maryland AG

Letter states that it has come to the Division's attention that Multivend "may be offering and

selling business opportunities in violation of" disclosure and anti-fraud laws (2007 Maryland AG

Letter, at 1), and that the Division "has received information suggesting that Multi Vend [sic]

may be offering and selling vending machine business opportunities without providing a

business opportunity disclosure statement as required by the Maryland Business Opportunity

Act...[and] information suggesting that Multi Vend [sic] makes unlawful earnings

representations about the Vendstar business opportunity." 2007 Maryland AG Letter, at 1-2.

When viewed in context of the rest of the letter, which requests that Multivend "cease all

offers and sales of the Vendstar business opportunity" (2007 Maryland AG Letter, at 3), and

describes the civil and criminal penalties for violations of investor protection and antifraud laws,

it is clear that the 2007 Maryland AG Letter contains allegations of a Wrongful Act. The request

to cease all offers and sales of the Vendstar business opportunity would make no sense if there

were not some allegations of an actual or alleged error, misstatement, misleading statement, act,

omission, neglect, or breach of duty by Multivend, even if the allegations later proved to be

untrue. *See Quanta Lines Ins. Co.*, 2009 WL 4884096, at *12-13 (finding that a letter alleged a

"Wrongful Act" despite its "erroneous claims and subsequent withdrawal").

---

[13]     *ProMedica*, a decision decided by the Sixth Circuit, is also distinguishable from the present case
because in *ProMedica*, the Court was not analyzing when a Claim "arises" from a "Wrongful Act," but
rather was deciding when the FTC had "alleged" a Wrongful Act, specifically an antitrust violation, as
part of its analysis regarding whether the FTC's August 2010 actions constituted a "Claim" because the
Policy at issue in that case required that "written demand for monetary, non-monetary or injunctive
relief...against an Insured" be "*for a Wrongful Act.*" See *ProMedica*, 524 Fed. Appx. at 243 (emphasis
added). The Court in *ProMedica* then analyzed the plain and ordinary meaning of the term "alleged" and
found that the FTC did not "allege" antitrust violations until it commenced an administrative action
because its actions prior to that did not "assert to be true" or "declare" that antitrust violations had
occurred or would occur and therefore were not enough to "allege" wrongdoing. *Id.* at 248. The question
at issue here is not whether the 2007 Maryland AG Letter "alleged" or "asserted to be true" a Wrongful
Act, but whether 2007 Maryland AG Letter arose from a Wrongful Act.

The fact that the 2007 Maryland AG Letter contains terms such as "may" or "suggesting" does not compel the conclusion that the 2007 Maryland AG Letter does not contain allegations. Where "Wrongful Act" is defined to include acts "allegedly" committed, "the scope of the term necessarily includes acts that *may have been* committed." *Nat'l Stock Exch. v. Fed. Ins. Co.*, No. 06-civ-1603, 2007 WL 1030293, at *5 (N.D. Ill. Mar. 30, 2007) (emphasis in original). In *Nat'l Stock Exch. v. Fed. Ins. Co.*, the Court found that an order containing the following statements alleged Wrongful Acts: the SEC "had information that certain acts, practices or courses of business...were '*in possible violation*'" of securities laws, and that target of investigative order "*may* have failed to enforce compliance" with securities laws, "*may* have failed to file" certain documents with the SEC, and "may have failed to maintain certain records." *Id.* (emphasis added); *see also ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 797 (D. Md. 2008) (finding a subpoena indicating that the insured was "the focus of an inquiry for violation of the Maryland Consumer Protection Act" as well as a CID that "specifically mention[ed] a possible violation" of law both alleged a "Wrongful Act").[14]

### b. The 2007 Maryland AG Letter and the Criminal Action Arise From Interrelated Wrongful Acts

As noted above, the Policy defines Interrelated Wrongful Acts to mean "any and all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of casually or logically connected facts, circumstances, situations, events, transactions or causes." *Id.* § III.A.6.

---

[14]     The Sixth Circuit's decision in *ProMedica* not to follow *Nat'l Stock Exch. v. Fed. Ins. Co.*, No. 06-civ-1603, 2007 WL 1030293 (N.D. Ill. Mar. 30, 2007) and *ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008) is not binding on this Court.

In interpreting policies with substantially similar definitions of Interrelated Wrongful Acts, courts have noted that "[t]o establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a 'sufficient factual nexus.'" *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *14. "A sufficient factual nexus exists where the Claims 'are neither factually nor legally distinct, but instead arise from common facts' and where the 'logically connected facts and circumstances demonstrate a factual nexus' among the Claims." *Id.* (quoting *Seneca Ins. Co.*, 2004 WL 1145830, at *9). "To demonstrate a sufficient factual nexus, the claims need not 'involve precisely the same parties, legal theories, Wrongful Acts, or requests for relief.'" *Glascoff v. OneBeacon Midwest Ins. Co.*, 13-civ-1013, 2014 WL 1876984, at *5 (S.D.N.Y. May 8, 2014) (quoting *Zunenshine v. Exec. Risk Indem. Inc.*, No. 97-civ-5525, 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998)). Where the policy's language refers to "*any*" fact, circumstance, situation, event, transaction, cause or series of casually or logically connected facts, circumstances, situations, events, transactions or causes, it is "immaterial" that one claim may involve additional facts or allegations because all that is required is "any" common fact, circumstance, situation, event, transaction, cause or series of casually or logically connected facts, circumstances, situations, events, transactions or causes. *See Zunenshine v. Executive Risk Indem., Inc.*, 182 F.3d 902 (2d Cir. 1999) (summary order) (finding it "immaterial that the Shareholders' claims also involved a series of additional misrepresentations beyond those connected with the Noteholders' lawsuit because the exclusions apply if the Noteholders' claims were based on *any* fact underlying the Shareholder litigation").

A review of the Indictment and the 2007 Maryland AG Letter reveals numerous logically connected facts and circumstances between the Criminal Action and the 2007 Maryland AG Letter related to Multivend's alleged scheme to defraud customers in connection with the

24

Vendstar business, specifically regarding unlawful representations about the expected profits and earnings of the Vendstar business opportunity and the omission of required disclosure information.

The Indictment alleges that defendants' materially false and fraudulent statements and concealment of material facts concerned, among other things, "the expected profits of the business opportunities and services that would be provided by Vendstar." Indictment, at 4. Similarly, the 2007 Maryland AG Letter states that the Division has received information suggesting that Multivend "makes unlawful earnings representations about the Vendstar business opportunity." 2007 Maryland AG Letter, at 1-2. The 2007 Maryland AG Letter also requests all documents containing "claims of" and "substantiation of all claims of actual or potential income, earnings, revenue, or 'profit margin' related to the Vendstar business opportunity made or sent to any Maryland resident" (*Id.* at 3) as well as "documents reflecting actual earnings, income, revenue and profit margins earned by buyers of the Vendstar business opportunity." *Id.*

The Indictment additionally alleges that "[w]ith the knowledge and approval of Vendstar's management...Vendstar's sales representatives routinely removed from the disclosure statements the front page, which contained warnings about the investment and encouraged the prospective customer to speak to an attorney and get other professional advice before purchasing the business opportunity." Indictment, at 5-6. The 2007 Maryland AG Letter states that the Division has received information suggesting that Multivend "may be offering and selling vending machine business opportunities in Maryland without providing a business opportunity disclosure statement." 2007 Maryland AG Letter, at 1. The 2007 Maryland AG Letter requests "all versions of business opportunity disclosure statements distributed to Maryland residents regarding the Vendstar business opportunity" (*Id.* at 2) and "all

25

acknowledgments of receipt forms showing the dates all Maryland residents received a business opportunity disclosure statement from Multi Vend [sic]." *Id.*

These logically connected facts and circumstances demonstrate a "common nexus" between the 2007 Maryland AG Letter and the Criminal Action. Courts routinely find the existence of a "sufficient factual nexus" in cases such as this one where the two claims have overlapping facts. *See, e.g., Seneca Ins. Co.*, 2004 WL 1145830, at *9 (excluding coverage based on the policy's "first-made" provision because the later complaint and earlier letter were claims arising from "Interrelated Wrongful Acts" because the Wrongful Acts underlying both claims were "neither factually nor legally distinct, but instead ar[o]se from common facts" regarding violations of antitrust laws); *Quanta Lines Ins. Co*, 2009 WL 4884096, at *14 ("sufficient factual nexus" found where an allegation in an earlier claim letter "share[d] a common nexus with the allegations in" the later claims regarding "[a former representative's] sales of the unregistered...securities and [the company's] failure to supervise such sales").

The Court therefore holds, as a matter of law, that the 2007 Maryland AG Letter and the Criminal Action are Claims arising from Interrelated Wrongful Acts. Because the 2007 Maryland AG Letter and the Criminal Action are "Claims...arising from...Interrelated Wrongful Acts," Section V.A. of the Policy mandates that they are "deemed one Claim...first made on" November 26, 2007, the date that "any of the Claims [was] first made against [Multivend]." Policy § V.A.

3. Section V.A. Does not Relate Solely to the Number of Limits of Liability

Plaintiff argues that Section V.A. does not apply here because the heading of Section V.A. is titled "Limits of Liability," and therefore that section "operates only to determine whether Claims are related for the purpose of calculating the Policy's 'limits of liability', and

26

specifically to determine whether more than one $5 million limit of liability is available to the insured based on the relationship between current and prior Claims" and cannot be relied upon to argue that a claim is "related to a prior claim for the purpose of excluding coverage entirely." Pl. Reply Mem., at 27. Plaintiff argues that "to the extent there is any ambiguity with regard to this issue, such ambiguities must be interpreted in favor the insured." Pl. Mem., at 22 (citations omitted).

Courts interpreting nearly identical language have rejected such arguments regarding the headings of similarly worded provisions in insurance policies. *See Biochemics, Inc. v. Axis Reinsurance Co.*, 963 F. Supp. 2d 64, 70-71 (D. Mass. 2013) (rejecting the same argument that a nearly identically worded provision, found under a heading titled, "Limits of Liability" should be interpreted only to limit the total amount of coverage and not to act as a complete bar to coverage because given the "unambiguous" language in this section, "a reasonable insured could not have ignored that section V.A. of the policy bar[red] coverage for a claim deemed to be first made before the policy period—including any later claims based on the same interrelated wrongful acts"). Another court, in rejecting this exact argument held that "[a]lthough the heading under which the 'single claim' provision appears does not describe the effect of the provision on the determination of when a claim was first made or reported, the absence of a fully descriptive heading does not restrict the plain meaning of the provision." *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1395 (Cal. Ct. App. 2008). That court also distinguished many of the authorities relied upon by Weaver and held that the single claim provision was "not expressly limited to only the determination of liability limits and retention amounts." *Id.* at 1395-96 (finding that *Homestead Ins. Co. v. American Empire Surplus Lines Ins. Co.*, 44 Cal.App.4th 1297 (Cal. Ct. App. 1996) and *Helfand v. Nat'l Union Fire Ins. Co.*, 10

Cal.App.4th 869 (Cal. Ct. App. 1992) concerned different issues and did not address "the effect of a 'single claim' provision on a provision limiting coverage to claims 'first made' during the policy period").[15]

The Court finds that the language of Section V.A. is unambiguous. It states clearly that all claims arising from interrelated wrongful acts shall be deemed one claim and that claim shall be deemed to be first made on the earlier date that any of the claims is first made, or valid notice is given by the insureds. The last sentence in Section V.A. then states that "[c]overage under this Policy shall apply only with respect to Claims deemed to have been first made during the Policy Period and reported in writing to the Insurer in accordance with the terms herein." Policy § V.A. Regardless of the heading under which that language appears, a reasonable person reading the

---

[15] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ambassador Grp., Inc.*, 691 F. Supp. 618 (E.D.N.Y. 1988) does not dictate a contrary result. In that case, the court found that a provision stating that "[l]osses arising out of the same act or interrelated acts of one or more of the Insurers shall be considered a single loss and only one retention amount shall be deducted from the aggregate amount of such losses" applied "to the calculation of the retention amount" and "not to the issue of when claims are made for the purposes of calculating…maximum liability for a particular year." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ambassador Grp., Inc.*, 691 F. Supp. 618, 622 (E.D.N.Y. 1988). First, the language of the provision at issue in *Ambassador Grp., Inc.* related to losses and retention amounts, and unlike the provision at issue here, did not contain any language with respect to when claims are deemed to be first made, and particularly not the clear language found in the Policy stating that "[c]overage under this Policy shall apply only with respect to Claims deemed to have been first made during the Policy Period and reported in writing to the insurer in accordance with the terms herein." Policy § V.A. Second, the Court in *Ambassador Grp., Inc.* stated that its conclusion was "buttressed by the fact that comparable language, providing that claims arising out of the same act or interrelated acts constitute a single claim or relate back to when notice of the first claim was received, is notably absent from the remainder of the Policy." *Ambassador Grp., Inc.*, 691 F. Supp. at 622. Unlike the Policy at issue there, the Policy at issue in this case states, on the first page, that it "covers only claims first made against the insured during the policy period." Policy, at 1 (Declarations). Section V.A. then repeats that the Policy only covers claims "deemed to have been first made during the Policy Period." Policy § V.A. As other courts have noted, these references throughout the Policy "to claims '*first* made (italics added) suggest that the same claim can be made more than once…that two events each constituting a claim under the policy…can constitute a single claim made more than one." *Westrec Marina Mgmt., Inc.*, 163 Cal. App. 4th at 1394-95.

28

language in Section V.A. would interpret it to have only one meaning: that the Policy bars coverage for claims deemed to be first made before the policy period, and not that it applies only "to determine whether more than one $5 million limit of liability is available to the insured based on the relationship between current and prior Claims" (Pl. Reply Mem., at 27), as plaintiff suggests.

Reading the Policy as a whole, particularly the Declaration found on its first page in bolded and capitalized font stating that the Policy is "written on a claims made and reported basis and covers only claims first made against the insureds during the policy period or the extended reporting period, if applicable, and reported in writing to the insurer within the time and pursuant to terms [therein]" (Policy, at 1 (Declarations)), confirms this reading of Section V.A. as applying to bar coverage for claims first made prior to the inception of the policy period. Because the Policy covers only "claims first made against the insureds during the policy period or the extended reporting period" (Policy, at 1 (Declarations)), and because, for all the reasons described above, the Criminal Action and the 2007 Maryland AG Letter are deemed one Claim made prior to inception of the policy period or the extended reporting period, the Court finds there is no genuine issue of material fact with respect to whether the Criminal Action is covered under the Policy. The Court hereby grants summary judgment in favor of Axis on Weaver's first claim for breach of contract (duty to defend) and third claim for declaratory judgment.

E.      Section IV.A.2. Also Excludes Coverage for the Criminal Action

Section IV.A.2 of the Policy includes the following exclusion:

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**...based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

   a.   any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable

29

> Pending or Prior Claim Date set forth in Item 8 in the Declarations, or any **Wrongful Act**, fact, circumstance or situation alleged therein; or
>
> b. any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**.

*Id.* § IV.A.2.

Where an insurance contract contains an exclusion provision, "[t]he insurer generally bears the burden of proving that the claim falls within the scope of an exclusion." *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115-16 (2d Cir. 1995) (citing *Maurice Goldman & Sons, Inc. v. Hanover Ins. Co.*, 80 N.Y.2d 986, 592 N.Y.S.2d 645, 607 N.E.2d 792 (1992)). "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Id.* (quoting *Sea Ins. Co., Ltd. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 (2d Cir.1995)). Where the exclusion provision lists "more than one type of relationship to the actions for which coverage is sought and is separated in the disjunctive – by the use of the word "or" – the insurer need not show that every relationship in unambiguous and applicable so long as one relationship is unambiguous and applicable." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *20 (citing *Pereira v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 525 F. Supp. 2d 370, 376 (S.D.N.Y. 2007)).

Plaintiff argues that the exclusion in Section IV.A.2.a does not bar coverage because the 2007 Maryland AG Letter is not a "demand or other proceeding pending" against Multivend prior to February 28, 2008 Pending or Prior Claim Date. Pl. Mem., at 22.[16] However, for the

---

[16] The parties also dispute the applicability of Section IV.A.2.b. Because the Court finds that Section IV.A.2.a. applies to bar coverage, it need not address the parties' arguments regarding subsection b. of that provision.

reasons set forth *supra* in Section III.D.1, the 2007 Maryland AG Letter constitutes "a demand." As it was made on November 26, 2007, this demand against Multivend was made "on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations [February 20, 2008]. *See* Policy, at 1 (Declarations, Item 8). And for the reasons set forth *supra* in Section III.D.2., the Criminal Action involves some of the same facts as those alleged in the 2007 Maryland AG Letter. Therefore, the Court finds that Axis has carried its burden to show that the exclusion in Section IV.A.2.a unambiguously operates as second, independent reason to deny coverage for the Criminal Action because it is a Claim "in any way involving...any demand, suit or other proceeding pending, or order decree, or judgment entered, against any Insured on or prior to [February 20, 2008], or any Wrongful Act, fact, circumstance or situation alleged therein." Policy § IV.A.2.a.

      F.      Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

As noted above in Section III.A., the parties have identified one choice of law issue with respect to Plaintiff's breach of the implied covenant of good faith and fair dealing claim. California law "recognizes an independent cause of action for bad faith" (Pl. Reply Mem., at 33) whereas New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)).

Under New York law, where a party pleads a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim based upon the same facts, "the latter claim" should "be dismissed as redundant." *Sikarevich Family L.P. v. Nationwide Mut. Ins. Co.*, No. 13-civ-05564, 2014 WL 3127729, at *2 (E.D.N.Y. July 3, 2014) (citations and quotations

omitted). New York law does not "recognize an independent cause of action for bad faith denial of insurance coverage" because such a claim "would be duplicative of a claim sounding in breach of contract." *Id.* at *3 (citations and quotations omitted). In his complaint, plaintiff alleges that "AXIS breached the implied covenant of good faith and fair dealing by unreasonably, without proper cause, and in bad faith withholding policy benefits due to Mr. Weaver and by wrongfully refusing to defend Mr. Weaver against the Indictment." Compl. ¶ 34. Because "defendant's decision to deny plaintiff coverage is the crux of plaintiff's bad faith allegations...[t]hat is, the same facts, regarding defendant's compliance with its contractual obligations, give rise to both claims," Weaver's claim for breach of the implied covenant of good faith and fair dealing must be dismissed under New York law. *See Sikarevich Family L.P.*, 2014 WL 3127729, at *3 (dismissing insured's claim for breach of the implied covenant of good faith and fair dealing arising from insurer's denial of coverage because insured also brought a breach of contract claim and the same facts gave rise to both claims); *see also Goldmark, Inc. v. Catlin Syndicate Ltd.*, No. 09-civ-3876, 2011 WL 743568, at *4 (E.D.N.Y. Feb. 24, 2011) ("The New York Court of Appeals has recognized that implicit in contracts of insurance is a covenant of good faith and fair dealing, such that a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims. Consequently, New York generally does not recognize a damages claim for bad faith denial of coverage because such claims would be duplicative of a claim sounding in breach of contract.") (citations and internal quotation marks omitted) (collecting cases).

Even under California law, "[a]bsent a finding of coverage, a cause of action for breach of the implied covenant of good faith and fair dealing must fail." *S & L Oil, Inc. v. Zurich Am. Ins. Co.*, No. 07-civ-01883, 2009 WL 2050489, at *8 (E.D. Cal. July 10, 2009) (citations

omitted). Under California law, "[t]o establish breach of the implied covenant [of good faith and fair dealing], the insured must show that: (1) benefits due under the policy were withheld, and (2) such withholding was unreasonable." *O'Keefe v. Allstate Indem. Co.*, 953 F. Supp. 2d 1111, 1115 (S.D. Cal. 2013) (citing *Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136, 1151, 271 Cal.Rptr. 246 (Cal. Ct. App. 1990)). A defendant "cannot be found to have breached the implied covenant of good faith and fair dealing when it declined coverage because no coverage was due to [plaintiff], which is a prerequisite for a bad faith claim." *Charles Dunn Co. v. Tudor Ins. Co.*, 308 F. App'x 149, 151-52 (9th Cir. 2009) (affirming district court's granting of summary judgment to insurer on breach of contract and breach of the implied covenant of good faith and fair dealing claim where claim was "first made" outside of the applicable policy period and insurer failed to report the claim during the earlier policy period) (citations omitted). Plaintiff acknowledges as much in his reply brief when he states that "AXIS is arguing that if it does not have a duty to defend Mr. Weaver, it cannot be found to have denied a defense in bad faith. Mr. Weaver agrees. The issue though is whether there is a triable issue as to Axis's bad faith if the Court determines that AXIS was wrong to deny Mr. Weaver a defense." Pl. Reply Mem., at 34. Because the Court finds that no coverage was due to plaintiff under the Policy, his claim for breach of the implied covenant of good faith and fair dealing must be dismissed. *See O'Keefe,* 953 F. Supp. 2d at 1116 ("because [plaintiffs] cannot establish that coverage existed under the express terms of the contract, there is no cause of action for breach of the implied covenant of good faith and fair dealing"). The Court hereby grants summary judgment in favor of Axis on Weaver's second claim for breach of implied covenant of good faith and fair dealing.

33

III.    Conclusion

Based upon the foregoing, Weaver's Motion for Partial Summary Judgment is denied,

Axis's Cross-Motion for Summary Judgment is granted and Weaver's Letter Motion to Strike

Axis's Reply in Support of its Cross-Motion for Summary Judgment is denied.  The Clerk of the

Court shall enter judgment accordingly and close this case.


**SO ORDERED.**

                                        s/ Sandra J. Feuerstein
                                        _____
                                        Sandra J. Feuerstein
                                        United States District Judge


Dated: October 30, 2014
        Central Islip, New York